IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
In re:                                      :        Chapter 11
                                            :
DENDREON CORPORATION, et al.,               :        Case No. 14-12515 (___)
                                            :
              Debtors.[1]                   :
                                            :        Joint Administration Pending
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### DECLARATION OF ROBERT L. CROTTY IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Robert L. Crotty, being duly sworn, depose and say:

1.    I am the Executive Vice President, General Counsel and Secretary of Dendreon Corporation ("Dendreon"), a publicly-held corporation organized under the laws of the state of Delaware.  Dendreon is the ultimate parent of Dendreon Holdings, LLC, Dendreon Distribution, LLC and Dendreon Manufacturing, LLC, each a limited liability company organized under the laws of the state of Delaware, and the other debtors and debtors-in-possession in the above-captioned cases (and together with Dendreon, the "Debtors," and the Debtors together with their non-debtor subsidiaries and affiliates, the "Company").  To minimize any disruption to the Debtors' business and ensure a smooth transition into chapter 11, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with these chapter 11 cases (the "Chapter

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

<u>11 Cases</u>").[2]  I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and (b) the First Day Pleadings.  I am over the age of 18, competent to testify, and authorized to submit this declaration (the "<u>Declaration</u>") on behalf of the Debtors.

2.        I have held my current position of Executive Vice President, General Counsel and Secretary of Dendreon since May of 2014.  I joined Dendreon in April of 2012 and previously served as Vice President, Assistant General Counsel and Assistant Secretary.  I have nearly a decade of experience within the biotechnology industry.  Prior to joining Dendreon, I was Senior Counsel and Assistant Secretary at ImClone Systems Incorporated and then, at NPS Pharmaceuticals.  Prior to that time I was an attorney at several mid-to-large size law firms in the New York-New Jersey area.  I received my B.A. from Princeton University, and my J.D. from the University of Pennsylvania Law School.

3.        Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

4.        This Declaration is divided into two parts.  Part I provides background information about the Debtors, their business operations, their corporate and capital structures,

---

[2]        Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

and the circumstances surrounding the commencement of the Chapter 11 Cases.  Part II sets forth

the relevant facts in support of each of the First Day Pleadings.

<div align="center">

**PART I.**

**BACKGROUND**

</div>

**A.      The Chapter 11 Filings**

        5.        On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a

voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors

continue to manage and operate their business as debtors-in-possession pursuant to Bankruptcy

Code sections 1107 and 1108.

**B.      The Debtors' Formation**

        6.        Dendreon was incorporated in Delaware in 1992 as Activated Cell

Therapy, Inc. and changed its corporate name to Dendreon Corporation in June 2000.  Dendreon

Holdings, LLC, Dendreon Distribution, LLC and Dendreon Manufacturing, LLC were each

organized in Delaware in 2010.

**C.      The Debtors' Business**

        7.        The Company is a biotechnology company focused on the discovery,

development and commercialization of novel cellular immunotherapies to significantly improve

treatment options for cancer patients. The Company is primarily focused on commercializing

PROVENGE® in the United States (the "<u>U.S.</u>") and around the world.  PROVENGE is the first

and only FDA approved personalized immunotherapy.  It is a first-in-class immunotherapy used

to treat patients suffering from advanced-stage prostate cancer, which is the most common non-

skin cancer and the second-leading cause of cancer deaths among men in the U.S.  Cancer

immunotherapies are designed to stimulate the immune system, the body's natural mechanism for

<div align="center">

3

</div>

fighting disease, to mount a specific response to tumor cells. Cancer immunotherapies can direct the immune system to fight cancers by (i) modifying, or engineering, tumor antigens[3] so that they can be recognized by the immune system, and (ii) engineering a context in which these antigens can trigger an immune response.[4]

8.    The Company develops its active cellular immunotherapy products using a three phase approach: identification, engineering and production and delivery. First, the Company's internal research and development teams identify new antigens expressed in specific tissues or in malignant cells. When the Company identifies an antigen that is found in a specific tissue or disease, it can begin to engineer a therapy directed at such antigen (i.e., a drug that can stimulate an immune response to fight the antigen). For example, PROVENGE is designed to target a certain prostate cancer antigen (prostatic acid phosphatase) ("PAP"), an antigen that is expressed in more than 90% of all prostate cancers. The Company then engineers these antigens to be used as key agents for the production of immunotherapies to fight the disease in which the antigen presents itself. While a typical immune response from the body triggers antibodies to help fight disease, the Company designs these agents to trigger and maximize cell-mediated immunity by activating the cells to deliver a signal to other components of the immune system to fight the antigen. This is achieved in part by fusing the antigen to an immune-stimulatory protein in the Company's proprietary Antigen Delivery Cassette.™

---

3    An antigen is a specific chemical substance that invokes an immune response from the body.

4    The specialized cells in the immune system recognize specific antigens. Foreign antigens trigger an immune response that typically results in resistance to disease-causing agents from the body. The immune system recognizes and generates a strong response to hundreds of thousands of different foreign antigens. Tumors, however, originate from the body's own cells and largely display antigens that are also found on normal cells. The immune system may not be able to distinguish between tumors and normal cells and, thus, may be unable to mount a strong anti-cancer response.

9.      The final phase, production and delivery, involves two key elements: the antigen in the Antigen Delivery Cassette technology and antigen-presenting cells.[5]  To obtain antigen-presenting cells, the Company acquires white blood cells removed from a patient via a standard blood collection process called leukapheresis.  The Company then transports the cells to one of its manufacturing facilities via professional courier service.  The cells are further processed using the Company's proprietary cell separation technology.  The resulting antigen-presenting cells are then incubated with the required concentration of the antigen under controlled conditions.  The final product is transported back to the physician site, where the cells are re-infused into the patient.  The process requires less than three days from cell collection to the administration of the active immunotherapy product.

10.      While the Company is focused on the commercialization of PROVENGE, the Company has several other product candidates in research and development.  These include: (i) DN24-02, the Company's investigational active cellular immunotherapy that potentially may be used for the treatment of patients with bladder, breast, ovarian and other solid tumors expressing the antigen HER2/neu; (ii) CA-9 antigen, which is a transmembrane protein highly expressed in over 75% of primary metastatic renal cell carcinomas, as well as other cancers, such as non-small cell lung and breast tumors; and (iii) CEA, an antigen found to be present on 70% of lung cancers, virtually all cases of colon cancers and approximately 65% of breast cancers.

---

[5]      The body triggers the immune system to respond to possible threats through a specialized class of immune system cells called antigen-presenting cells.  Antigen-presenting cells take up antigen from their surroundings and process the antigen into fragments that are then displayed on the surface of the antigen-presenting cell.  Once displayed, these antigens can then be recognized by classes of immune cells call lymphocytes.  One category of lymphocytes, cytotoxic T lymphocytes ("T cells"), combats disease by killing antigen-bearing cells directly; another class of T lymphocytes, helper T cells, coordinates the activities of cells that directly target diseased tissue.  Through this process, T cells may eliminate cancers and virally infected tissue.  T cell immunity is also known as cell-mediated immunity and is commonly thought to be a key defense against tumor and cells chronically infected by viruses.

The Company is also exploring the application of small molecules for the treatment of a variety of cancers.

11.     The primary market for PROVENGE is the U.S., where the drug was approved for marketing by the Food and Drug Administration (the "FDA") and became commercially available for the treatment of men with asymptomatic or minimally symptomatic castrate-resistant (hormone-refractory) prostate cancer in April 2010.  Castrate-resistant (hormone-refractory) prostate cancer is an advanced stage of prostate cancer in which the tumor growth is no longer controlled by hormone therapy.  The American Cancer Society estimates that in 2014 approximately 233,000 new cases of prostate cancer will be diagnosed in the U.S. Approximately 1 in 7 men will be diagnosed with prostate cancer during his lifetime.  Early-stage localized prostate cancer may be cured with surgery or radiation therapy.  The disease will recur in approximately 20% to 30% of men, at which point hormone ablation therapy is the most commonly used treatment approach.  While most prostate cancer initially responds to hormone ablation therapy, the majority of these patients will experience disease progression after 18 to 24 months, as the cancer becomes resistant to hormone treatment.  PROVENGE is used to treat patients in this advanced stage of prostate cancer.

12.     PROVENGE sales are made to providers through several third-party drug wholesalers.  The Company has also entered into distribution agreements with these wholesalers, whereby the Company manufactures and ships the product direct to the provider and transfers the sale of PROVENGE to the wholesalers, who assume all of the bad debt risk from the physician or institution.  In 2013, the Company achieved net revenue from the sale of PROVENGE of $283.7 million.[6]  Approximately 970 accounts, some of which have multiple sites had infused

---

[6]     The Company recorded net revenue from the sale of PROVENGE of $325.3 in 2012 and $213.5 in 2011.

the product as of June 30, 2014.  Commercial sale of PROVENGE  has thus far been limited to

the U.S. and is currently supported by the Company's manufacturing facilities in Seal Beach,

California and Union City, Georgia.[7]

13.    PROVENGE has also been approved for marketing in the European Union

(the "EU").  In September of 2013, the Company was granted an authorization to market the drug

in all 28 countries of the E.U., as well as Norway, Iceland and Lichtenstein.  The Company plans

to manufacture PROVENGE in the E.U. through a contract manufacturing organization.  In

Germany and the United Kingdom, the Company will make PROVENGE commercially

available to patients through various institutions located in larger cities where a high volume of

prostate cancer patients are treated by leading prostate cancer experts.  The Company expects

PROVENGE to be available to its first European patients in Germany in November 2014.

14.    The Company's principal research, development and administrative

facilities are located at its corporate headquarters in Seattle, Washington, where the Company

leases approximately 112,915 square feet of office space[8] and in Bridgewater, New Jersey, where

the Company leases 39,937 square feet.[9]  As of the Petition Date, the Debtors had approximately

700 employees.  The Employees provide a variety of essential functions, including: (i) sales and

marketing, (ii) research and development (including clinical, regulatory, quality assurance and

---

[7]    The Company depends on specialized vendor relationships that are not readily replaceable for some of the components of their active immunotherapy candidates.  One of the components of the antigen used in the manufacture of PROVENGE is supplied to the Company under a supply agreement with Fujifilm Diosynth Biotechnologies.  In addition, cell separation devices and related media that isolate cells for the Company's active immunotherapy candidates from a patient's blood and other bodily fluids are manufactured by third-party contractors.

[8]    The Company subleases to two separate third-parties 22,583 square feet each at these premises.

[9]    The Company also leases 97,365 square feet in Seattle, Washington for laboratory and office space.  In addition the company leases approximately 156,000 square feet for its manufacturing facility in Atlanta, Georgia and approximately 184,000 square feet for its manufacturing facility in Orange County, California.  Finally, the Company leases approximately 2,400 square feet of office space in Morrisville, North Carolina.

control, and manufacturing or production), and (iii) general and administrative (including executive, finance, legal, human resources, investor relations, information technology and operations).

15.     As of the period ending September 30, 2014 the Company had $340,263,000 in assets and $660,732,000 in liabilities on a book value basis.  As of November 7, 2014, the Debtors had approximately $100 million in cash.

**D.     The Debtors' Corporate and Capital Structure**

16.     The Debtors in the Chapter 11 Cases are Dendreon, Dendreon Holdings, Inc., Dendreon Distribution, LLC and Dendreon Manufacturing, LLC.  Dendreon is the parent of Dendreon Holdings, Inc., which in turn is the parent of Dendreon Distribution, LLC and Dendreon Manufacturing, LLC.  Dendreon is also the parent of its wholly-owned, non-Debtor subsidiary, Dendreon Holdings (Netherlands) B.V., which in turn is the parent of non-debtors Dendreon UK Limited, Dendreon Germany GmbH and Dendreon Operations B.V.  A corporate organization chart depicting the Company's ownership structure is attached hereto as <u>Exhibit A</u>.

17.     As of the Petition Date, the Debtors had one issuance of debt outstanding: the "<u>2016 Notes</u>" (defined and described below).[10]

18.     <u>The 2016 Notes</u>.  Pursuant to a First Supplemental Indenture dated January 20, 2011, Dendreon issued $620 million aggregate principal amount of 2.875% Convertible Senior Notes with a maturity date of January 15, 2016 (the "<u>2016 Notes</u>").[11]  The 2016 Notes were issued as part of an offer and sale underwritten by J.P. Morgan Securities LLC, which included an initial issuance of $540 million in 2016 Notes and, after the exercise of an

---

[10]   On June 17, 2014, Company timely paid the final principal and interest payment on its 4.75% Convertible Senior Subordinated Notes due 2014.

[11]   This indenture supplemented the indenture Dendreon entered into on March 16, 2007 for the issuance of debt securities in an unlimited amount.

overallotment option by the underwriter, an additional issuance of $80 million.  The 2016 Notes are unsecured and resulted in the Company's receipt of net cash proceeds in the amount of $607.1 million.  The 2016 Notes are convertible at the option of the holder at a conversion rate equivalent to an initial conversion price of $51.24 per share.  As of the Petition Date, the 2016 Notes had an outstanding principal balance of $620 million.

19.     Dendreon Common Stock.  As of September 30, 2014, there were 158,716,893 shares of common stock in Dendreon outstanding.[12]  On November 7, 2014, the closing price of Dendreon's stock was $0.942 per share.  The Company's stock was traded on The NASDAQ Global Market.

**E.     Events Leading to the Chapter 11 Filing**

(i)     Challenges Faced by the Debtors and Restructuring Efforts

20.     When PROVENGE was officially launched after receiving FDA approval in April 2010, expectations for the pioneering drug were high.  It received a substantial amount of market attention and certain market analyst projections estimated that PROVENGE could generate over $4 billion of revenue by 2020.[13]  To support its efforts to commercialize PROVENGE and create a platform through which it could ultimately support the revenues predicted by the market, early in 2011, the Company raised capital through the issuance of the 2016 Notes, among other securities.  Consistent with management and market expectations, the Company's operating structure and footprint was developed to support billions in revenue:  at that time the Company employed nearly 1,500 individuals and had significantly invested in manufacturing facilities and related operations, including facilities in New Jersey, Georgia and

---

[12]     The Company currently has 10,000,000 shares, $0.01 par value, of authorized preferred stock, of which 2,500,000 shares have been designated as Series A Junior Participating Preferred Stock.  As of the Petition Date, no preferred stock was issued or outstanding.

[13]     Canaccord Genuity, "Dendreon Corporation -  Daily Letter", August 1, 2011.

California.   However, with the passage of time after launch and by August 2011, it became

apparent to the Company that revenue growth would take more time than initially anticipated and

the Company predicted a more gradual adoption of use by physicians.  While the Company

remained optimistic about its potential for significant growth in the long term, it decided to

aggressively manage its costs in the interim.

21.     In furtherance of its efforts to increase revenue and manage costs, in

September of 2011, the Company implemented a reduction of 25% of its workforce.  Then, in

July of 2012, the Board of Directors (the "Board") directed the Company to engage in additional

efforts to reduce costs.  To that end, the Company announced a 12-month strategic restructuring

plan that included a re-configuration of the Company's manufacturing model, a restructuring of

its administrative functions and a strengthening of the Company's marketing and sales

operations.  The Company hoped that the restructuring would allow a reduction in costs by

approximately $150 million annually.  In addition, the Company reduced headcount by more

than 600 full-time and contractor positions and sold its manufacturing facility in Morris Plains,

New Jersey.  The Company projected that it would be able to continue to reduce cost of goods

sold through, among other things, the implementation of certain automated manufacturing

processes.  The Company expected to see net benefits associated with this restructuring as early

as the first half of 2013.

22.     During the second half of 2013, after the 2012 restructuring was

completed, the Debtors decided to begin exploring potential strategic alternatives for maximizing

value and managing its debt load, including exploring exchange transactions and a potential sale.

To that end, the Company worked with outside advisors to explore a potential debt exchange

transaction.  Further, in September of 2013 the Debtors retained J.P. Morgan Securities LLC

("JPM") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") to assist the Company with a potential sale or other transaction.  At this time, the Company again assessed and evaluated its overall strategy and cost-structure to identify additional expense reductions.  As a result, on November 13, 2013, at the direction of the Board, the Company announced that it was implementing additional cost reduction measures, including a reduction of cash operating expenses by approximately $125 million or 20% and a reduction in workforce of approximately 150 full-time employees.

23.     Between October and December 2013, JPM and Merrill conducted a broad confidential auction process to solicit potential buyers for the Company.  A significant number of parties conducted due diligence; however, no bids were ultimately submitted.

24.     Although, the Company remained positive about its longer-term prospects and its ability to ultimately maximize value, the Company continued to be concerned with its highly levered capital structure and inability to generate positive free cash flow in the near term. Therefore, in February 2014, the Debtors retained Lazard Frères & Co. LLC ("Lazard") as their investment banker to provide general financial advisory services and evaluate potential strategic alternatives, including assisting the Company in any potential  restructuring, sale transaction or financing transaction.  The Company's initial goal in hiring Lazard was to gain assistance with addressing the 2016 Notes, possibly through a refinancing, an extension of the maturity or a conversion of the 2016 Notes to new debt or equity.  Soon thereafter, the Board directed the Company to hire AlixPartners, LLP ("AlixPartners") to, among other things, work with management to identify further cost reductions.  Additionally, the Company engaged Trinity Partners, LLC, a life science strategic consulting firm, to prepare a valuation report and develop independent revenue forecast models.  In March and April 2014, the Company discussed the

possibility of a strategic combination with two separate third-parties, however, these discussions did not advance beyond the preliminary stages.

      (ii)     <u>Consideration of Strategic Alternatives and Discussions with Creditors</u>

      25.     The Company continued to consider its strategic alternatives, refine its business plan, and examine the possibility of further cost reductions throughout the spring and summer of 2014. While the Company had concluded (and disclosed in its Form 10-Q for the second quarter of 2014) that absent executing an alternative transaction there was significant risk that it would be unable to repay or refinance the 2016 Notes, it remained hopeful that such a transaction would occur and would provide value for all stakeholders, including equity.

      26.     In early summer 2014, the Company had completed its revised business plan and its analysis with respect to cost reductions and, as a result, came to several conclusions. First, the Company determined that its previously-held view that it would ultimately be able to increase revenues through an increase in its volume of units sold was unlikely to occur in the next few years. Second, while the Company had managed to cut costs significantly over the last several years, and AlixPartners has identified certain additional areas for cost reduction, the Company determined that cost reductions alone would not make the Company independently viable with its existing capital structure. Finally, the manufacturing process for PROVENGE has a relatively high cost because it is made manually by skilled lab technicians. The Company had begun to implement plans for automated manufacturing in 2012 to increase quality control and came to believe that automation would also result in significant cost savings. However, after analysis by AlixPartners and investigation by the Company's automation group, the results of which were presented to the Board, it became clear that while automation could improve quality control, there would be no meaningful cost savings resulting from automation.

27.     As a result, the Company concluded that given that it was highly levered and faced significant challenges in achieving positive free cash flows in the near term, the business likely would not be viable on a stand-alone basis absent a strategic transaction or a restructuring of its debt.

28.     To that end, and beginning in July of 2014, the Board authorized Lazard, on behalf of the Company, to initiate discussions with the largest holder of the 2016 Notes, Deerfield Management Company, L.P. ("Deerfield") (holding approximately 36% of the 2016 Notes) pursuant to a NDA regarding, among other things, a restructuring of the debt or a potential sale process.  Given that the 2016 Notes constitute the Company's only outstanding institutional debt and the overwhelming majority of the unsecured claims against the Debtors, the Debtors believed that it would be desirable to obtain input from the holders of such notes or their representatives.  In August 2014, the Debtors executed an NDA with counsel to certain unaffiliated holders of approximately 48% of the 2016 Notes (collectively, the "Unaffiliated Noteholders").  The Debtors, subject to these NDAs, informed Deerfield and its counsel as well as counsel to the Unaffiliated Noteholders of the Company's investigation of strategic alternatives.  In September 2014, the Company, Deerfield and the Unaffiliated Noteholders mutually agreed that, among the strategic alternatives considered, the appropriate path for the Company would involve pursuing a sale process that would be implemented through the filing of these Chapter 11 Cases.

(iii)     The Pre-filing Marketing Process

29.     The Company believed that on account of the significant investments the Company had made in commercializing PROVENGE, the cutting edge technology, equipment and process it had developed and the intellectual "know-how", that there might be additional value to a purchaser, particularly one with "synergies".  Therefore, the Board directed the

13

Company to conduct a marketing process, in parallel with discussions with Deerfield and counsel
to the Unaffiliated Noteholders as an additional option to maximize value.  To that end, and
acknowledging that the in-court process would include a marketing process toward a potential
sale, Lazard identified and developed a list of potentially interested parties and solicited such
parties' interest in a sale transaction.  Beginning in mid-September 2014, Lazard contacted
approximately forty (40) potential buyers, a number of which had been contacted in the auction
process conducted by JPM and Merrill in the third quarter of 2013.  The goal in this pre-filing
marketing process was to sign up potential buyers to NDAs and afford them time to evaluate the
opportunity in advance of any in-court sale process.  A virtual data room was made available
containing extensive information about the Company, including documents describing the
Company's business and financial results in considerable detail, and Lazard gave potential
purchasers the opportunity to conduct due diligence via the electronic data room.

(iv)    The Plan Support Agreements and the Competitive Process

30.    Contemporaneous with the pre-filing marketing process, the Company
continued discussions with Deerfield and counsel to the Unaffiliated Noteholders, as well as their
financial advisors.  In September and October of 2014, the Debtors entered into NDAs with
individual members of the Unaffiliated Noteholders.  The Debtors periodically updated counsel
to the Unaffiliated Noteholders and Deerfield regarding the process and strategic alternatives.

31.    The Company continued discussions with the Unaffiliated Noteholders
and Deerfield regarding a consensual stand-alone restructuring to right-size the Company's
balance sheet.  Good faith, arm's length negotiations culminated in the execution of two
substantially similar agreements dated November 9, 2014 (the "Plan Support Agreements") one
among the Debtors and the Unaffiliated Noteholders and the other among the Debtors and certain
funds managed by Deerfield (the "Deerfield Noteholders") and together with the Unaffiliated

Noteholders (the "Supporting Noteholders").  Pursuant to the Plan Support Agreements, the

Debtors and the Supporting Noteholders agreed to the terms of a restructuring in accordance with

the terms of a term sheet attached to each of the Plan Support Agreements (the "Plan Term

Sheet").  The Plan Support Agreements contemplate that the Debtors will, with the support of the

Supporting Noteholders, pursue a dual path of third-party sale or plan transaction with a "stand-

alone plan" backstop.

    32.   Specifically, the Plan Support Agreements provide the framework for

a competitive process (the "Competitive Process") whereby prospective buyers may bid to

purchase all or substantially all of the Debtors' non-cash assets either (i) in a sale pursuant to

Bankruptcy Code section 363, or (ii) in the form of a recapitalization transaction effectuated

through a plan of reorganization.  Simultaneously with the filing of the Chapter 11 Cases, the

Debtors have filed a motion seeking approval of the bidding procedures (the "Bidding

Procedures") pursuant to which the Competitive Process will take place.  The Bidding

Procedures provide that the Competitive Process will result in the highest and otherwise best bid

for all or substantially all of the Debtors' non-cash assets.  A Qualified Bid (as defined in the

Bidding Procedures) in the Competitive Process must have a value in excess of $275 as

determined by the Bidding Procedures.  The Plan Term Sheet specifies that the Competitive

Process will be run in parallel with the process for seeking confirmation of a stand-alone plan of

reorganization.

    33.   Pursuant to the Plan Term Sheet, whether the Competitive Process results

in a sale pursuant to Bankruptcy Code section 363 followed by a plan of liquidation or in a

recapitalization transaction followed by a plan of reorganization, the result is the same for the

Debtors' two largest creditor constituencies, holders of claims pursuant to the 2016 Notes and

holders of general unsecured claims.  In either case, these constituencies will share pro rata in the distributable cash of the Debtors' estates.  If the Competitive Process does not result in any Qualified Bid being received, the Debtors will prosecute the stand-alone plan of reorganization and emerge from bankruptcy as a reorganized entity.  In that case the holders of claims pursuant to the 2016 Notes will receive their pro rata share of 100% of the common stock of the reorganized Debtors, and holders of general unsecured claims will receive treatment to be reasonably determined by the Debtors and Supporting Noteholders.

34.     As such, the transaction contemplated by the Plan Support Agreements paves the way for a substantial deleveraging of the Debtors' balance sheet through a stand-alone plan of reorganization that equitizes the 2016 Notes, while allowing the Debtors to simultaneously pursue a competitive sale process in an effort ensure that the value of their estates will be maximized for the benefit of all stakeholders.  The Debtors believe that engaging in the Competitive Process to potentially effectuate a sale of substantially all of the Debtors' assets in parallel ensures that the path ultimately pursued will maximize the value of the Debtors' estates for the benefit of all stakeholders.

35.     The Board met bi-weekly throughout the Debtors' process of considering strategic alternatives and was kept fully apprised of the status of proposals and options available to the Debtors.  The Board directed the Company's actions throughout this process and was kept regularly informed of all actions taken by the Company in connection therewith.  In addition to the numerous other meetings that were regularly held throughout the strategic alternatives process, at a meeting of the Board held on November 5, 2014, the Board was updated and advised regarding the Plan Support Agreements negotiated with the Supporting Noteholders and other matters relevant to the Competitive Process and the Debtors strategic options.  At the

meeting (and in prior meetings throughout the process), the Board was advised by Lazard and by counsel regarding these matters.  After full deliberation, on November 9, 2014, the Board determined that entering into the Plan Support Agreements, filing these Chapter 11 Cases and pursuing the Competitive Process contemplated in the Plan Support Agreements as part of these Chapter 11 Cases, is the best way to maximize value.

## PART II.

### FIRST DAY PLEADINGS

36.     In furtherance of these objectives, the Debtors expect to file the First Day Pleadings,[14] and respectfully request that the Court consider entering the proposed orders granting such First Day Pleadings.  I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

### A.     Administrative and Procedural Matters

37.     The Debtors have filed five "administrative" pleadings that seek to (1) jointly administer the Debtors' Chapter 11 Cases for procedural purposes only, (2) extend the time for the Debtors to file their schedules and statements, (3) to retain Prime Clerk LLC ("Prime Clerk") as claims and noticing agent, (4) seeking entry of an order enforcing the Bankruptcy Code's automatic stay provisions and bankruptcy termination provisions, and (5) an equity

---

[14]     Any term not defined herein has the meaning ascribed to it in the specific First Day Pleading being described.

trading procedures motion. The Debtors' attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

<div align="center">Joint Administration</div>

38.     The Debtors are requesting that their chapter 11 cases be jointly administered, for procedural purposes only. As set forth above, the Debtors in these proceedings are (i) Dendreon Corporation, (ii) Dendreon Holdings, LLC, a direct subsidiary of Dendreon Corporation, (iii) Dendreon Distribution, LLC, a direct subsidiary of Dendreon Holdings, LLC, and (iv) Dendreon Manufacturing, LLC, also a direct subsidiary of Dendreon Holdings, LLC. That is, Dendreon Corporation, directly or indirectly, owns all of the outstanding voting securities of Dendreon Holdings, LLC, Dendreon Distribution, LLC, and Dendreon Manufacturing, LLC. As such, I believe that Dendreon Corporation, Dendreon Holdings, LLC, Dendreon Distribution, LLC, and Dendreon Manufacturing, LLC, are "affiliates," as that term is defined in Bankruptcy Code section 101(2) and as used in Bankruptcy Rule 1015(b).

39.     I believe that joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, and related notices, that otherwise would need to be filed in each separate case absent joint administration. Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files, and will ease the burden on the office of the U.S. Trustee in supervising these cases. Accordingly, I believe that joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the U.S. Trustee and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates. Furthermore, I believe that the rights of the creditors of each of the Debtors will not be adversely affected by

joint administration of the Chapter 11 Cases inasmuch as the relief sought is purely procedural and is not intended to affect substantive rights.

<p align="center">Application to Appoint Prime Clerk as Claims and Noticing Agent</p>

40.    It is my understanding that the Debtors are applying (the "Section 156(c) Application") for entry of an order appointing Prime Clerk as claims and noticing agent in these Chapter 11 Cases. I understand that such appointment is required by the rules of this Court. Moreover, I believe that such relief is prudent in light of the thousands of creditors, potential creditors and parties in interest to whom certain notices will be sent.

41.    I believe that Prime Clerk's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and of other developments in the Chapter 11 Cases. Moreover, I am informed that Prime Clerk has acted as the claims and noticing agent in numerous cases of comparable size, including several large bankruptcy cases pending in both this District and in other districts. Moreover, in compliance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of Delaware, the Debtors obtained and reviewed engagement proposals from two (2) other Court-approved claims and noticing agents to ensure selection through a competitive process.

42.    As more fully detailed in the Section 156(c) Application, I understand that Prime Clerk will engage in certain Claims and Noticing Services, including, but not limited to, transmitting, receiving, docketing and maintaining proofs of claim filed in connection with the Chapter 11 Cases. Prime Clerk will also work with the office of the Clerk of the United States Bankruptcy Court for the District of Delaware to ensure that its methodology conforms with all of the Court's procedures, the Local Bankruptcy Rules and the provisions of any order entered by

this Court. Moreover, I am informed that the Section 156(c) Application pertains only to the work to be performed by Prime Clerk under the Clerk of the United States Bankruptcy Court for the District of Delaware delegation of duties permitted by 28 U.S.C. § 156(c) and Local Bankruptcy Rule 2002-1(f).[15]

43.    Accordingly, I believe that retention of Prime Clerk, an independent third party with significant experience in this role, to act as an agent of the Court, is in the best interests of the Debtors and their estates and creditors.

<u>Extension of Time to File Schedules and Statements</u>

44.    It is my understanding that the Debtors are requesting that the Court extend the time by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (the "<u>Schedules and Statements</u>") to thirty (30) days after the current deadline. It is my understanding that the Local Bankruptcy Rules automatically extended the Debtors' deadline thirty (30) days because the Debtors filed a creditor matrix containing more than two hundred (200) creditors. Thus, the Debtors are requesting the Court to extend the deadline to file Schedules and Statements to January 8, 2015 (the "<u>Filing Deadline</u>").

45.    Given the substantial burdens already imposed on the Debtors' management by the commencement of the Chapter 11 Cases, the limited number of employees available to collect the information, the competing demands upon such employees and the time and attention that the Debtors must devote to the Chapter 11 process, the Debtors may be unable to complete their Schedules and Statements by the current deadline imposed by the Bankruptcy Rules and the Local Bankruptcy Rules. I also believe that the relief requested is in the best interest of the Debtors, their estates, creditors and other parties in interest.

---

[15]    The Debtors also intend to file an application to retain Prime Clerk to perform certain administrative services pursuant to Bankruptcy Code section 327.

46.     Accordingly, I believe that "cause" exists to extend the current deadline imposed by Bankruptcy Rule 1007(c) for an additional thirty (30) days, until the Filing Deadline. The requested extension will enhance the accuracy of the Debtors' Schedules and Statements and avoid the necessity of substantial subsequent amendments.

<u>Motion to Enforce the Automatic Stay and Bankruptcy Termination Provisions</u>

47.     he Debtors have filed a Motion seeking entry of an order enforcing the Bankruptcy Code's automatic stay provisions and bankruptcy termination provisions, and the protections thereunder.  The Debtors and their non-debtor foreign affiliates have developed valuable business relationships with entities, including contract counterparties, located outside of the United States, including in various countries in the European Union, such as Germany, the Netherlands, Switzerland and the United Kingdom, who are critical to the manufacturing and commercialization of PROVENGE and the overall success of the Debtors' business operations. The Debtors believe that many of these creditors and contract counterparties are unfamiliar with the provisions of the Bankruptcy Code, and in particular, the self-executing nature of the automatic stay provisions under Bankruptcy Code section 362 and the protections afforded chapter 11 debtors under Bankruptcy Code section 365.  To that end, upon learning of the commencement of the Debtors' Chapter 11 Cases, such non-U.S. contract counterparties may take precipitous action against the Debtors and/or the property of the estates, and those that are party to executory contracts and unexpired leases with the Debtors may try to terminate such executory contracts or unexpired leases pursuant to bankruptcy termination provisions contained therein – which would be in direct contravention of Bankruptcy Code section 365.

48.     Accordingly, to aid in the administration of the Debtors' Chapter 11 Cases and to ensure that their business is not disrupted, the Debtors, out of an abundance of caution,

have filed a Motion seeking this Court's assistance in clarifying the fundamental rights and

protections to which the Debtors are entitled pursuant to sections 362 and 365 of the Bankruptcy

Code.  The Debtors intend to provide the order to such foreign creditors and contract

counterparties to ensure that they are apprised of the commencement of the Chapter 11 Cases,

the imposition of the automatic stay and the protections to which the Debtors are entitled

pursuant to sections 362 and 365 of the Bankruptcy Code.

<div align="center">Equity Trading Procedures Motion</div>

49.    The Debtors have generated, and are currently generating, a significant

amount of Tax Attributes for U.S. federal income tax purposes. For example, as of December 31,

2013, the Debtors had approximately $1.8 billion of NOLs that were available to offset taxable

income and approximately $25 million of research credits available to offset tax liability.  The

Debtors' Tax Attributes are a valuable asset because the Debtors generally can carry forward

their Tax Attributes to reduce or eliminate their income tax liability, thereby potentially freeing

up funds to meet working capital requirements and service debt.  In particular, the Tax Attributes

may be available to the Debtors to offset taxable income generated by ordinary course activity

and other transactions completed during the course of the Chapter 11 Cases, including pursuant

to a sale of the Debtors' assets under section 363 of the Bankruptcy Code.  Additionally, the

Debtors can carry forward the NOLs and credits to reduce their future tax liability, thereby

potentially recovering cash for the benefit of their estate.

50.    It is my understanding that the Debtor's ability to use its tax attributes,

however, could be severely limited under Section 382 of title 26 of the United States Code as a

result of the trading and accumulation of its equity securities prior to consummation of a chapter

11 plan. The Debtor thus seeks to establish procedures for continuously monitoring the trading of

its equity securities, so that the Debtor can preserve its ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of its NOLs under Section 382. Therefore, I submit that the relief requested in the Equity Trading Procedures Motion is necessary and in the best interests of the Debtor's estate, its creditors and other parties in interest.

**B.      Motion to Continue Cash Management System**

51.      <u>Cash Management</u>. The Debtors have filed a motion to continue their ordinary course banking practices. I understand that the Debtors maintain a cash management system, comprised of six (6) bank accounts (the "<u>Bank Accounts</u>"), maintained in financially stable FDIC-insured banks or in high quality securities and money market mutual funds, that facilitates the efficient flow and management of funds involved in the Debtors' operations (the "<u>Cash Management System</u>"). The Debtors routinely deposit, withdraw and otherwise transfer money to, from and between the Bank Accounts by various methods. I believe that the Cash Management System is essential to enable the Debtors to control and monitor funds, ensure cash availability and liquidity, comply with the requirements of their financing arrangements, and reduce administrative expenses by facilitating the movement of funds and enhancing the development of accurate account balance information.

52.      <u>Receipts</u>. The Debtors' cash receipts derive primarily from the sale of PROVENGE in the United States and flow directly to a lockbox in a depository account maintained by Dendreon Distribution at U.S Bank (the "<u>Receipts Account</u>"). The Receipts Account is a zero balance account, and therefore funds are immediately transferred from the Receipts Account to a day-to-day operating account maintained by Dendreon Corporation at U.S. Bank, N.A. ("<u>U.S. Bank</u>") (the "<u>Operating Account</u>"). The Debtors' other cash receipts, including

vendor refunds, cash from financing and intercompany transfers also flow into the Operating Account.

53.    <u>Disbursements</u>. The Operating Account is also used to disburse funds on behalf of Dendreon Corporation, which is the entity through which most of the Debtors' operations are conducted. Such disbursements include, but are not limited to, payroll, healthcare, other employee benefits and general corporate expenses. Dendreon Corporation disburses funds to ADP for third-party payroll services provided. Dendreon Corporation also disburses funds to Concur Technologies, Inc., which provides an online automated system to process reimbursements of business expenses for Dendreon's employees.

54.    <u>Additional Accounts</u>. In addition to the accounts described above, Dendreon Corporation maintains an interest-bearing investment account at Morgan Stanley Smith Barney, LLC (the "<u>Investment Account</u>"). The funds are invested in order to maximize the interest accruing on such funds through a diversified portfolio of reasonably safe and conservative investments. The Investment Account holds mutual funds, United States government securities, investment-grade corporate fixed income securities with an average duration of approximately sixty (60) days issued by entities such as Berkshire Hathaway Inc., Pepsi Americas Inc., Boeing Capital Corporation and The Walt Disney Company,  as well as cash. The Debtors transfer funds from the Investment Account to the Operating Account as needed to fund operations.  The Debtors also occasionally transfer funds from the Operating Account to the Investment Account in order to  earn investment income on excess cash. Dendreon Corporation also maintains an interest-bearing money market account at Wells Fargo Securities, LLC relating to letters of credit required in connection with certain of its real property leases, which holds money market mutual funds (the "<u>Letters of Credit Account</u>"). The funds are

invested in a money market account in order to maximize the interest accruing on such funds.

Dendreon maintains a deposit account at U.S. Bank (the "Deposit Account"). This account is not

used on a regular basis but rather on an ad hoc basis; for example, it has been used as an escrow

account. Finally, Dendreon Manufacturing, LLC maintains an account at U.S. Bank, which was

opened for the purpose of settling intercompany payments between Dendreon and its non-debtor

foreign affiliates (the "Intercompany Account"). However, this account is not currently, and in

fact never has been, in use.

       55.   Intercompany Transactions. In the ordinary course of business, Dendreon

Distribution transfers money to Dendreon from the Receipts Account to the Operating Account

(the "Intercompany Transactions"). The Debtors' record any transfers of funds between the

Receipts Account to the Operating Account pursuant to an automated system, and such transfers

are reflected on Dendreon's trial balance. Although the Intercompany Transactions involve the

transfer of funds between a bank account owned by Dendreon Distribution and a bank account

owned by Dendreon Corporation, because the Company operates on a consolidated basis and

Dendreon Distribution (as well as Dendreon Manufacturing, LLC and Dendreon Holdings, LLC)

are disregarded entities for tax purposes, the Company maintains its books and records on a

consolidated basis. Dendreon Corporation, which is the entity through which the day-to-day

operations for the commercialization of PROVENGE are performed, relies on the Intercompany

Transactions to fund day-to-day operations. Accordingly, I strongly believe that absent the

continuation of the Intercompany Transactions, the Debtors' ability to operate their primary

business during the Chapter 11 Cases would be severely prejudiced, and their ability to

maximize value for creditors would be drastically reduced. Avoiding such potentially crippling

hindrances by continuing the Intercompany Transactions is, therefore, in the best interests of the estates.

56.   <u>Business Forms</u>. In the ordinary course of business, the Debtors use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "<u>Business Forms</u>"). Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Requiring the Debtors to modify the Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

57.   <u>Waiver of Investment and Deposit Requirements.</u>  I am advised by counsel that section 345 of the Bankruptcy Code establishes certain investment and deposit restrictions. I believe that the Debtors' cash investment practices substantially conform with the approved investment and deposit practices identified in section 345 of the Bankruptcy Code, and that all money deposits are safe and prudent and yield, under the circumstances, the maximum reasonable net return on such money. Nonetheless, out of an abundance of caution, to the extent that such deposits do not conform to the approved practices identified in section 345 of the Bankruptcy Code, the Debtors seek to have such requirements waived so as to allow the Company's Banks to accept and hold such funds in accordance with the Debtors' prepetition practices. In my opinion, a waiver of the section 345 requirements is in the best interests of the estates, all creditors and other parties in interest.

58.   It is my understanding that requiring the Debtors to alter their Cash Management System would impair the Debtors' estates and disrupt their efforts to reorganize and pursue other alternatives to maximize value of their estates. Consequently, I believe that

maintenance of the Cash Management System and the Debtors' other business and banking

practices, as requested in certain of the First Day Pleadings, during the duration of the Chapter

11 Cases, is in the best interest of all creditors and other parties in interest.

**C.      Payment of Employee and Payroll Obligations and Certain Taxes**

59.      As of October 31, 2014, the Debtors employed approximately 698

Employees. Of these, 507 are salaried Employees and 191 are hourly Employees.  The

Employees provide a variety of essential functions, including: sales and marketing, research and

development (including with respect to clinical, regulatory, quality assurance and control, and

manufacturing or production matters), general and administrative (including with respect to

executive, finance, legal, human resources, corporate communications, information technology

and operations matters). Retaining the Employees, whose skills and understanding of the

Debtors' operations and infrastructure are essential to the effective operation of the Debtors'

businesses, is critical to the Debtors' ability to operate and maximize value in these Chapter 11

Cases.

60.      <u>Wages and Salaries</u>.  In the ordinary course of business, the Debtors pay

all of their Employees on a bi-weekly basis, every other Friday, one week in arrears.  For the

month of October 2014, the Debtors' monthly payroll obligation (excluding any amounts paid in

connection with the Debtors' commissions, bonus, severance and retention programs) was

approximately $6.1 million, including payroll taxes and processing fees.

61.      On November 7, 2014, the Debtors made their most recent company-wide

payroll, which was disbursed by ADP to Employees through electronic funds transfer and

checks.  As such, I believe that, other than amounts sought to be paid pursuant to the Final Order,

no Employee has a claim for payment against the Debtors in excess of the $12,475 Priority Cap

set forth in section 507(a)(4) of the Bankruptcy Code on account of Prepetition Employee Obligations.

62.   <u>Commissions</u>.  Approximately 100 of the Debtors' field-based sales Employees receive commissions that are paid on a quarterly basis (the "<u>Commissioned Employees</u>") under the Debtors'  Field Commercial Incentive Compensation Plans ("<u>FCICP</u>"). Amounts payable to Commissioned Employees under the FCICP depend upon the Employees' performance during the quarter, with various incentive components under the FCICP being designed to reward the Commissioned Employees for business growth – including (but not limited to) through the number of infusions of PROVENGE – and to align such Employees' interests with the operational goals and objectives of the Debtors. I believe that the commissions under the FCICP are an integral part of the aggregate compensation package for Commissioned Employees and provide substantial value to the Debtors' estates because they encourage such Employees to achieve important performance goals.  The Debtors are not seeking authority to pay commissions under the FCICP  pursuant to the Interim Order.  However, since the FCICP is critical to maintaining the morale and productivity of the Debtors' sales force and to maximizing the value of the Debtors' estates, the Debtors seek authority pursuant to the Final Order to, at their discretion, honor certain prepetition commissions under the FCICP.

63.   <u>Bonus</u>. In the ordinary course of business, the Debtors maintain an annual incentive plan designed to reward non-sales Employees for helping the business achieve certain goals (the "<u>Annual Bonus Plan</u>"). Approximately 600 Employees are eligible to participate in the Annual Bonus Plan, the vast majority of which are not involved in the management of the Debtors' business. In 2014, the Debtors aimed to achieve four (4) goals with respect to sales, cash flow, achieving certain business initiatives, and maintaining industry standards. If the 100%

target is reached with respect to the 2014 goals, the Debtors estimate that approximately $6.7 million will be due to eligible Employees in February 2015.

64.     I believe payment of bonuses under the Annual Bonus Plan is critical to maintaining the productivity and morale of the participants and to maximizing the value of the Debtors' estates.  The Debtors, therefore, request authority pursuant to the Final Order to make all payments pursuant to the Annual Bonus Plan in the ordinary course of business, including amounts that exceed the Priority Cap.

65.     <u>Other Employee Compensation: Paid Time Off and Expense Reimbursement</u>.  The Debtors also offer their Employees other forms of compensation, including paid time off and reimbursement of certain business expenses.  Certain of the Debtors' Employees, are eligible to receive paid time off (the "<u>Paid Time Off</u>").  Employees are eligible for Paid Time Off if they are full-time Employees or part-time Employees who are regularly scheduled to work between 24 and 35 hours per week.  The Debtors' Paid Time Off policies include holidays, vacation pay, and sick days.  As of the Petition Date, the Debtors estimate that the value of accrued and unused or unpaid vacation time equals approximately $4.6 million. Additionally, the Debtors routinely reimburse Employees or pay credit card invoices on behalf of Employees for certain approved, reasonable expenses incurred within the scope of their employment (collectively, the "<u>Reimbursable Expenses</u>").  The Debtors' ability to pay the Reimbursable Expenses has a significant effect on the Debtors' sales force, which is the life blood of the Debtors' business.  The average aggregate monthly amount expended by the Debtors for Reimbursable Expenses is approximately $600,000 per month, which is primarily related to expenses incurred by Employees in a sales-related function.  As of the Petition Date, certain Reimbursable Expenses may not have been paid because, among other reasons, Employees had

not yet submitted a request for reimbursement, or approval of an expense report was pending as of the Petition Date.  The Debtors seek authority, but not direction, to pay all outstanding prepetition Reimbursable Expenses and to continue their expense reimbursement policy during and after the Interim Period in the ordinary course of business and subject to the Debtors' discretion and applicable restrictions under the Debtors' policy; provided, however, that no Employee will receive payment in excess of the $12,475 Priority Cap on account of Prepetition Employee Obligations, including Reimbursable Expenses during the Interim Period.

66.    Other Prepetition Employee Obligations: Temporary Employees and Independent Contractors. The Debtors supplement their work force by utilizing the services of temporary employees (the "Temporary Employees") and independent contractors (the "Independent Contractors"). As of November 6, 2014, approximately seventy-three (73) Temporary Employees and ten (10) Independent Contractors were utilized by the Debtors. The Temporary Employees are critical to the Debtors' manufacturing process. The Temporary Employees are employed through third-party agencies whom the Debtors directly pay for the Temporary Employee services. As of the Petition Date, the Debtors estimate that approximately $80,000 is accrued but not outstanding with respect to the Temporary Employees. The Independent Contractors provide professional services to the Debtors, including with respect to public relations, consulting and clinical research. The Independent Contractors are paid directly by the Debtors when invoiced for services performed. As of the Petition Date, the Debtors believe that no amounts are outstanding with respect to the Independent Contractors. The Debtors request authority, but not direction, to continue utilizing the services of the Temporary Employees (through the staffing agencies) and the Independent Contractors in the ordinary course of business and to pay any prepetition amounts with respect thereto.

67.      <u>Medical and Insurance Benefit Plans</u>.  In the ordinary course of business, the Debtors have established various standard and customary plans and policies to provide their Employees with (a) health benefits, including medical, prescription drug, dental and vision benefits (collectively, the "<u>Health Insurance Benefits</u>"), and (b) insurance benefits, including short and long-term disability, life insurance and accidental death and dismemberment insurance (together with the Health Insurance Benefits, the "<u>Medical and Insurance Benefits</u>").

68.      The Debtors offer self-insured medical plans and prescription drug plans that are administered by Connecticut General Life Insurance Company ("<u>Cigna</u>"). With respect to the medical and prescription drug plans, the Debtors pay an average of approximately $76,000 per month to Cigna for administering the plans and a stop-loss policy, and approximately $717,000 per month to Cigna for claims. The Debtors also offer a self-insured dental plan administered by Delta Dental ("<u>Delta</u>"), under which the Debtors pay an average of approximately $5,700 per month to Delta for administering the plan and approximately $61,000 to Delta for claims. Further, the Debtors offer a self-insured vision plan administered by Vision Service Plan ("<u>VSP</u>"), under which the Debtors pay an average of approximately $1,900 per month to VSP for administering the plan and approximately $8,200 per month to VSP for claims. Because the Debtors are self-insured, and due to a lag in the processing of claims, certain amounts may be accrued but not outstanding on account of the Health Insurance Benefits.  The Debtors seek authority, but not direction, to pay benefits and administrative costs under the Health Insurance Benefits plans, and to continue their practices related to these plans during and after the Interim Period in the ordinary course of business.

69.      The Debtors also provide Employees with life insurance and accidental death and dismemberment insurance coverage (the "<u>Life and AD&D Plan</u>"). Insurance under the

Debtors' Life and AD&D Plan is provided by Reliance Standard ("Reliance"). On average, the Debtors pay approximately $13,000 per month to Reliance under the Life and AD&D Plan. In addition, the Debtors provide long-term disability insurance (the "LTD Plan") and short-term disability insurance (the "STD Plan") to Employees, also through Reliance. The Debtors pay premiums of approximately $14,000 per month under the LTD Plan and approximately $21,000 per month under the STD Plan.   I believe that, as of the Petition Date, no amounts will be outstanding on account of the  Life and AD&D Plan, LTD Plan and STD Plan.  The Debtors request authority, but not direction, to pay benefits and administrative costs under the Life and AD&D Plan, LTD Plan and STD Plan, and to continue to pay for their policies and continue their practices related to these plans during and after the Interim Period in the ordinary course of business.

    70.    Optional Insurance Benefits.  The Debtors also make available to Employees, at the Employees' expense, supplemental (voluntary) life and AD&D insurance (the "Optional Plan").  The Optional Plan, for which insurance is also provided by Reliance, is fully funded by Employees.  The Debtors request authority to continue the Optional Plan during and after the Interim Period in the ordinary course of business and, to the extent that the Debtors hold funds representing premiums withheld from Employees' paychecks in connection with the Optional Plan, to remit such funds to Hartford during and after the Interim Period in the ordinary course of business.

    71.    Other Benefit Plans and Programs.  The Debtors also maintain a 401(k) savings plan (the "Savings Plan") for Employees administered by Fidelity Investments.  Under the Savings Plan, eligible Employees may elect to contribute up to the annual IRS dollar limit (which varies annually) to the Savings Plan, and the Debtors match 50% of each Employee's

contribution up to a maximum of $4,000 per year.  The Debtors also offer Employees the

opportunity to use tax-advantaged flexible spending accounts ("Flexible Spending Accounts" or

"FSA") to use pre-tax dollars toward the payment of non-reimbursed out of pocket medical

expenses and dependent care expenses. On average, the aggregate monthly amount that is

deducted from participating Employees' payroll disbursements under the FSA is approximately

$31,000. Further, as of the Petition Date, the Debtors estimate that account balances under the

FSA (that are not subject to any claims) will total approximately $60,000 in the aggregate.  The

Debtors provide a tuition reimbursement benefit to Employees (the "Tuition Reimbursement

Program").  Eligible Employees may be reimbursed for tuition in approved coursework, up to a

maximum of $2,000 per Employee per year for college or university-level coursework that is

job-related, along with $1,000 per year for laboratory expenses or books required for such

courses.  As of the Petition Date, only seven (7) Employees are participating in the Tuition

Reimbursement Program.  The Debtors estimate that, as of the Petition Date, approximately

$7,737 is accrued but not outstanding on account of the Tuition Reimbursement Program.  In

addition to the Debtors' other benefit plans and programs, the Debtors provide severance pay to

Employees under two (2) severance benefit plans (the "Severance Plans").  As of the Petition

Date, there are no amounts due with respect to the Severance Plans. Out of an abundance of

caution, however, the Debtors seek authority, but not direction, to pay prepetition obligations

under the Severance Plans, and to continue the Severance Plans in the ordinary course of

business postpetition; provided, however, that no terminated Employee will receive payment on

account of any Prepetition Employee Obligations in excess of the Priority Cap prior to entry of

the Final Order. In the ordinary course of business, the Debtors also maintain a retention

program for certain non-insider Employees (the "Retention Program") to induce and reward

critical, highly-valued Employees to remain in the employment of the Debtors through a specified date. Thirteen (13) Employees are currently eligible for retention awards at various dates postpetition. The outstanding awards range from $17,500 to $60,000. As of the Petition Date, no amounts are outstanding under the Retention Program. An aggregate of approximately $442,000 will be due to eligible Employees at various postpetition dates between January 15, 2015 and April 30, 2015. The Debtors request authority, but not direction, pursuant to the Final Order, to make all payments under the Retention Program in the ordinary course of business.

72.    <u>Direction to Banks</u>.  Finally, the Debtors seek an order authorizing and directing the financial institutions upon which any checks, drafts, electronic funds transfers, or wire transfers are drawn in payment of the Prepetition Employee Obligations – either before, on, or after the Petition Date – to honor all such checks or drafts issued, upon presentation thereof, or all such wire transfer instructions, upon receipt thereof, provided that sufficient funds are immediately available and on deposit in the applicable accounts.  The Debtors also seek an order authorizing them to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.  The Debtors also request that any party receiving payment from the Debtors be authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by the requested relief.

73.    I believe the Debtors' ability to maximize value depends, in large part, upon the motivation of the Employees.  Most of the Debtors' Employees (and their families) are dependent upon the wages, salaries, reimbursements and other benefits they receive from the Debtors.  Any disruption from Employee resignations or lack of morale could have devastating effects on the Debtors' restructuring efforts.  Accordingly, I believe it is critical that the Debtors

be authorized to honor their Prepetition Employee Obligations during and after the Interim

Period, subject to the limitations described in the Motion.

**D.      Motions for Payment of Other Critical Business Expenditures**

<u>Insurance</u>

74.      In the ordinary course of business, the Debtors maintain various insurance

policies providing coverage for, among other things, workers' compensation liability, directors

and officers liability and product liability (collectively, the "<u>Insurance Policies</u>").  The Insurance

Policies are essential to the preservation of the value of the Debtors' business, property and

assets.  Not only are some of the Insurance Policies required by various regulations, laws, and

contracts that govern the Debtors' commercial activities, but I have also been advised by counsel

that section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate

insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or

dismissal of a chapter 11 case.

75.      Moreover, I have been advised by counsel that the Operating Guidelines

for Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the

"<u>U.S. Trustee Guidelines</u>") require the Debtor to maintain insurance coverage throughout the

pendency of the Chapter 11 Cases.  For the policy period of 2014 to 2015, the total annual

premiums under the Insurance Policies (including taxes and fees) was approximately

$3,344,366.87, and the Debtors paid a broker fee of $620,520.00 to assist in placement of such

Insurance Policies.  I believe that the coverage types, levels and premiums for these Insurance

Policies are neither unusual in amount nor in number in relation to the extent of the business

operations conducted by the Debtors, and they are similar to businesses of comparable size and

type to those of the Debtors.

76.     In general, the Debtors' Insurance Policies require payment of the entire premium upfront and at inception and, as of the Petition Date, I believe the Debtors were substantially current on amounts owed under the Insurance Policies.  Nevertheless, for the reasons described herein and in the Insurance Motion, I believe it is necessary for the Debtors to obtain authorization to make payments of Insurance Obligations (as defined below) attributable to the prepetition period, plus any unforeseen deductible payment amounts for prepetition claims.

77.     If the Debtors are unable to make any outstanding payments that may be owed on account of the Insurance Policies, I have been advised by counsel that the Debtors' insurance providers (the "Insurance Providers") may seek relief from the automatic stay to terminate such Insurance Policies.  If that were to happen, the Debtors would be required to obtain replacement insurance on an expedited basis and at a significant cost to the estates.  If the Debtors are required to obtain replacement insurance, this payment would be likely greater than what the Debtors currently pay.  Even if the Debtors' Insurance Providers were not permitted to terminate the agreements, it is my opinion that any interruption of payment would have a severe, adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

78.     In light of the importance of maintaining insurance coverage with respect to its business activities and preserving liquidity by financing its insurance premiums, I believe it is in the best interest of the Debtors' estates to receive Court approval to honor the Debtors' obligations under the Insurance Policies and, as necessary, renew or enter into new such agreements.

79.     Additionally, I have been advised by counsel that under the laws of the various jurisdictions in which they operate, the Debtors' are required to maintain policies and programs to provide Employees with workers' compensation benefits.  The Debtors' primary

36

workers' compensation policy is administered by the Chubb Indemnity Insurance Company (the "WC Policy").  The WC Policy pays the total of all benefits, damages and expenses resulting from any accident or disease for which the Debtors are legally liable.  There is no deductible under the WC Policy.  In connection with the WC Policy, the Debtors pay annual premiums to the Chubb Indemnity Insurance Company of approximately $251,728.00.  As of the Petition Date, one claim was pending under the WC Policy, for which the Debtors have reserved approximately $1,030.

        80.     The Debtors maintain workers' compensation insurance policies in all jurisdictions where they operate.  I have been advised by counsel that failure to maintain workers' compensation insurance could result in administrative or legal proceedings against the Debtors and their officers and directors.  Accordingly, the Debtors seek authority to pay all workers' compensation obligations, including any outstanding insurance premiums and any other amounts related to prepetition workers' compensation claims as they become due in the ordinary course of business.  In addition, the Debtors seek to honor the workers' compensation benefits and continue the workers' compensation benefits in the ordinary course on a postpetition basis in accordance with prepetition practices.

        81.     In sum, through the Insurance Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to (i) maintain existing Insurance Policies and to pay on an uninterrupted basis all premiums, deductibles and administration fees (the "Insurance Obligations") arising thereunder, and (ii) renew, revise, extend, supplement, change or enter into new insurance policies as needed in their business judgment.  The Debtors also request that the Court grant certain related relief.

82.     I believe that all of the relief requested in the Insurance Motion is in the best interest of the Debtors, their estates, creditors and other parties in interest.  I also believe that all of the relief requested in the Insurance Motion is necessary to preserve and enhance the value of the Debtors' estates for the benefit of all creditors, and that absent the relief sought in the Insurance Motion, a failure to pay any Insurance Obligations or to permit the Debtors to renew, revise, extend, supplement, change or enter into new insurance policies, as needed in their business judgment, will immediately threaten the continued operation of the Debtors and, consequently, the Debtors' estates.  As detailed above and in the Insurance Motion, for instance, the non-payment of the Insurance Obligations could result in cancellation of the Insurance Policies.  In such an event, the Debtors would not only be in violation of the U.S. Trustee Guidelines, the laws of various states in which the Debtors operate and various contractual agreements, but also may be unable to find alternative insurance coverage and consulting services at a reasonable cost.  Therefore, it is my opinion that the potential harm and economic disadvantage that would stem from the cancellation of the Insurance Policies, and failure to renew the Insurance Policies or revise, extend, supplement, change or enter into new insurance arrangements as needed in their business judgment, are grossly disproportionate to the amount of the Insurance Obligations, and the costs to renew, revise, extend, supplement, change or enter into new insurance coverage.

<u>Taxes</u>

83.     The Debtors, in the ordinary course of their business, incur various tax liabilities, including use taxes; income and franchise taxes; property taxes; gross receipts and business and occupation taxes; regulatory and licensing fees; business license fees; annual report taxes and other taxes and fees; and all other similar obligations, and have generally paid such tax

liabilities as they become due.  As of the Petition Date, other than approximately $36,000 in

Franchise Taxes outstanding, the Debtors were substantially current in the payment of assessed

and undisputed Taxes; however, certain Taxes attributable to the prepetition period were not yet

due.  Specifically, in the aggregate, the Debtors estimate that approximately $38,000 in

prepetition Taxes will become due and payable following the Petition Date.  As of the Petition

Date, the Debtors estimate that approximately $35,000 in Use Taxes and approximately $3,000

in Business Occupation Taxes relating to the prepetition period will become due and owing to

the Taxing Authorities in the ordinary course of business.

      84.     It is my belief that the continued payment of the Taxes on their normal due

dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their

prospects for maximizing the value of their estates. If such obligations are not timely paid, it is

my understanding that the Debtors will be required to expend time and money to resolve a

multitude of issues related to such obligations, each turning on the particular terms of each

Taxing Authority's applicable laws.  The Debtors desire to avoid unnecessary disputes with the

Taxing Authorities – and expenditures of time and money resulting from such disputes – over a

myriad of issues that are typically raised by such entities as they attempt to enforce their rights to

collect taxes.  Accordingly, I believe that the Debtors could suffer irreparable harm if the

prepetition Taxes are not paid when they become due and payable.

      85.     Additionally, the Taxing Authorities may cause the Debtors to be audited

if Taxes are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention

away from their efforts to maximize value, including the conduct of their business and the sale

process.  If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may

attempt to revoke the Debtors' licenses, suspend the Debtors' operations and pursue other

remedies that will harm the estates.  In all cases, the Debtors' failure to pay Taxes could have a material adverse impact on their ability to operate in the ordinary course of business.

86.     I have also been advised that the federal government and many states in which the Debtors operate have laws providing that the Debtors' officers, directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes.  In such event, collection efforts by the Taxing Authorities would be extremely distracting for the Debtors and their directors and officers in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

<div align="center">Customer Programs</div>

87.     Prior to the Petition Date and in the ordinary course of business, the Debtors sought to further their commercialization of PROVENGE and maximize the sale of the product through the implementation of certain customer programs, including participation in certain government programs, payment discount and sales rebate programs, chargebacks and other price adjustment programs, financial support and sampling programs, and product return programs (collectively, the "Customer Programs"). The Debtors' customers are wholesalers (the "Wholesalers"), who sell PROVENGE to physicians and institutions (the "Providers") who, in turn, administer the medication to patients. Many Providers are members of Group Purchasing Organizations ("GPOs") with which the Debtors have special pricing arrangements (collectively, with the Wholesalers, Providers and GPOs, the "Customers"). Providers are reimbursed for PROVENGE by various entities, including government healthcare programs and private insurance plans. PROVENGE is currently covered under Medicare Part B and Medicaid, and is available for purchase by authorized users of the General Services Administration's Federal Supply Schedule (the "Federal Supply Schedule"), including the U.S. Department of Veterans

Affairs, the U.S. Department of Defense, the Coast Guard and the Public Health Service. PROVENGE is also covered under the 340B drug pricing program (defined below). In addition to participating in government programs under which patients receive PROVENGE at reduced prices, the Debtors also participate in a non-federally mandated discount program and two patient assistance programs, PROvide and the Uninsured Patient Program (as defined below).The Debtors seek authority to continue the Customer Programs described below and to honor prepetition claims arising therefrom in the ordinary course of business.  I believe that the continuation of the Customer Programs, including the payment of related prepetition obligations, is necessary to preserve the Debtors' critical customer relationships and is in the best interests of the Debtors and their estates.

88.     Non-Federally Mandated Discount Program. The Debtors sell PROVENGE to Wholesalers at the wholesale acquisition cost ("WAC"), which is the base price set by the Debtors in their sole discretion and adjusted from time to time. The Debtors enter into agreements with GPOs, under which the GPOs' member Providers buy PROVENGE from Wholesalers at prices lower than the WAC and correlated with the amounts that Providers are reimbursed by insurers and government payors (e.g., Medicaid, Medicare). In turn, Wholesalers submit chargebacks to the Debtors for the difference between the WAC price that the Wholesaler paid to the Debtors and the discounted price paid by the Providers to the Wholesaler (the "Wholesaler Chargebacks").

89.     The Debtors also have contracted with certain GPOs to provide rebates to their eligible Provider members (the "GPO Rebates" and collectively with Wholesaler Chargebacks, the "Non-Federally Mandated Discount Program"). GPO Rebates are based upon the volume of PROVENGE purchases and are payable at the end of each quarter.

41

90.    <u>Discounted Rates Under Federally-Mandated Programs</u>.  In order to participate in the Medicaid program, the Debtors are required to comply with the U.S. Department of Health and Human Services' 340B Drug Pricing Program (the "<u>340B Program</u>") and the Federal Supply Schedule, under which PROVENGE must be sold at specified prices that reflect a substantial discount to WAC.

91.    340B Hospital Providers.  Certain hospitals provide the majority of their services to low income patients and receive payments from the Centers for Medicare & Medicaid Services ("<u>CMS</u>") to cover the costs of providing care to uninsured patients (such hospitals being the "<u>340B Hospitals</u>"). Pursuant to the 340B Program, the 340B Hospitals are entitled to receive PROVENGE at a discounted price set by statute, which is calculated on a quarterly basis. In order to effectuate this, 340B Hospitals purchase PROVENGE from one of the Debtors' Wholesalers at the discounted price, and the Wholesaler then submits a chargeback to the Debtors for the difference between the WAC price that the Wholesaler paid to the Debtors and the discounted price paid by the 340B Hospital to the Wholesaler. The Debtors expect that the PROVENGE discount will remain the same or increase in the future, contingent on price changes.

92.    Federal Supply Schedule Providers. The Debtors were awarded a Federal Supply Schedule contract by the U.S. Department of Veterans Affairs that requires them to offer deeply discounted pricing for PROVENGE to four federal agencies: the U.S. Department of Veterans Affairs, the U.S. Department of Defense, the Coast Guard and the Public Health Service (the "<u>Federal Supply Schedule Programs</u>"). The Federal Supply Schedule provides the maximum amount that can be charged to certain government entities for pharmaceuticals based on a specific formula. The price of PROVENGE offered through the Federal Supply Schedule is

lower than the WAC price; therefore, Wholesalers charge back the Debtors for this difference. The Debtors expect that the PROVENGE discount will remain the same or increase in the future, contingent on price changes.

93.    Medicaid Rebates.  Medicaid is a health program, jointly funded by state and federal governments and managed by the states, that assists low-income individuals and families in obtaining health care. The Medicaid Drug Rebate Program covers certain outpatient drugs, including PROVENGE, and requires the Debtors to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services in exchange for Medicaid coverage of PROVENGE. Individual states collect PROVENGE utilization data and invoice the Debtors for related rebates ("Medicaid Rebates"), which are calculated based on a statutory formula. The Debtors pay the Medicaid Rebates to CMS on a quarterly basis, and the amount is shared between the states and the federal government.

94.    The Debtors' participation in the Federal Supply Schedule Programs and the 340B Program, which also cover a significant portion of the PROVENGE user base, requires the Debtors to participate in the Medicaid program and pay Medicaid Rebates. As a result, if the Debtors fail to fulfill their obligations to Medicaid, including payment of the Medicaid Rebates as they become due, they risk becoming excluded from all federal programs. As such, I believe that honoring Medicaid Rebates is integral to the Debtors' business, and the Debtors cannot risk the substantial harm that could arise from the failure to pay Medicaid Rebates, including denial of coverage and damage to the Debtors' relationship with their Customers. Such a result would irreparably impair the Debtors' efforts to conduct their business during the Chapter 11 Cases and maximize value. Consequently, the Debtors request authorization to continue to make Medicaid

Rebate payments during the Chapter 11 Cases as related to both prepetition and postpetition sales of PROVENGE.

95.    <u>Patient Assistance Programs</u>.  In the ordinary course of business, the Debtors offer assistance to a limited number of patients in covering the cost of PROVENGE through two programs: PROvide and the Uninsured Patient Program (each as defined below, and collectively the "<u>Patient Assistance Programs</u>").

96.    PROvide. Patients with commercial insurance may still face out of pocket costs such as co-pays, co-insurance and deductible costs. Through PROvide, a program sponsored by the Debtors, the Debtors aim to support eligible patients by covering an average of $1,000 to $2,000 for any combination of these costs over the three PROVENGE treatments. Applications for the program are reviewed by Debtor personnel, and qualification is determined by a panel of Debtor employees after a thorough information collection process.  The patient must have adjusted gross income of less than $150,000 per year and must be diagnosed with a condition that is FDA-approved for treatment with PROVENGE.  Three to four patients per month typically receive assistance through PROvide.

97.    Uninsured Patient Program. For eligible patients who do not have coverage for PROVENGE, either because they do not have insurance or because their insurance provider refuses coverage, the Debtors may provide the drug free of cost (the "Uninsured Patient Program"). As with PROvide, applications for the program are reviewed by Debtor personnel, and qualification is determined by a panel of Debtor employees after a thorough information collection process.  The Debtors provide PROVENGE to two to three patients per month through the Uninsured Patient Program.

98.     I believe that the financial assistance the Debtors offer through PROvide and the Uninsured Patient Program have been important to their efforts to build and strengthen the customer base for PROVENGE and that continuing the programs is necessary for preserving the value of the business. Moreover, such programs are standard in the pharmaceutical industry.

99.     In my opinion, the Customer Programs are critical to the Debtors' ability to serve their Customers and are essential to the Debtors' business and growth. During fiscal year 2013, approximately ninety percent (90%) of the Debtors' unit sales ultimately went to patients who received PROVENGE pursuant to a Customer Program. Approximately twenty percent (20%) of the patients who received PROVENGE benefitted from government programs such as Medicaid, Federal Supply Schedule pricing or the 340B Program. Approximately seventy percent (70%) of the patients who receive PROVENGE receive it from a Provider that is a member of a GPO.  The success and viability of the Debtors' business, and ultimately, the Debtors' ability to preserve and maximize value for creditors through the Chapter 11 Cases, therefore, are fundamentally dependent upon the continuation of the Customer Programs and honoring the Debtors' obligations thereunder. Maintaining ordinary course relationships with Customers is integral to preserving the value of the business, as there are a limited number of Customers who are knowledgeable about PROVENGE. A knowledgeable customer base is important to both the maintenance and growth of the Debtors' business.  Accordingly,  I believe it is critical that the Debtors be authorized to honor their Customer Programs in the ordinary course of business.

<u>Utilities</u>

100.     In connection with the operation of their businesses and the management of their properties, the Debtors obtain electric, gas, water, sewer, telecommunications and other

similar services (collectively, the "Utility Services") from various utility companies (the "Utility Companies"). The Debtors have filed a motion requesting that the Court approve the Debtors' proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies, as that term is used in Bankruptcy Code section 366, approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance and prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors.

101.    I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. Such a result could potentially jeopardize the Debtors' ability to operate their businesses and impair the Debtors' efforts to maximize the value of their estates and, ultimately, their ability to reorganize or sell their assets and business. In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases. I believe that the procedures the Debtors have proposed for the Utility Companies adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

102.    I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. Such a result could potentially jeopardize the Debtors' ability to operate their businesses and impair the Debtors' efforts to maximize the value of their estates and, ultimately, their ability to sell their assets and business.  In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.  I believe that the procedures the Debtors have proposed for the Utility Companies adequately protect the rights that I have been advised are provided to the Utility

Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to

receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

Critical Vendors

103.    The Debtors continue to do business with four types of vendors whose

goods and services are essential to the Debtors' operations: (i) specialty manufacturers and

suppliers; (ii) couriers; (iii) clinical trial sites; and (iv) foreign vendors (collectively, the "Critical

Vendors"). By this Motion, the Debtors seek entry of an order granting them authority to make

payments toward the prepetition claims of the Critical Vendors (the "Critical Vendor Claims"),

on the terms set forth below. The Debtors estimate that they have approximately 117 Critical

Vendors, that are owed approximately $3 million. The Debtors wish to pay such Critical Vendors

up to $3 million, to be allocated at the Debtors' discretion.

104.    The Debtors believe that many of their vendors will continue to do

business with the Debtors after commencement of the Chapter 11 Cases because doing so simply

makes good business sense. However, I anticipate that certain vendors that supply goods or

services that are critical to maintaining patient care and necessary to the Debtors' business, will:

(a) refuse to deliver goods and services without payment of their prepetition claims; (b) refuse to

deliver goods and services on reasonable credit terms absent payment of prepetition claims,

thereby requiring the Debtors to use even greater liquidity and increase their operating costs; or

(c) suffer significant financial hardship, such that the Debtors' non-payment of their prepetition

claims could have a significant negative impact on a Critical Vendor's business and therefore its

ability to supply the Debtors with needed goods and services.

105.    Accordingly, the Debtors request the Court's authority to pay the

prepetition Critical Vendor Claims because payment of such claims is necessary to an effective

47

reorganization. In order to determine which of the Debtors' vendors are critical to the Debtors' businesses, the Debtors used the following criteria: (a) whether the vendor in question is a "sole source" provider; (b) whether quality requirements or other specifications prevent the Debtors from obtaining a vendor's products or services from alternative sources within a reasonable timeframe; (c) whether a vendor meeting the standards of (a) or (b) is likely to refuse to ship product to the Debtors postpetition if its prepetition balances are not paid; (d) whether a vendor would suffer significant financial hardship absent the Debtors' payment of prepetition claims; (e) the degree to which replacement costs (including, pricing, transition expenses, professional fees and lost sales of future revenue) exceed the amount of a vendor's prepetition claim; (f) whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms; and (g) for foreign vendors specifically, whether the vendor lacks minimum contacts with the United States such that the vendor may not be subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations, or may simply be confused by the chapter 11 process.

106.    I am confident that this process has appropriately identified only those vendors that meet some or all of the foregoing stringent guidelines and that, if the Debtors failed to pay for the vital goods and services they provided prepetition, would likely cease to provide them in the future. It is my opinion that the cessation of such goods or services would adversely impact the Debtors' ability to reorganize, and any efforts to replace such good or services would distract the Debtors from the chapter 11 process more generally, at the expense of the Debtors' creditors and other parties in interest.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: Bridgewater, New Jersey
November 10, 2014

By:    _Robert L. Crotty_____
Name: Robert L. Crotty

**<u>EXHIBIT A</u>**

**Corporate Organizational Chart**

Dendreon Corporation
(Delaware)
100%
100%
Dendreon Holdings, LLC
(Delaware)
Dendreon Holdings (Netherlands) B.V.
(The Netherlands)
100%
100%
100%
Dendreon Distribution, LLC
(Delaware)
Dendreon Manufacturing, LLC
(Delaware)
100%
100%
Dendreon Operations B.V.
(The Netherlands)
Legend
Debtor Entities
Non-Debtor Subsidiaries
Dendreon UK Limited
(England and Wales)
Dendreon Germany GmbH
(Germany)