IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :    Chapter 11
                                              :
DENDREON CORPORATION, et al.,                 :    Case No. 14-12515 (____)
                                              :
           Debtors.[1]                        :
                                              :    Joint Administration Pending
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
11 U.S.C. §§ 105(a), 363, 1107, AND 1108 AND FED. R. BANKR. P. 6003 AND 6004
AUTHORIZING DEBTORS TO (I) HONOR CERTAIN PREPETITION OBLIGATIONS
TO CUSTOMERS AND TO CONTINUE CUSTOMER PROGRAMS AND (II) PAY
MEDICAID AND OTHER OBLIGATIONS**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors") hereby move (this "Motion") this Court for entry of an interim order (the "Interim

Order") and a final order (the "Final Order"), pursuant to sections 105(a), 363, 1107 and 1108 of

title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtors to

continue to (i) honor prepetition obligations owed to customers and otherwise continue their

prepetition customer programs and practices in the ordinary course of business and (ii) pay

Medicaid and other obligations. In support of this Motion, the Debtors rely upon and incorporate

by reference the Declaration of Robert L. Crotty in Support of Chapter 11 Petitions and First Day

Pleadings (the "First Day Declaration"), filed with the Court concurrently herewith. In further

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon
Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon
Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle,
Washington 98101.

support of this Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 1107, and 1108, and Bankruptcy Rules 6003 and 6004.

3.      Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

7.      The Debtors and their non-debtor affiliates are biotechnology companies focused on the discovery, development and commercialization of novel therapies to significantly

2

improve treatment options for cancer patients. The Debtors are primarily focused on commercializing PROVENGE® in the United States and around the world. PROVENGE is a first-in-class immunotherapy used to treat patients suffering from advanced-stage prostate cancer, which is the most common non-skin cancer and the second-leading cause of cancer deaths among men in the United States.

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, their capital raising and restructuring activities and the events leading to the Debtors' decision to file the Chapter 11 Cases, is set forth in detail in the First Day Declaration.[2]

## RELIEF REQUESTED

9.      By this Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to continue, in the ordinary course of business, to (i) honor prepetition obligations owed to customers and otherwise continue their prepetition customer programs and practices and (ii) pay Medicaid and other obligations (collectively, the "Customer Programs").[3]  The continuation of the Customer Programs further described below is necessary to sustain the Debtors' business during the course of these Chapter 11 Cases and maximize the value of the Debtors' estates.

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

[3]   Certain Customer Programs described herein assist government-related customers, such as Medicare and Medicaid recipients, the U.S. Department of Veteran Affairs, the U.S. Department of Defense, the Coast Guard, the Public Health Service and 340B Hospitals (defined below). These are not Customer Programs implemented by the Debtors, but are those that are required when participating in certain federal programs. Continuing to participate in these government-related programs is critical to the Debtors' efforts to market and sell its products and continue the business as a going concern. Therefore, the Debtors request authorization to continue to provide the benefits afforded to customers in the ordinary course of business as part of their Customer Programs.

10.     The Debtors also request that the interim and final orders (a) authorize and direct all banks to receive, process, honor, and pay any and all checks, drafts and other forms of payment, including to fund transfers and other bank accounts used by the Debtors with respect to the Customer Programs, provided that sufficient funds are on deposit in the applicable accounts to cover such payments, (b) authorize banks to rely on the representations of the Debtors as to which checks are subject to this Motion, (c) prohibit the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of the Customer Programs, and (d) authorize the Debtors to issue new postpetition checks to replace any checks, drafts, or other forms of payment, or effect new postpetition fund transfers, which may be inadvertently dishonored or rejected and to reimburse any expenses that may be incurred as a result of any bank's failure to honor a prepetition check.

11.     For the reasons set forth herein, the Debtors submit that the relief requested is in the best interests of the Debtors, their estates, creditors and other parties in interest, and therefore, should be granted.

## DESCRIPTION OF THE CUSTOMER PROGRAMS

12.     Prior to the Petition Date and in the ordinary course of their business, the Debtors implemented the Customer Programs to further their commercialization of PROVENGE and maximize the sales of the product. The Debtors' customers are wholesalers (the "Wholesalers"), who sell PROVENGE to physicians and institutions (the "Providers") who, in turn, administer the medication to patients. Many Providers are members of Group Purchasing Organizations ("GPOs") with which the Debtors have special pricing arrangements (collectively, with the Wholesalers, Providers and GPOs, the "Customers"). Providers are reimbursed for PROVENGE by various entities, including government healthcare programs and private insurance plans. PROVENGE is currently covered under Medicare Part B and Medicaid, and is

4

available for purchase by authorized users of the General Services Administration's Federal Supply Schedule (the "Federal Supply Schedule"), including the U.S. Department of Veterans Affairs, the U.S. Department of Defense, the Coast Guard and the Public Health Service. PROVENGE is also covered under the 340B drug pricing program (defined below). In addition to participating in government programs under which patients receive PROVENGE at reduced prices, the Debtors also participate in a non-federally mandated discount program and two patient assistance programs, PROvide and the Uninsured Patient Program (as defined below).

13.     The Customer Programs are critical to the Debtors' ability to serve their Customers and are essential to the Debtors' business and growth. During fiscal year 2013, approximately ninety percent (90%) of the Debtors' unit sales ultimately went to patients who received PROVENGE pursuant to a Customer Program. Approximately twenty percent (20%) of the patients who received PROVENGE benefitted from government programs such as Medicaid, Federal Supply Schedule pricing or the U.S. Department of Health and Human Services' 340B Drug Pricing Program (the "340B Program"). Approximately seventy percent (70%) of the patients who receive PROVENGE receive it from a Provider that is a member of a GPO.  The success and viability of the Debtors' business, and ultimately, the Debtors' ability to preserve and maximize value for creditors through the Chapter 11 Cases, therefore, are fundamentally dependent upon the continuation of the Customer Programs and honoring the Debtors' obligations thereunder. Maintaining ordinary course relationships with Customers is integral to preserving the value of the business, as there are a limited number of Customers who are knowledgeable about PROVENGE. A knowledgeable customer base is important to both the maintenance and growth of the Debtors' business.

14.     Accordingly, the Debtors seek authority, but not direction, to continue the Customer Programs, including authority to honor prepetition claims arising therefrom, in their sole discretion.[4]

### Overview of the Customer Programs

15.     Prior to the Petition Date, the Debtors offered and participated in certain programs for the benefit of their Customers. Through the Customer Programs, the Debtors provide, among other things, (a) discounted rates on PROVENGE for purchases made through GPOs; (b) discounted rates on PROVENGE related to patients eligible for certain federal government programs; and (c) patient assistance programs to offset patient costs. The Debtors' Customer Programs are common and typical of those in the pharmaceutical industry. Therefore, if the Debtors are to stay competitive, it is critical that the Debtors be authorized to continue the Customer Programs and honor prepetition obligations associated with them. The following are general descriptions of the Debtors' principal Customer Programs.

**A.      Non-Federally Mandated Discount Program**

16.     The Debtors sell PROVENGE to Wholesalers at the wholesale acquisition cost ("WAC"), which is the base price set by the Debtors in their sole discretion and adjusted from time to time. The Debtors enter into agreements with GPOs, under which the GPOs' member Providers buy PROVENGE from Wholesalers at prices lower than the WAC and correlated with the amounts that Providers are reimbursed by insurers and government payors (e.g., Medicaid, Medicare). In turn, Wholesalers submit chargebacks to the Debtors for the

---

[4]    Nothing in this Motion should be construed as an assumption or rejection of any executory contract or unexpired lease between the Debtors and any other party. The Debtors reserve the right to contest the amount claimed to be due by any person or entity, including the Customers. The Debtors reserve the right, in their business judgment, to renew, replace, implement, modify, or terminate any Customer Program.

difference between the WAC price that the Wholesaler paid to the Debtors and the discounted price paid by the Providers to the Wholesaler (the "Wholesaler Chargebacks").

17.     The Debtors also have contracted with certain GPOs to provide rebates to their eligible Provider members (the "GPO Rebates" and collectively with Wholesaler Chargebacks, the "Non-Federally Mandated Discount Program"). GPO Rebates are based upon the volume of PROVENGE purchases and are payable at the end of each quarter.

18.     The Debtors seek authority to continue the Non-Federally Mandated Discount Program in the ordinary course of business. The Debtors' average monthly liability for Wholesaler Chargebacks is approximately $1,500,000, though Wholesaler Chargebacks are netted against accounts receivable and thus do not generally result in a cash payment. The Debtors seek authority to apply any prepetition Wholesaler Chargebacks that may be outstanding against subsequent orders of PROVENGE in the ordinary course of business. The Debtors estimate that as of the Petition Date, approximately $750,000 has accrued but has not been invoiced or paid for GPO Rebates. The Debtors seek authority to pay GPO Rebates when they become due in the ordinary course of business.

**B.      Discounted Rates Under Federally-Mandated Programs**

19.     In order to participate in the Medicaid program, the Debtors are required to comply with the 340B Program and the Federal Supply Schedule, under which PROVENGE must be sold at specified prices that reflect a substantial discount to WAC.

20.     **340B Hospital Providers.** Certain hospitals provide the majority of their services to low income patients and receive payments from the Centers for Medicare & Medicaid Services ("CMS") to cover the costs of providing care to uninsured patients (such hospitals being the "340B Hospitals"). Pursuant to the 340B Program, the 340B Hospitals are entitled to receive PROVENGE at a discounted price set by statute, which is calculated on a quarterly basis. In

order to effectuate this, 340B Hospitals purchase PROVENGE from one of the Debtors' Wholesalers at the discounted price, and the Wholesaler then submits a chargeback to the Debtors for the difference between the WAC price that the Wholesaler paid to the Debtors and the discounted price paid by the 340B Hospital to the Wholesaler. The Debtors expect that the PROVENGE discount will remain the same or increase in the future, contingent on price changes.

21.     The Debtors seek authority to continue the 340B Program in the ordinary course of business. The Debtors' average monthly liability for chargebacks related to the 340B Program is approximately $1,250,000, though chargebacks are netted against accounts receivable and thus do not generally result in a cash payment. The Debtors seek authority to apply any prepetition chargebacks that may be outstanding against subsequent orders of PROVENGE in the ordinary course of business.

22.     **Federal Supply Schedule Providers**. The Debtors were awarded a Federal Supply Schedule contract by the U.S. Department of Veterans Affairs that requires them to offer deeply discounted pricing for PROVENGE to four federal agencies: the U.S. Department of Veterans Affairs, the U.S. Department of Defense, the Coast Guard and the Public Health Service (the "Federal Supply Schedule Programs"). The Federal Supply Schedule provides the maximum amount that can be charged to certain government entities for pharmaceuticals based on a specific formula. The price of PROVENGE offered through the Federal Supply Schedule is lower than the WAC price; therefore, Wholesalers charge back the Debtors for this difference. The Debtors expect that the PROVENGE discount will remain the same or increase in the future, contingent on price changes.

23.     The Debtors seek authority to continue to sell PROVENGE under the Federal Supply Schedule pricing in the ordinary course of business.  The Debtors' average monthly liability for chargebacks related to the Federal Supply Schedule is approximately $40,000, though chargebacks are netted against accounts receivable and thus do not generally result in a cash payment. The Debtors seek authority to apply any prepetition chargebacks that may be outstanding against subsequent orders of PROVENGE in the ordinary course of business.

24.     **Medicaid Rebates**.  Medicaid is a health program, jointly funded by state and federal governments and managed by the states, that assists low-income individuals and families in obtaining health care. The Medicaid Drug Rebate Program covers certain outpatient drugs, including PROVENGE, and requires the Debtors to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services in exchange for Medicaid coverage of PROVENGE. Individual states collect PROVENGE utilization data and invoice the Debtors for related rebates ("Medicaid Rebates"), which are calculated based on a statutory formula. The Debtors pay the Medicaid Rebates to CMS on a quarterly basis, and the amount is shared between the states and the federal government. The Debtors estimate that approximately $150,000 has been accrued but has not been invoiced for PROVENGE Medicaid Rebates as of the Petition Date. While this amount is not yet due and payable, it may become due and payable over the course of the Chapter 11 Cases.

25.     The Debtors' participation in the Federal Supply Schedule Programs and the 340B Program, which as noted above also cover a significant portion of the PROVENGE user base, requires the Debtors to participate in the Medicaid program and pay Medicaid Rebates. As a result, if the Debtors fail to fulfill their obligations to Medicaid, including payment of the Medicaid Rebates as they become due, they risk becoming excluded from all federal programs.

As such, honoring Medicaid Rebates is integral to the Debtors' business, and the Debtors cannot risk the substantial harm that could arise from the failure to pay Medicaid Rebates, including denial of coverage and damage to the Debtors' relationship with their Customers. Such a result would irreparably impair the Debtors' efforts to conduct their business during the Chapter 11 Cases and maximize value. Consequently, the Debtors request authorization to continue to make Medicaid Rebate payments during the Chapter 11 Cases as related to both prepetition and postpetition sales of PROVENGE.

### C.    Patient Assistance Programs

26.    In the ordinary course of business, the Debtors offer assistance to a limited number of patients in covering the cost of PROVENGE through two programs: PROvide and the Uninsured Patient Program (each as defined below, and collectively the "Patient Assistance Programs").[5]

27.    **PROvide**. Patients with commercial insurance may still face out of pocket costs such as co-pays, co-insurance and deductible costs. Through PROvide, a program sponsored by the Debtors, the Debtors aim to support eligible patients by covering an average of $1,000 to $2,000 for any combination of these costs over the three PROVENGE treatments. Applications for the program are reviewed by Debtor personnel, and qualification is determined by a panel of Debtor employees after a thorough information collection process. The patient must have adjusted gross income of less than $150,000 per year and must be diagnosed with a condition that is FDA-approved for treatment with PROVENGE. Three to four patients per month typically receive assistance through PROvide. The Debtors estimate that the monthly cost

---

[5]    In addition to these two programs, travel cost assistance is available to some patients. Funding for travel cost assistance is provided by the Patient Access Network Foundation ("PAN"), a non-profit third party. The Debtors have regularly contributed to PAN in the past.

of PROvide is $40,000, which includes both the direct and indirect costs of the program. The

Debtors do not believe they have any prepetition liability for PROvide, however, out of an

abundance of caution, the Debtors seek authority to pay any prepetition amounts that may be

outstanding.

28.     **Uninsured Patient Program**. For eligible patients who do not have

coverage for PROVENGE, either because they do not have insurance or because their insurance

provider refuses coverage, the Debtors may provide the drug free of cost (the "Uninsured Patient

Program"). As with PROvide, applications for the program are reviewed by Debtor personnel,

and qualification is determined by a panel of Debtor employees after a thorough information

collection process.  The Debtors provide PROVENGE to two to three patients per month through

the Uninsured Patient Program. The Debtors estimate that the monthly cost of the Uninsured

Patient Program, including administration of the program and the wholesale cost of the product,

is $55,000. The Debtors do not believe they have any prepetition liability for the Uninsured

Patient Program, however, out of an abundance of caution, the Debtors seek authority to pay any

prepetition amounts that may be outstanding.

29.     The Debtors believe that the financial assistance they offer through

PROvide and the Uninsured Patient Program have been important to their efforts to build and

strengthen the customer base for PROVENGE and that continuing the programs is necessary for

preserving the value of the business. Moreover, such programs are standard in the

pharmaceutical industry. Therefore, the Debtors seek authorization to continue these programs in

the ordinary course of business.

## The Critical Nature of the Customer Programs

30.     The ability of the Debtors to maximize the value of their businesses and

their inventory is dependent on continuing the Customer Programs. Any delay in honoring the

Debtors' obligations thereunder could severely disrupt the Debtors' efforts to maximize value in the Chapter 11 Cases. Any failure to honor prepetition customer obligations, even for a brief period of time, may drive away valuable Customers, thereby harming the Debtors' efforts to maximize the value of their inventory. Accordingly, the Debtors seek authorization to continue the Customer Programs.

## APPLICABLE AUTHORITY

31.     The Debtors submit that an order authorizing them to (i) continue the Customer Programs as they determine to be appropriate; (ii) renew, modify, terminate or replace such Customer Programs or agreements that, in their discretion, are necessary and in the best interests of the Debtors' estates, creditors and other parties in interest; and (iii) make payments owing on account of prepetition product sales, regardless of when the obligations were incurred.

**A.     The Debtors Should Be Authorized To Continue The Customer Programs In Their Discretion.**

32.     The Debtors, operating their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

33.     Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.; see also In re Mirant Corp., 296 B.R. 427, 429-30 (Bankr. N.D. Tex. 2003) (allowing debtors to pay claims "reasonably believe[d]" to be authorized under the CoServ test or whose payment was necessary "in the exercise of their business judgment . . . in order for [the d]ebtors to continue

their respective businesses"). The <u>CoServ</u> court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." <u>CoServ</u>, 273 B.R. at 497. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

<u>Id.</u> at 498.

34.      Honoring the customer obligations and maintaining the Customer Programs meets each element of the <u>CoServ</u> court's standard. As described above, preserving the value of the Debtors' business is contingent, in large part, upon continuing to operate in the ordinary course and the value of the Debtors' business can only be enhanced by continued customer loyalty and patronage. In the Debtors' business judgment, the uninterrupted maintenance of their Customer Programs is essential to maintaining such customer relations. Any disruption and adverse publicity that would necessarily result from the discontinuing their Customer Programs would threaten the Debtors' customer base and ultimately, their ability to maximize the value of their business. Accordingly, continuing the Customer Programs and honoring customer obligations is a valid exercise of the Debtors' fiduciary duties.

**B.      The Proposed Payments Are Appropriate Under Bankruptcy Code Section 363(b).**

35.      Under Bankruptcy Code section 363(b), a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the court's discretion outside the ordinary course of business. <u>See</u> 11 U.S.C. § 363(b)(1). In order to obtain approval for the use of estate

assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

36.     Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

37.     The business judgment rule applies in chapter 11 cases. See Integrated Res., 147 B.R. at 656 (noting that "Delaware business judgment rule principles have 'vitality by analogy' in Chapter 11" (citation omitted)); see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.").

38.     As discussed above, the Debtors have determined, in the sound exercise of their business judgment, that maintaining the Customer Programs in the ordinary course of business is critical to ensure that the Debtors maintain their customer base. The failure to honor these obligations could have a material adverse impact on the Debtors' continued operation and, by extension, its efforts to maximize the value for its stakeholders. Accordingly, the preservation and protection of the Debtors' business through ongoing relationships with the Debtor's Customers provides a sufficient business justification for satisfying obligations to customers,

14

even if such payment were deemed to be outside the ordinary course of business. See <u>Ionosphere Clubs, Inc.</u>, 98 B.R. at 175.

39.     The Debtors therefore seek authorization under Bankruptcy Code section 363(b) to honor prepetition obligations to Customers and continue the Customer Programs.

**C.     Maintenance Of The Customer Programs Is Also Appropriate Under Section 105 Of The Bankruptcy Code And The Doctrine Of Necessity.**

40.     Maintenance of the Customer Programs should be authorized under Bankruptcy Code section 105(a) and under the "doctrine of necessity."  The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in <u>Miltenberger v. Logansport  C. & S.W. Ry. Co.</u>, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. <u>See</u> <u>id.</u> at 309-12. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in <u>Miltenberger</u>. <u>See</u> <u>In re Lehigh & New Eng. Ry. Co.</u>, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

41.     The doctrine of necessity "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. at 176; <u>see also</u> <u>In re Just for Feet, Inc.</u>, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor

"cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should

be invoked to permit payment); In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992)

("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the

continued operation of the debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr.

S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show

that the payment is necessary to avert a serious threat to the Chapter 11 process.").

      42.     The doctrine of necessity is an accepted component of modern bankruptcy

jurisprudence. See Just For Feet, 242 B.R. at 826 (approving payment of key inventory suppliers'

prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new

inventory on eve of debtor's key sales season); In re Payless Cashways, Inc., 268 B.R. 543, 546-

47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when

such suppliers agree to provide postpetition trade credit); see also In re Columbia Gas Sys., Inc.,

171 B.R. 189, 191-92 (Bankr. D. Del. 1994); In re Ionosphere Clubs, Inc., 98 B.R. at 175.

      43.     Maintaining the Customer Programs, and satisfying any related prepetition

obligations or fees, as needed in the Debtors' business judgment, is consistent with the doctrine

of necessity. As noted above, the Customer Programs are vital to the Debtors' efforts to

maximize the value of their estates. The potential harm and economic disadvantage that would

stem from an inability to honor customer obligations is grossly disproportionate to the costs

associated with the Customer Programs.

      44.     The relief requested herein is commonly granted in this District. See, e.g.,

In re Energy Future Holdings Corp., Case No. 14-10979 (CSS) (Bankr. D. Del. May 2, 2014); In

re Savient Pharms., Inc., Case No. 13-12680 (MFW) (Bankr. D. Del. Oct. 16, 2013 and Nov. 19,

2013) (granting interim and final relief); In re Exide Technologies, Case No. 13-11482 (KJC)

(Bankr. D. Del. June 11, 2013 and July 11, 2013) (granting interim and final relief); <u>In re B456</u>

<u>Sys., Inc.</u>, Case No. 12-12859 (KJC) (Bankr. D. Del. Nov. 7, 2012); <u>In re Blitz U.S.A., Inc.</u>, Case

No. 11-13603 (PJW) (Bankr. D. Del. Dec. 5, 2011); <u>In re Graceway Pharms.</u>, Case No. 11-13036

(PJW) (Bankr. D. Del. Oct. 17, 2011).[6]

### IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

45.     Bankruptcy Rule 6003 provides that the relief requested in this Motion

may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R.

Bankr. P. 6003; <u>see also</u> <u>In re First NLC Fin. Servs., LLC</u>, 382 B.R. 547, 549 (Bankr. S.D. Fla.

2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid

irreparable harm). The Third Circuit has interpreted the language "immediate and irreparable

harm" in the context of preliminary injunctions. In that context, the court has instructed that

irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the

merits and for which money damages cannot provide adequate compensation. <u>See, e.g.</u>, <u>Norfolk</u>

<u>S. Ry. Co. v. City of Pittsburgh</u>, 235 F. App'x 907, 910 (3d Cir. 2007) (citing <u>Glasco v. Hills</u>,

558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and

imminent, not speculative or unsubstantiated. <u>See, e.g.</u>, <u>Acierno v. New Castle Cnty.</u>, 40 F.3d

645, 653-55 (3d Cir. 1994). The Debtors submit that for the reasons already set forth herein, the

relief requested in this Motion is necessary to avoid immediate and irreparable harm to the

Debtors.

---

[6]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion. Copies of these orders, however, are available on request.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

46.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### NOTICE

47.    Notice of this Motion shall be given to: (i) the U.S. Trustee, (ii) the indenture trustee for the 2.875% Convertible Senior Notes due 2016, (iii) counsel to the Unaffiliated Noteholders, (iv) counsel to the Deerfield Noteholders, (v) the parties included on the Debtors' list of twenty (20) largest unsecured creditors and (vi) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m). The Debtors submit that, under the circumstances, no other or further notice is required.

### NO PRIOR REQUEST

48.    No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order, substantially in the forms annexed hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated:  Wilmington, Delaware
         November 10, 2014

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Sarah E. Pierce*
Anthony W. Clark (I.D. No. 2051)
Sarah E. Pierce (I.D. No. 4648)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman (*pro hac vice admission pending*)
Raquelle L. Kaye (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

Felicia Gerber Perlman (*pro hac vice admission pending*)
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession

# EXHIBIT A

**Proposed Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re: : Chapter 11
:
DENDREON CORPORATION, et al., : Case No. 14-12515 (___)
:
Debtors.[1] : Jointly Administered
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    **Related Docket No. ____**

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, 1107, AND 1108 AND FED. R. BANKR. P. 6003 AND 6004 AUTHORIZING DEBTORS TO (I) HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS AND TO CONTINUE CUSTOMER PROGRAMS AND (II) PAY MEDICAID AND OTHER OBLIGATIONS**

Upon the motion (the "Motion")[2] of the Debtors for an interim order (the "Interim Order"), pursuant to sections 105(a), 363, 1107, and 1108 of the Bankruptcy Code, and Bankruptcy Rule 6003 and 6004, authorizing the Debtors to continue to (i) honor prepetition obligations owed to customers and otherwise continue their prepetition customer programs and practices in the ordinary course of business and (ii) pay Medicaid and other obligations; and upon the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby,

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

**ORDERED, ADJUDGED, AND DECREED that**:

1.      The Motion is GRANTED as set forth herein on an interim basis.

2.      The Debtors are authorized, but not directed, to continue the Customer Programs in the ordinary course of business and without further order of this Court, and to perform and honor all prepetition obligations thereunder in the ordinary course of business and in the same manner and on the same basis as if the Debtors performed and honored such obligations prior to the Petition Date.

3.      All banks are (a) authorized and directed to receive, process, honor and pay any and all checks drawn on the payroll, drafts and other forms of payment, including fund transfers, used by the Debtors on account of the Customer Programs, whether presented before, on or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments, (b) authorized to rely on the representations of the Debtors as to which checks are subject to this Motion, and (c) prohibited from placing any holds on, or attempting to reverse, any automatic transfers on account of the Customer Programs; provided that the Debtors are authorized to issue new postpetition checks to replace any checks, drafts and other forms of payment, or effect new postpetition fund transfers, which may be inadvertently dishonored or rejected and to reimburse any expenses that may be incurred as a result of any bank's failure to honor a prepetition check.

4.      The Debtors are authorized, but not directed, to continue, renew, replace, modify and/or terminate such of its Customer Programs as they deem appropriate, in their discretion, and in the ordinary course of business, without further application to the Court.

5.      The provisions contained herein shall not be construed to limit, or in any way affect, the Debtors' ability to contest any claims, on any ground permitted by applicable law,

and neither the provisions contained herein, nor any actions or payment made by the Debtors pursuant to the Interim Order, shall be deemed an admission as to the validity of the underlying obligation or a waiver of any rights the Debtors may have to subsequently dispute such obligation on any ground that applicable law permits.

6.     Nothing in the Interim Order or the Motion shall be deemed to constitute postpetition assumption, reaffirmation or adoption of any agreement under Bankruptcy Code section 365. Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

7.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

8.     Notwithstanding Bankruptcy Rule 6004(h), the Interim Order shall be effective and enforceable immediately upon entry hereof.

9.     The final hearing on this Motion is set for _____ ___, 2014, at __:__ [a.m./p.m.] (prevailing Eastern Time). Any objections or responses to entry of the proposed Final Order shall be filed and served, so as to be received by 4:00 p.m. (prevailing Eastern Time) no later than seven (7) days prior to the final hearing, upon: (i) the Debtors, care of Dendreon Corporation, 200 Crossing Boulevard, Bridgewater, NJ 08807, Attention: Robert L. Crotty, (ii) proposed counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: Kenneth S. Ziman and 155 North Wacker Drive, Chicago, Illinois 60606, Attention: Felicia Gerber Perlman and One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Sarah E. Pierce, (iii)

counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston,

Massachusetts 02111, Attention: Steven D. Pohl, (iv) counsel to the Deerfield Noteholders,

Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention:

John C. Longmire and (v) the U.S. Trustee.

   10. The requirements set forth in Local Bankruptcy Rule 9013-1(b) are

satisfied by the contents of the Motion.

   11. The Debtors are authorized and empowered to take all actions necessary to

implement the relief granted in the Interim Order.

   12. This Court shall retain jurisdiction with respect to all matters arising from

or related to the implementation or interpretation of this Interim Order.


Dated: Wilmington, Delaware
   _____, 2014


     _____
     UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT B**

## **Proposed Final Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re: | Chapter 11 |
| DENDREON CORPORATION, et al., | Case No. 14-12515 (___) |
| Debtors.[1] | Jointly Administered |
|  | **Related Docket No. ____** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, 1107, AND 1108 AND FED. R. BANKR. P. 6003 AND 6004 AUTHORIZING DEBTORS TO (I) HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS AND TO CONTINUE CUSTOMER PROGRAMS AND (II) PAY MEDICAID AND OTHER OBLIGATIONS

Upon the motion (the "Motion")[2] of the Debtors for a final order (the "Final Order"), pursuant to sections 105(a), 363, 1107, and 1108 of the Bankruptcy Code, and Bankruptcy Rule 6003 and 6004, authorizing the Debtors to continue to (i) honor prepetition obligations owed to customers and otherwise continue their prepetition customer programs and practices in the ordinary course of business and (ii) pay Medicaid and other obligations; and upon the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby,

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

**ORDERED, ADJUDGED, AND DECREED that**:

1.       The Motion is GRANTED on a final basis as set forth herein.

2.       The Debtors are authorized, but not directed, to continue the Customer Programs in the ordinary course of business and without further order of this Court, and to perform and honor all prepetition obligations thereunder in the ordinary course of business and in the same manner and on the same basis as if the Debtors performed and honored such obligations prior to the Petition Date.

3.       All banks are (a) authorized and directed to receive, process, honor and pay any and all checks drawn on the payroll, drafts and other forms of payment, including fund transfers, used by the Debtors on account of the Customer Programs, whether presented before, on or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments, (b) authorized to rely on the representations of the Debtors as to which checks are subject to this Motion, and (c) prohibited from placing any holds on, or attempting to reverse, any automatic transfers on account of the Customer Programs; provided that the Debtors are authorized to issue new postpetition checks to replace any checks, drafts and other forms of payment, or effect new postpetition fund transfers, which may be inadvertently dishonored or rejected and to reimburse any expenses that may be incurred as a result of any bank's failure to honor a prepetition check.

4.       The Debtors are authorized, but not directed, to continue, renew, replace, modify and/or terminate such of its Customer Programs as they deem appropriate, in their discretion, and in the ordinary course of business, without further application to the Court.

5.       The provisions contained herein shall not be construed to limit, or in any way affect, the Debtors' ability to contest any claims, on any ground permitted by applicable law,

and neither the provisions contained herein, nor any actions or payment made by the Debtors pursuant to the Final Order, shall be deemed an admission as to the validity of the underlying obligation or a waiver of any rights the Debtors may have to subsequently dispute such obligation on any ground that applicable law permits.

6.      Nothing in the Final Order or the Motion shall be deemed to constitute postpetition assumption, reaffirmation or adoption of any agreement under Bankruptcy Code section 365. Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

7.      The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

8.      Notwithstanding Bankruptcy Rule 6004(h), the Final Order shall be effective and enforceable immediately upon entry hereof.

9.      The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

10.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in the Final Order.

11.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Final Order.

Dated: Wilmington, Delaware
_____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

3