IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

In re:                    :    Chapter 11
                    :

DENDREON CORPORATION, et al.,    :    Case No. 14-12515 (___)
                    :

           Debtors.[1]    :    Joint Administration Pending
                    :
                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363, 507(a), 541, 1107(a) AND 1108, AND FED. R. BANKR. P. 6003 AND 6004, TO, *INTER ALIA*, (I) AUTHORIZE, BUT NOT DIRECT, THE DEBTORS TO PAY PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS; (II) AUTHORIZE, BUT NOT DIRECT, THE DEBTORS TO CONTINUE CERTAIN EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE; AND (III) DIRECT ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF <u>PREPETITION EMPLOYEE OBLIGATIONS</u>**

        The debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), hereby move (this "<u>Motion</u>") this Court for entry of interim and final orders (the "<u>Interim Order</u>" and "<u>Final Order</u>," respectively), pursuant to sections 105(a), 363, 507(a)(4), 507(a)(5), 541, 1107(a) and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"): (i) authorizing, but not directing, the Debtors to (a) pay or otherwise honor various prepetition employee-related obligations, including, but not limited to, wages, salaries, reimbursable employee expenses and employee benefits, and (b) continue on a postpetition basis certain of the Debtors' employee benefit plans and programs in effect immediately prior to the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

filing of these bankruptcy cases; (ii) directing all banks to honor prepetition checks for payment of the Debtors' prepetition employee-related obligations; and (iii) granting related relief as further described herein. In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration of Robert L. Crotty in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), filed with the Court concurrently herewith. In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The legal predicates for the relief requested herein are sections 105(a), 363(b), 507(a)(4), 507(a)(5), 541, 1107(a) and 1108 of the Bankruptcy Code, and Bankruptcy Rules 6003 and 6004.

3.     Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

4.     On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5.      The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

7.      The Debtors and their non-debtor affiliates are biotechnology companies focused on the discovery, development and commercialization of novel therapies to significantly improve treatment options for cancer patients. The Debtors are primarily focused on commercializing PROVENGE® in the United States and around the world. PROVENGE is a first-in-class immunotherapy used to treat patients suffering from advanced-stage prostate cancer, which is the most common non-skin cancer and the second-leading cause of cancer deaths among men in the United States.

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, their capital raising and restructuring activities and the events leading to the Debtors' decision to file the Chapter 11 Cases, is set forth in detail in the First Day Declaration.[2]

## RELIEF REQUESTED

9.      By this Motion, the Debtors request entry of the Interim Order and the Final Order, pursuant to Bankruptcy Code sections 105(a), 363, 507(a)(4), 507(a)(5), 541, 1107(a) and 1108, and Bankruptcy Rules 6003 and 6004, authorizing, but not directing, the Debtors to (a) pending entry of a Final Order (i) pay and/or otherwise honor, as applicable, prepetition obligations to current employees (collectively, the "Employees"), including accrued

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

prepetition wages, salaries, paid time off (including vacation and sick leave), and other cash and non-cash compensation claims, except as otherwise set forth herein, (ii) honor and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off, severance, and employee benefit plans and programs (the most significant of which are described below) except as otherwise set forth herein, and to pay all fees and costs associated therewith, (iii) reimburse Employees for certain prepetition expenses incurred by such Employees on behalf of the Debtors in the ordinary course of business, (iv) pay any and all local, state and federal withholding and payroll-related taxes associated with the foregoing and relating to prepetition periods, and (v) pay any and all prepetition amounts due to temporary employees and independent contractors in the ordinary course of business (collectively (i) – (v), the "Prepetition Employee Obligations") and (b) pursuant to the Final Order, (i) pay amounts under the Field Commercial Incentive Compensation Plans, (ii) pay amounts under the Annual Bonus Plan (as defined herein), (iii) pay amounts under the Severance Plans and Retention Agreements (both as defined herein) and (iv) continue to honor and pay all other Prepetition Employee Obligations in the ordinary course of business during the Chapter 11 Cases. Following entry of the requested Interim Order and prior to the entry of the Final Order (the "Interim Period"), no Employee will receive payments in amounts in excess of the $12,475 priority cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Priority Cap").

10.     To assist in implementing the relief requested, the Debtors also request an order (i) authorizing and directing the Debtors' banks to receive, process, honor and pay all of the Debtors' prepetition checks and to fund transfers on account of any Prepetition Employee Obligations to the extent sufficient funds are available; (ii) authorizing, but not directing, the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of

4

the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected; and (iii) authorizing, but not directing, the Debtors to continue their ordinary course employee compensation, benefits and related programs described in this Motion during the Debtors' restructuring process.

11.    For the reasons set forth herein, the Debtors submit that the relief requested is in the best interest of the Debtors, their estates, creditors and other parties in interest, and therefore, should be granted.

## BASIS FOR RELIEF

12.    As of October 31, 2014, the Debtors employed approximately 698 Employees. Of these, 507 are salaried Employees and 191 are hourly Employees.[3] The Employees provide a variety of essential functions, including: sales and marketing, research and development (including with respect to clinical, regulatory, quality assurance and control, and manufacturing or production matters), general and administrative (including with respect to executive, finance, legal, human resources, corporate communications, information technology and operations matters). Retaining the Employees, whose skills and understanding of the Debtors' operations and infrastructure are essential to the effective operation of the Debtors' businesses, is critical to the Debtors' ability to operate and maximize value in these Chapter 11 Cases.

13.    In Part A(I) of this Motion, the Debtors describe and seek authority, but not direction, to pay Employees' prepetition and postpetition wages, salaries, commissions and bonuses. In Part A(II) of this Motion, the Debtors describe their paid time off and expense reimbursement programs and request authority, but not direction, to continue each of these

---

[3]    In addition, as of November 6, 2014, the Debtors utilized the services of approximately 83 temporary employees and independent contractors, which are discussed more fully herein.

programs and pay prepetition and postpetition amounts thereunder. In Part A(III), the Debtors

describe and request authority, but not direction, to pay the prepetition and postpetition wages of

temporary employees and independent contractors. In Part B of this Motion, the Debtors describe

and seek authority, but not direction, to pay certain prepetition amounts under their healthcare,

insurance and other employee benefit programs and continue those programs during the

postpetition period. Part B(I) sets forth the Debtors' medical and insurance benefit plans and their

obligations thereunder. Part B(II) addresses other benefit plans and programs that the Debtors

provide for their Employees. Finally, in Part C of this Motion, the Debtors ask this Court to

direct banks to honor checks for the payment of the Prepetition Employee Obligations until

further order of this Court.

**A.      Authorizing, But Not Directing, Payment of Prepetition Employee Obligations
(I) Employee Compensation: Wages, Salaries, Commissions and Related Payroll
Taxes**

14.      <u>Wages and Salaries</u>. In the ordinary course of business, the Debtors pay all

of their Employees on a bi-weekly basis, every other Friday, one week in arrears. For the month

of October 2014, the Debtors' monthly payroll obligation (excluding any amounts paid in

connection with the Debtors' commissions, bonus,[4] severance and retention programs) was

approximately $6.1 million, including payroll taxes and processing fees.

---

[4]      The Debtors also offer certain Employees a signing bonus (the "<u>Signing Bonus</u>") and an employee referral
bonus (the "<u>Referral Bonus</u>") in the ordinary course of business. In order to be entitled to the Signing Bonus, the
eligible Employee must remain employed by the Debtors until the date specified in their offer letter. The
Signing Bonus varies based on the particular circumstances related to the Employee being hired. As of the
Petition Date, there is one (1) outstanding signing bonus of $5,000, which is due to be paid on November 13,
2014. The Debtors Referral Bonus program provides payment to an Employee for recommending a candidate
for hire. In order to be entitled to the Referral Bonus, the referred Employee must be employed by the Debtors
for ninety (90) days. The Referral Bonus is $5,000 per referral. As of the Petition Date, nine (9) Employees will
be entitled to a Referral Bonus postpetition if the referred Employee remains employed on the relevant date, for
a total aggregate amount of $45,000. The Debtors request authority, but not direction, to continue the Signing
Bonus and Referral Bonus programs in the ordinary course of business, and to pay the amounts with respect

*(cont'd)*

15. The Debtors' payroll process is administered through ADP, Inc. ("ADP"). The Debtors send ADP the net payroll amount two (2) days before each payroll date and then send employee tax obligations to ADP one (1) day before each payroll date. ADP initiates electronic fund transfers or issues checks to Employees,[5] remits payroll taxes to government agencies and handles garnishments as necessary.

16. On November 7, 2014, the Debtors made their most recent company-wide payroll, which was disbursed by ADP to Employees through electronic funds transfer and checks. As such, the Debtors believe that, other than as noted herein, no Employee has a claim for payment against the Debtors in excess of the Priority Cap on account of Prepetition Employee Obligations.

17. Commissions. Approximately 100 of the Debtors' field-based sales Employees receive commissions that are paid on a quarterly basis (the "Commissioned Employees") under the Debtors' Field Commercial Incentive Compensation Plans ("FCICP"). Amounts payable to Commissioned Employees under the FCICP depend upon the Employees' performance during the quarter, with various incentive components under the FCICP being designed to reward the Commissioned Employees for business growth – including (but not limited to) through the number of infusions of PROVENGE – and to align such Employees' interests with the operational goals and objectives of the Debtors. In addition to meeting performance requirements, Commissioned Employees must remain employed with the Debtors through the end of the quarter to be eligible to receive payment under the FCICP. Commissions paid under the FCICP are an integral part of the aggregate compensation package for

_____

(cont'd from previous page)
thereto if the requisite conditions are met, provided that no amounts will be paid on account of the Signing Bonus and Referral Bonus in excess of the Priority Cap prior to entry of the Final Order.

[5] Approximately 11 Employees are paid by check.

Commissioned Employees and provide substantial value to the Debtors' estates because they encourage such Employees to achieve important performance goals.

18.     The Debtors' average quarterly obligation under the FCICP (based on amounts paid in the ordinary course over the last twelve-month period) is approximately $1.8 million. As of the Petition Date, the Debtors do not owe amounts due for the fourth quarter portion of the FCICP, but a portion of the fourth quarter commissions will cover a period of time prior to the Petition Date. The fourth quarter commissions will likely be paid in February 2015. The Debtors estimate that the maximum prepetition portion of the fourth quarter commissions is approximately $880,000. Amounts due to nearly all of the Commissioned Employees for the prepetition portion of the fourth quarter are below the Priority Cap. The FCICP is critical to maintaining the morale and productivity of the Debtors' sales force and to maximizing the value of the Debtors' estates. The Debtors, therefore, request authority to continue the FCICP in the ordinary course of business and, pursuant to the Final Order to, at their discretion, honor prepetition commissions under the FCICP, including amounts in excess of the Priority Cap.

19.     Bonus. In the ordinary course of business, the Debtors maintain an annual incentive plan designed to reward non-sales Employees for helping the business achieve certain goals (the "Annual Bonus Plan"). Approximately 600 Employees are eligible to participate in the Annual Bonus Plan, the vast majority of which are not involved in the management of the Debtors' business. The Compensation Committee of the Board of Directors determines specific targets for Employees eligible for the Annual Bonus Plan. In 2014, the Debtors aimed to achieve four (4) goals with respect to sales, cash flow, achieving certain business initiatives, and maintaining industry standards. If the 100% target is reached with respect to the 2014 goals, the

Debtors estimate that approximately $6.7 million will be due to eligible Employees in February 2015.[6]

20.     The Debtors are not seeking authority to pay amounts under the Annual Bonus Plan pursuant to the Interim Order. However, the Annual Bonus Plan was promised to Employees for assisting the Debtors in reaching their goals and to reward personal achievements. Payment of bonuses under the Annual Bonus Plan is critical to maintaining the productivity and morale of the participants and to maximizing the value of the Debtors' estates. The Debtors, therefore, request authority pursuant to the Final Order to make all payments pursuant to the Annual Bonus Plan in the ordinary course of business, including amounts that exceed the Priority Cap.

21.     <u>Social Security, Income Taxes and Other Withholding</u>. In connection with paying wages and salaries, the Debtors and/or ADP routinely withhold from Employee payroll disbursements amounts that the Debtors are required to transmit to third parties. Examples of such withholding include, without limitation, FICA (Social Security and Medicare), federal, state and local income taxes, garnishments, health care payments and certain voluntary payroll deductions. Typically, total payroll taxes are approximately $2.2 million per month, including both the Debtors' obligations (which are, on average, approximately $360,000 per month) and

---

[6]     Prior to the Petition Date, in order to address Employee unrest, stabilize the workforce and demonstrate the Debtors' commitment, the Debtors prepaid a portion of the Annual Bonus Plan amounts that will be due in the ordinary course of business in February 2015. Specifically, eligible Employees received a 30% prepayment of the 100% target under the Annual Bonus Plan. The aggregate amount of prepayments made pursuant to the Annual Bonus Plan was approximately $2.8 million. Awards to vice presidents and executive vice presidents are subject to clawback in the event that the eligible Employee's employment terminates upon the earlier of a consummated sale transaction or February 28, 2015. The Debtors are also party to retention agreements with certain key employees. Total payments under these agreements are approximately $2.2 million, all of which were made prior to the Petition Date. Such payments (less taxes paid by the Employees) are subject to repayment in the event that the Employees voluntarily resign or are terminated for cause prior to the completion of a transaction.

the Employees' obligations (which are, on average, approximately $1.8 million per month).[7]

Such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys

held in trust and, therefore, are not property of the Debtors' bankruptcy estates. As noted above,

because the Debtors made their most recent company-wide payroll on November 7, 2014,

amounts owed to Employees on account of prepetition payroll is minimal. However, certain

Employees who are eligible for shift differential or overtime pay may have such amounts

outstanding for hours worked on the Petition Date. Such amounts are difficult to estimate, but are

likely below the Priority Cap. As a result, payroll taxes would also be outstanding on account of

these prepetition payroll obligations. The Debtors hereby request authority to direct such trust

funds to the appropriate parties when such amounts are due.

22.     By this Motion, the Debtors seek authority, but not direction, to pay and/or

otherwise honor (during the Interim Period) in the ordinary course of business the outstanding

amounts owed as of the Petition Date for accrued and unpaid wages and salaries, including all

amounts that the Debtors are required by law to withhold from Employee payroll disbursements

in respect of federal, state and local income taxes, garnishment contributions, social security and

Medicare taxes.

**(II) Other Employee Compensation: Paid Time Off and Expense Reimbursement**

23.     In addition to salaries and wages, the Debtors offer their Employees other

forms of compensation, including paid time off and reimbursement of certain business expenses.

These forms of compensation are usual and customary and necessary if the Debtors are to retain

qualified Employees to maximize the value of the Debtors' business. Accordingly, the Debtors

request authority, but not direction, to honor outstanding prepetition obligations with respect to

---

[7]    Estimates set forth herein with respect to the Debtors' average payroll taxes are calculated based on amounts
paid from January through October 2014.

10

the policies that provide for such other forms of compensation during and after the Interim

Period in the ordinary course of business, and subject to the Debtors' discretion and applicable

restrictions under the Debtors' policies.

        24.    <u>Paid Time Off</u>. Specifically, the Debtors' Employees are eligible to receive

paid time off (the "<u>Paid Time Off</u>").[8] The Debtors' Paid Time Off policies are described in more

detail immediately below.

a)  <u>Holidays</u>. The Debtors designate ten (10) scheduled holidays per year (the "<u>Company Holidays</u>"). Regular, full-time non-shift[9] Employees receive the Company Holidays and two (2) days of floating holidays. Regular shift Employees are eligible for ninety-six (96) hours of floating holiday, which may be taken for Company Holidays, observance of a scheduled holiday within a week of that holiday, holidays that are not Company Holidays, an Employee's birthday, anniversary or religious observances. Part-time Employees are eligible for the Company Holidays and two (2) floating holidays.

b)  <u>Vacation</u>. Regular full-time and part-time Employees are eligible to earn paid time off for vacation. Employees accrue vacation time based on the number of years of service and the number of hours worked as shown below.[10]

| Length of Service | Accrual Per Year |
|---|---|
| Through end of 4th year | 15 days/120 hours |
| Between 5 and 10 years | 20 days/160 hours |
| 10+ years | 25 days/200 hours |

Part-time Employees accrue a pro-rated amount of vacation based on the number of hours the Employee is regularly scheduled to work. Vacation time accrues on a per-pay-period basis, and accrued, unused vacation time is carried over from year to year up to a maximum of 240 hours. Employees who terminate their employment with the Debtors are entitled to receive payment for accrued but unused vacation days. As of October 31, 2014, the Debtors estimate that the value of accrued and unused or unpaid vacation time equals approximately $4.6 million.

---

[8]   Employees are eligible for Paid Time Off if they are full-time Employees or part-time Employees who are regularly scheduled to work between 24 and 35 hours per week.

[9]   To meet the needs of their business, particularly with respect to departments that are critical to the production of PROVENGE, the Debtors have utilized a shift policy in the ordinary course of business. Management determines who is an eligible shift Employee, and schedules are determined by management and approved by an Employee's department head and human resources.

[10]   For service between 0 and 10 years, the vacation accrual for vice presidents is 160 hours per year. For 10 or more years of service, the accrual is 200 hours per year.

c) <u>Sick Days</u>. Most eligible Employees are entitled to seven (7) paid sick days per year, while eligible Employees working in Seattle are entitled to nine (9) paid sick days per year pursuant to city ordinance.[11] Part-time Employees receive pro-rated sick leave in proportion to their regular work schedule.

25.     By this Motion, the Debtors seek authority, but not direction, to honor all prepetition obligations with respect to the Paid Time Off policies (including accrued vacation pay) during and after the Interim Period in the ordinary course of business, and subject to the Debtors' discretion and applicable restrictions under the Debtors' policies.

26.     <u>Expense Reimbursement</u>. In the ordinary course of business, the Debtors routinely reimburse Employees or pay credit card invoices on behalf of Employees for certain approved, reasonable expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies, miscellaneous business expenses and relocation expenses[12] (collectively, the "<u>Reimbursable Expenses</u>"). Accordingly, the Reimbursable Expenses are incurred by Employees with the understanding that they will be reimbursed by the Debtors. The Debtors' ability to pay the Reimbursable Expenses has a significant effect on the Debtors' sales force, which is the life blood of the Debtors' business. Specifically, the sales force is on the road incurring expenses in support of their sales of PROVENGE, the Debtors' primary source of revenue, and, thus, the Debtors believe that payment of the Reimbursable Expenses is important to the morale of the Debtors' workforce, which, in turn, is critical to maximizing the value of the estates. The

---

[11]   Seattle employees are also entitled to carry over unused sick days up to 144 hours, but such amounts are not paid out upon termination.

[12]   The Debtors offer certain Employees relocation assistance (the "<u>Relocation Assistance Program</u>"). Benefits under the Relocation Assistance Program include reimbursement of certain expenses related to home sale, new home search, new home purchase and moving costs, among others. The Debtors currently have two (2) relocations in progress. The Relocation Assistance Program is administered through a third-party. The Debtors seek authority, but not direction, to continue the Relocation Assistance Program, and to pay any amounts due to the Employees and the third-party provider, in the ordinary course of business postpetition. Certain of these amounts have not yet become due and payable as of the Petition Date.

Reimbursable Expenses represent a relatively minimal cost to the Debtors' estates in light of the overall benefits achieved.

27.     Most charges, credits and payments for Reimbursable Expenses are administered by, and flow through, Concur, an online expense reimbursement software program.[13]  In particular, Employees submit expense reports through Concur. Some Employees are issued a corporate American Express credit card to pay for Reimbursable Expenses. The Debtors only pay for the Reimbursable Expenses charged to the Employee's corporate American Express card after the Employee's expense report is approved by the Employee's manager. After all requisite approvals by the Debtors and Concur's own audit, the Debtors pay Concur for charged amounts, and then Concur pays American Express on behalf of the Debtors. If Employees incur Reimbursable Expenses other than on an American Express card, the Debtors pay Concur and Concur pays the Employee directly.

28.     Certain prepetition Reimbursable Expenses may not have been paid as of the Petition Date because, among other reasons, Employees had not yet submitted a request for reimbursement or approval of an expense report was still pending. Because Employees do not always submit claims for reimbursement promptly, there may be a lag time between the time expenses are incurred and the time expenses are reimbursed, and because there is a review period, it is difficult for the Debtors to determine with precision the actual amount of incurred but not reported Reimbursable Expenses as of any particular time. The average aggregate monthly amount expended by the Debtors for Reimbursable Expenses is approximately $600,000, which is primarily related to expenses incurred by Employees in sales-related functions.

---

[13]    The Debtors reimburse eligible field-based Employees for vehicle costs and mileage through a separate third-party vendor, Runzheimer. The Debtors are unaware of any prepetition amounts due. The Debtors request authority, but not direction, to continue the mileage reimbursement program in the ordinary course of business and to pay any outstanding amounts related thereto, including with respect to administration fees.

29.     In addition, the Debtors pay a monthly fee to Concur, which, including a fee for their audit service, totals approximately $18,000 per month. The Debtors do not believe any amounts are owed to Concur as of the Petition Date. Out of an abundance of caution, however, the Debtors request authority to pay any such prepetition amounts owing to Concur.

30.     It would be inequitable to require the Employees to personally bear the cost of any approved, business-related expenses incurred in furtherance of their responsibilities to the Debtors. Accordingly, to avoid harm to the Employees, the Debtors seek authority, but not direction, to pay all outstanding prepetition Reimbursable Expenses and to continue their expense reimbursement policy during and after the Interim Period in the ordinary course of business and subject to the Debtors' discretion and applicable restrictions under the Debtors' policies.

**(III) Other Prepetition Employee Obligations: Temporary Employees and Independent Contractors**

31.     The Debtors supplement their work force by utilizing the services of temporary employees (the "Temporary Employees") and independent contractors (the "Independent Contractors"). As of November 6, 2014, approximately seventy-three (73) Temporary Employees and ten (10) Independent Contractors were utilized by the Debtors. Within the Debtors' manufacturing facilities, the Debtors do not hire any Employees directly. Instead, the Debtors utilize staffing agencies, which place Temporary Employees with the Debtors, who receive training over a ninety (90) day period. If a position is open at the end of that period, the Temporary Employee is then hired directly by the Debtors. These Temporary Employees are critical to the Debtors' manufacturing process. The Temporary Employees are employed through third-party agencies whom the Debtors directly pay for the Temporary

Employee services. As of the Petition Date, the Debtors estimate that approximately $80,000 is accrued but not outstanding with respect to the Temporary Employees.

32.     The Independent Contractors provide professional services to the Debtors, including with respect to public relations, consulting and clinical research. The Independent Contractors are paid directly by the Debtors when invoiced for services performed. As of the Petition Date, the Debtors believe that no amounts are outstanding with respect to the Independent Contractors.

33.     Failure to pay amounts due to Temporary Employees and Independent Contractors may jeopardize the Debtors' ability to maintain their services on a postpetition basis, which would be severely detrimental to the Debtors' business and, in particular, the manufacturing process. Therefore, the Debtors request authority, but not direction, to continue utilizing the services of the Temporary Employees (through the staffing agencies) and the Independent Contractors in the ordinary course of business and to pay any prepetition amounts with respect thereto.

**B.      Authorizing, But Not Directing, Payment of Prepetition Employee Benefits and the Continuation of Employee Benefit Programs in the Ordinary Course of Business**

**(I) Medical and Insurance Benefit Plans**

34.     In the ordinary course of business, the Debtors have established various standard and customary plans and policies to provide their Employees with (a) health benefits, including medical, prescription drug, dental and vision benefits (collectively, the "Health Insurance Benefits"), and (b) insurance benefits,[14] including short and long-term disability, life

---

[14]   The Debtors also maintain workers' compensation insurance for the benefit of their Employees, the terms of which are described in the Debtors' Motion For Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 1107 And 1108, And Fed. R. Bankr. P. 6003 And 6004 Authorizing Debtors To (I) Maintain Existing Insurance

*(cont'd)*

insurance and accidental death and dismemberment insurance (together with the Health

Insurance Benefits, the "Medical and Insurance Benefits").

35.     Health Insurance Benefits. The Debtors offer self-insured medical plans

and prescription drug plans that are administered by Connecticut General Life Insurance

Company ("Cigna").[15] With respect to the medical and prescription drug plans, the Debtors pay

an average of approximately $76,000 per month to Cigna for administering the plans and a stop-

loss policy, and approximately $717,000 per month to Cigna for claims.[16] The Debtors also offer

a self-insured dental plan administered by Delta Dental ("Delta"), under which the Debtors pay

an average of approximately $5,700 per month to Delta for administering the plan and

approximately $61,000 to Delta for claims. Further, the Debtors offer a self-insured vision plan

administered by Vision Service Plan ("VSP"), under which the Debtors pay an average of

approximately $1,900 per month to VSP for administering the plan and approximately $8,200

per month to VSP for claims. Approximately 85 percent (85%) of the cost of each of the Health

Insurance Benefits is borne by the Debtors, while Employees contribute approximately 15

percent (15%) of the cost through payroll deductions.[17]

---

*(cont'd from previous page)*
> Policies And Pay All Insurance Obligations Arising Thereunder And (II) Renew, Revise, Extend, Supplement,
> Change or Enter Into New Insurance Policies, filed contemporaneously herewith.

[15]   Pursuant to prepetition severance agreements, the Debtors currently pay COBRA benefits for four (4) former
   Employees. Because the Debtors are self-insured and due to the delay in claims processing, the amount of
   money expended on account of these benefits cannot be estimated accurately as it depends on the claims
   accrued by the former Employees for a given period. By this motion, the Debtors seek authority, but not
   direction, to pay any prepetition COBRA obligations and to continue to offer COBRA coverage during and
   after the Interim Period in the ordinary course of business.

[16]   The Debtors also offer additional health insurance benefits to Employees traveling internationally through
   Cigna Global Health. The Debtors pay an annual premium of $5,700 for these services.

[17]   The Debtors will be transitioning to an 80/20 split with respect to two of its Cigna medical plans and a 90/10
   split with respect to its high deductible plan option for 2015.

36.     Because the Debtors are self-insured, and due to a lag in the processing of claims, certain amounts may be accrued but not outstanding on account of the Health Insurance Benefits. Such amounts are difficult to estimate at this time. Each of these plans is important to the maintenance of Employee welfare and morale and is therefore critical to the uninterrupted operation of the Debtors' business. The Debtors therefore request authority, but not direction, to pay benefits and administrative costs under the Health Insurance Benefits plans, and to continue their practices related to these plans during and after the Interim Period in the ordinary course of business.

37.     <u>Life and Accident Insurance Benefits</u>. The Debtors provide or offer certain Employees various non-health insurance benefits, including life, short and long-term disability and accident insurance benefits and plans. Certain insurance plans are provided at the expense of the Debtors as a benefit to their Employees. For example, the Debtors provide Employees with life insurance and accidental death and dismemberment insurance coverage (the "<u>Life and AD&D Plan</u>"). Insurance under the Debtors' Life and AD&D Plan is provided by Reliance Standard ("<u>Reliance</u>").[18] On average, the Debtors pay approximately $13,000 per month to Reliance under the Life and AD&D Plan. In addition, the Debtors provide long-term disability insurance (the "<u>LTD Plan</u>") and short-term disability insurance (the "<u>STD Plan</u>") to Employees, also through Reliance. The Debtors pay premiums of approximately $14,000 per month under the LTD Plan and approximately $21,000 per month under the STD Plan.

---

[18]     Approximately fourteen (14) Employees (vice presidents and above) are enrolled in an executive long-term disability plan (the "<u>Executive LTD Plan</u>") administered by Unum. The average monthly cost for the Executive LTD Plan is approximately $2,700. In addition, one (1) executive is enrolled in a life insurance plan administered by Pacific Life Executive Life Insurance (the "<u>Executive Life Insurance Plan</u>"). The annual premium for the Executive Life Insurance Plan is approximately $5,500. As of the Petition Date, no amounts are due under the Executive LTD Plan and the Executive Life Insurance Plan. The Debtors seek authority, but not direction, to continue the Executive LTD Plan and the Executive Life Insurance Plan in the ordinary course of business postpetition.

38.     As of the Petition Date, the Debtors believe that no amounts are due with respect to the Life and AD&D Plan, the LTD Plan and the STD Plan. Like the Health Insurance Benefits, these plans are critical to maintaining Employee morale. The Debtors request authority, but not direction, to pay benefits and administrative costs under the Life and AD&D Plan, LTD Plan and STD Plan, and to continue to pay for their policies and continue their practices related to these plans during and after the Interim Period in the ordinary course of business.

39.     Broker Fees. The Debtors use Kibble & Prentice ("Kibble") as their broker for Employee insurance benefits. The Debtors pay Kibble an annual fee of $160,000 on a quarterly basis for these broker services. The Debtors request authority, but not direction, to continue utilizing Kibble as their broker and pay broker fees in the ordinary course of business. The Debtors believe that, as of the Petition Date, no amounts will be outstanding on account of Kibble's broker services.

40.     Optional Insurance Benefits. The Debtors also make available to Employees, at the Employees' expense, certain additional insurance coverage. As of the Petition Date, such optional coverage includes supplemental (voluntary) life and AD&D insurance (the "Optional Plan"). The Optional Plan, for which insurance is also provided by Reliance, is fully funded by Employees. As such, the Debtors withhold monthly premiums for the Optional Plan, on a post-tax basis, from the payroll disbursements to Employees who elect to participate. On average, the aggregate monthly cost for all Employee premiums under the Optional Plan is approximately $12,500. The Debtors incur no out-of-pocket costs on account of the Optional Plan. The Debtors hereby request authority to continue the Optional Plan during and after the Interim Period in the ordinary course of business and, to the extent that the Debtors hold funds representing premiums withheld from Employees' paychecks in connection with the Optional

Plan, to remit such funds to Reliance during and after the Interim Period in the ordinary course of business.

### (II) Other Benefit Plans and Programs

41.    Savings Plan. The Debtors also maintain a 401(k) savings plan for Employees (the "Savings Plan") administered by Fidelity Investments. Under the Savings Plan, eligible Employees may elect to contribute up to the annual IRS dollar limit (which varies annually) to the Savings Plan, and the Debtors match 50% of each Employee's contribution up to a maximum of $4,000 per year. For the year ended December 31, 2013, the Debtors' contribution to the Savings Plan amounted to approximately $2.9 million. The Debtors pay an annual service fee of $35,000 in quarterly installments to Kibble, along with an annual audit fee of $15,000 in quarterly installments to Bader Martin CPA. The Debtors believe that no amounts will be outstanding on account of Employee contributions, matching contributions, servicing or audit fees as of the Petition Date. Out of an abundance of caution, however, the Debtors seek authority, but not direction, to pay any such obligations in the ordinary course of business.

42.    The Debtors believe that performing their obligations under the Savings Plan, including providing the prepetition matching contributions, is essential to maintaining Employee morale. Accordingly, the Debtors request authority, but not direction, to continue the Savings Plan and to pay any outstanding accrued obligations related to the Savings Plan during and after the Interim Period in the ordinary course of business.

43.    Flexible Spending Accounts. The Debtors also offer Employees the opportunity to use tax-advantaged flexible spending accounts for healthcare-related expenses and dependent care expenses (the "FSA") to use pre-tax dollars toward the payment of non-

reimbursed out of pocket medical expenses and dependent care expenses.[19] The Debtors deduct

Employee contributions from the participants' earnings and hold the contributions in an account.

The FSA participants submit claims to ADP, the claims administrator for the FSA, and ADP

notifies the Debtors of the Employee claims.[20] Upon receiving wire transfers from the Debtors,

ADP reimburses the Employees for the claimed amounts.

44.     On average, the aggregate monthly amount that is deducted from

participating Employees' payroll disbursements under the FSA is approximately $31,000. Further,

as of the Petition Date, the Debtors estimate that account balances under the FSA (that are not

subject to any claims) will total approximately $60,000 in the aggregate. By this Motion, the

Debtors seek authority, but not direction, to honor the prepetition account balances under the

FSA, including any administrative costs due to ADP, and to continue the FSA program, during

and after the Interim Period, in the ordinary course of business.

45.     <u>Tuition Reimbursement Program</u>. The Debtors provide a tuition

reimbursement benefit to Employees (the "<u>Tuition Reimbursement Program</u>"). Eligible

Employees may be reimbursed for tuition in approved coursework, up to a maximum of $2,000

per Employee per year for college or university-level coursework that is job-related, along with

$1,000 per year for laboratory expenses or books required for such courses. As of the Petition

Date, seven (7) Employees are participating in the Tuition Reimbursement Program. The Debtors

estimate that, as of the Petition Date, approximately $7,737 is accrued but not outstanding on

account of the Tuition Reimbursement Program. Consequently, the Debtors are seeking minimal

---

[19]   Certain Employees are enrolled in Health Savings Accounts related to the high deductible health insurance plan
       option. Such accounts are not held by the Debtors but, out of an abundance of caution, the Debtors seek to
       continue the Health Savings Accounts, including the Debtors' contributions, in the ordinary course of business.

[20]   Participants may use a debit card to pay for office visit copays and other qualifying expenses.

relief in order to maintain a benefit that is customarily offered in the industry. By this Motion, the Debtors request authority, but not direction, to continue the Tuition Reimbursement Program in their sole discretion and to make payments pursuant to the Tuition Reimbursement Program during and after the Interim Period in the ordinary course.

46.     Severance Plans. In addition to the Debtors' other benefit plans and programs, the Debtors provide severance pay to Employees under two (2) severance benefit plans (the "Severance Plans"). Under the Severance Plans, severance pay and benefits may be granted to eligible full-time Employees in particular circumstances. As of the Petition Date, there are no amounts due with respect to the Severance Plans. Out of an abundance of caution, however, the Debtors seek authority, but not direction, to pay prepetition obligations under the Severance Plans, and to continue the Severance Plans in the ordinary course of business postpetition; provided, however, that no terminated Employee will receive payment on account of any Prepetition Employee Obligations in excess of the Priority Cap prior to entry of the Final Order.

47.     Retention Program. In the ordinary course of business, the Debtors maintain a retention program for certain non-insider Employees (the "Retention Program") to induce and reward critical, highly-valued Employees to remain in the employment of the Debtors through a specified date. Thirteen (13) Employees are currently eligible for retention awards at various dates postpetition.[21] The Retention Program requires eligible Employees to continue to perform their job requirements satisfactorily and adhere to the Debtors' policies and procedures. Upon reaching the requisite date, if an eligible Employee has remained actively employed with

---

[21]   Five (5) of the Employees were given a two-part retention award, whereby a portion of the award has already been paid and only the remaining portion is due postpetition.

no break in service, then he or she is entitled to the retention award. The outstanding awards range from $17,500 to $60,000. As of the Petition Date, no amounts are outstanding under the Retention Program. An aggregate of approximately $442,000 will be due to eligible Employees at various postpetition dates between January 15, 2015 and April 30, 2015. The Debtors request authority, but not direction, pursuant to the Final Order, to make all payments under the Retention Program in the ordinary course of business.

## C.      Direction to Banks

48.      Finally, the Debtors seek an order authorizing and directing the financial institutions upon which any checks, drafts, electronic funds transfers, or wire transfers are drawn in payment of the Prepetition Employee Obligations – either before, on, or after the Petition Date – to honor all such checks or drafts issued, upon presentation thereof, or all such wire transfer instructions, upon receipt thereof, provided that sufficient funds are immediately available and on deposit in the applicable accounts. The Debtors also seek an order authorizing them to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected. The Debtors also request that any party receiving payment from the Debtors be authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by the requested relief.

49.      Continued payment, when due, of prepetition wages and salaries, and the continuation, without interruption, of compensation and benefit plans, policies, programs and practices underlying the Prepetition Employee Obligations and described herein is necessary to ensure the ongoing services of the Debtors' Employees during the Chapter 11 Cases.

## APPLICABLE AUTHORITY

50.     As a result of the commencement of the Chapter 11 Cases and in the absence of an order of the Court providing otherwise, the Debtors will be prohibited from paying or otherwise satisfying their Prepetition Employee Obligations, and the checks, wire transfers, and direct deposit transfers issued in respect of the Prepetition Employee Obligations will be dishonored. Failing to honor these obligations would have devastating consequences on the Debtors' restructuring efforts necessary to maximize the value of the Debtors' estates.

51.     Under section 363 of the Bankruptcy Code, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. 11 U.S.C. § 363. In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989). Payment of prepetition wage and salary claims to preserve and protect a debtor's business and maximize value of its estate and maintain positive employee morale, even if such payment were deemed to be outside the ordinary course of business, is a sufficient business justification for such an authorization. See Id. at 175. Accordingly, this Court should grant the requested relief under section 363 of the Bankruptcy Code.

52.     The Debtors believe that all of the amounts they seek to pay, pursuant to the Interim Order, during the Interim Period are entitled to priority under sections 507(a)(4) and (a)(5) of the Bankruptcy Code. Section 507(a)(4) of the Bankruptcy Code grants priority to employee claims for "wages, salaries, or commissions, including vacation, severance and sick leave pay" earned within 180 days before the filing of the applicable petition up to $12,475 per employee. 11 U.S.C. § 507(a)(4). Similarly, section 507(a)(5) of the Bankruptcy Code provides that claims for contributions to certain employee benefit plans are also afforded priority

23

treatment to the extent of the number of employees covered by each plan multiplied by $12,475, less any amounts paid pursuant to section 507(a)(4) of the Bankruptcy Code. 11 U.S.C. § 507(a)(5). Thus, granting the relief sought herein would affect only the timing, and not the amount, of payment of the Prepetition Employee Obligations to the extent they constitute priority claims.

53.     Even if a particular claim is not entitled to priority, payment is nonetheless justified under section 105(a) of the Bankruptcy Code and the well-established "necessity of payment doctrine."  Under the "necessity of payment doctrine" and section 105(a) of the Bankruptcy Code, courts have consistently permitted immediate payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors, specifically including payment of prepetition employee claims. See, e.g., Miltenberger v. Logansport C. & S.W. Ry. Co., 106 U.S. 286, 312 (1882) (stating that payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of . . . [crucial] business relations"); see also Gregg v. Metro Trust Co., 197 U.S. 183, 187 (1905) (stating that "the payment of the employees of the [rail]road is more certain to be necessary in order to keep it running than the payment of any other class of previously incurred debts"); In re Ionosphere Clubs, Inc., 98 B.R. at 175-76 (finding that payment of prepetition wages, salaries, reimbursable business expenses and health benefits to active employees of debtor airline authorized). "The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11." In re Just for Feet, Inc., 242 B.R. 821, 825 (Bankr. D. Del. 1999).

54.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d

Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims

if such payment was essential to the continued operation of the debtor. Id. (stating a court may

authorize payment of prepetition claims when there "is the possibility that the creditor will

employ an immediate economic sanction, failing such payment"); see also In re Motor Coach

Indus. Int'l, Inc., 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying a stay pending appeal

on the grounds that there is not a serious basis to challenge the doctrine of necessity in the Third

Circuit); In re Just for Feet, Inc., 242 B.R. at 824-825 (noting that the Third Circuit permits

debtors to pay prepetition claims that are essential to continued operation of business).

   55. The Debtors' ability to maximize value depends, in large part, upon the

motivation of the Employees. Most of the Debtors' Employees (and their families) are dependent

upon the wages, salaries, reimbursements and other benefits they receive from the Debtors. Any

disruption from Employee resignations or lack of morale could have devastating effects on the

Debtors' restructuring efforts. Moreover, payments which are critical to the morale of the

Debtors' workforce actually add value to the estates because an unplanned reduction in the

workforce or productivity could have significant effect on the Debtors' business operations.

Accordingly, it is critical that the Debtors be authorized to honor their Prepetition Employee

Obligations during and after the Interim Period, subject to the limitations described herein.

   56. Moreover, a portion of the Prepetition Employee Obligations constitutes

funds held in trust for payment to third parties. Specifically, under Bankruptcy Code section 541,

all prepetition legal or equitable interests of a debtor are considered property of the estate subject

to certain exclusions. Bankruptcy Code section 541(b)(7) explicitly excludes amounts withheld

by an employer from employee wages as employee contributions to employee benefit plans

under ERISA and health insurance plans under state law. Thus, the payment of the employee

contribution component of the employer taxes or payment of garnished wages will not prejudice the Debtors' estates because such withholdings are held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code. See Begier v. IRS, 496 U.S. 53, 57 (1990); In re Am. Int'l Airways, Inc., 70 B.R. 102, 103 (Bankr. E.D. Pa. 1987) (funds held in trust for federal excise and withholding taxes are not property of debtor's estate and, therefore, not available for distribution to creditors).

57.     Finally, the Debtors, operating their business as debtors in possession under Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

58.     Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

59.     Payment of the Prepetition Employee Obligations meets each element of the <u>CoServ</u> court's standard. First, it is critical that the Debtors honor their Prepetition Employee Obligations because the Employees may maintain priority claims against the Debtors for the Prepetition Employee Obligations. In addition, the efforts of Employees are necessary to the Debtors' efforts to maximize the value of their estates. Any failure by the Debtors to pay the Prepetition Employee Obligations would negatively impact the morale of the Debtors' Employees at a critical time for the Debtors and their business. Second, the potential harm and economic disadvantage that would result from the failure to pay the Prepetition Employee Obligations outweighs the actual amount of any prepetition claims that may be paid. The amount owed to the Debtors' hard-working Employees is small in comparison to the value that they add and will continue to add and preserve through their efforts to grow and maintain the Debtors' business. Finally, there is no practical or legal alternative to payment that would not cause a significant disruption of the Debtors' business operations.

60.     Finally, pursuant to this Motion, the Debtors are also seeking the entry of a Final Order authorizing, but not directing, the Debtors to pay amounts due under the FCICP Plan, the Annual Bonus Plan and any Prepetition Employee Obligations in excess of the Priority Cap imposed by section 507(a)(4) of the Bankruptcy Code. As discussed in further detail herein, the Debtors believe that the programs and benefits described herein are an integral part of the aggregate compensation package for Employees. In addition, the FCICP and the Annual Bonus Plan provide substantial value to the Debtors' estates because they encourage Employees to achieve important performance targets. The eligible Employees play a critical role in maximizing the value of the Debtors' business operations. As such, failure to pay the commissions and the bonuses under the FCICP and the Annual Bonus Plan, respectively, in the ordinary course of

business would negatively affect the morale and productivity of the Debtors' Employees and would undoubtedly impair the Debtors' ability to maximize the value of their estates in these Chapter 11 Cases.

61.    Courts in this district have routinely granted the same or similar relief as requested in this Motion to chapter 11 debtors. See, e.g., In re Energy Future Holdings Corp., Case No. 14-10979 (CSS) (Bankr. D. Del. May 2, 2014 and June 4, 2014) (granting interim and final relief); In re Savient Pharms., Inc., Case No. 13-12680 (MFW) (Bankr. D. Del. Oct. 16, 2013 and Nov. 19, 2013) (granting interim and final relief); In re Exide Techs., Case No. 13-11482 (KJC) (Bankr. D. Del. June 11, 2013 and July 11, 2013) (granting interim and final relief); In re Synagro Techs., Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. Apr. 25, 2013 and May 23, 2013) (granting interim and final relief); In re ICL Holding Co., Inc., Case No. 12-13319 (KG) (Bankr. D. Del. Dec. 13, 2012 and Mar. 15, 2013) (granting interim and final relief).[22]

62.    For all the reasons previously set forth herein, the Debtors submit that payment of the Prepetition Employee Obligations and the continuation of the specified related employment policies and programs are necessary to the success of the Debtors' orderly restructuring and should be authorized by this Court.

63.    As a precaution, the proposed Interim and Final Orders provide that the relief granted therein shall not constitute or be deemed an assumption of any of the employment

---

[22]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion. Copies of these orders, however, are available on request.

and service agreements to which the Debtors are a party or any of the Debtors' Employee benefit

policies, plans, programs, practices and procedures under section 365 of the Bankruptcy Code.[23]

### IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

64.     Bankruptcy Rule 6003 provides that the relief requested in this Motion

may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R.

Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla.

2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis

to avoid irreparable harm). The Third Circuit has interpreted the language "immediate and

irreparable harm" in the context of preliminary injunctions. In that context, the court has

instructed that irreparable harm is a continuing harm which cannot be adequately redressed by

final relief on the merits and for which money damages cannot provide adequate compensation.

See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 F. App'x 907, 910 (3d Cir. 2007) (citing

Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be

actual and imminent, not speculative or unsubstantiated. See, e.g., Acierno v. New Castle Cnty.,

40 F.3d 645, 653-55 (3d Cir. 1994). The Debtors submit that for the reasons already set forth

herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm

to the Debtors.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

65.     The Debtors also request that the Court waive the stay imposed by

Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the order,

---

[23]   Nothing contained in this Motion is intended or should be construed as an admission as to the validity of any
claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, applicability of any law, or an
approval or assumption of any agreement, contract or lease under Bankruptcy Code section 365.

unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that

the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without

interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request

that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent

nature of the relief sought herein justifies immediate relief.

## NOTICE

66.     Notice of this Motion shall be given to: (i) the U.S. Trustee, (ii) the

indenture trustee for the 2.875% Convertible Senior Notes due 2016, (iii) counsel to the

Unaffiliated Noteholders, (iv) counsel to the Deerfield Noteholders, (v) the parties included on

the Debtors' list of twenty (20) largest unsecured creditors and (vi) all parties entitled to notice

pursuant to Local Bankruptcy Rule 9013-1(m). The Debtors submit that, under the circumstances,

no other or further notice is required.

## NO PRIOR REQUEST

67.     No previous request for the relief sought herein has been made to this

Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim

Order and the Final Order, substantially in the forms annexed hereto, granting the relief

requested in this Motion and such other and further relief as may be just and proper.


Dated: Wilmington, Delaware
        November 10, 2014

                                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                */s/ Sarah E. Pierce*
                                Anthony W. Clark (I.D. No. 2051)
                                Sarah E. Pierce (I.D. No. 4648)
                                One Rodney Square
                                P.O. Box 636
                                Wilmington, Delaware 19899-0636
                                Telephone: (302) 651-3000
                                Fax: (302) 651-3001

                                - and -

                                Kenneth S. Ziman (*pro hac vice admission pending*)
                                Raquelle L. Kaye *(pro hac vice admission pending)*
                                Four Times Square
                                New York, New York 10036-6522
                                Telephone: (212) 735-3000
                                Fax: (212) 735-2000

                                - and -

                                Felicia Gerber Perlman (*pro hac vice admission pending*)
                                155 N. Wacker Drive
                                Chicago, Illinois 60606-1720
                                Telephone: (312) 407-0700
                                Fax: (312) 407-0411

                                Proposed Counsel for Debtors and Debtors in Possession

## EXHIBIT A

**Proposed Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re:                                                        :     Chapter 11
                                                              :
DENDREON CORPORATION, et al.,                                 :     Case No. 14-12515 (___)
                                                              :
            Debtors.[1]                                       :     Jointly Administered
                                                              :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x     **Related Docket No.**

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, 507(a), 541, 1107(a) AND
1108, AND FED. R. BANKR. P. 6003 AND 6004, TO, *INTER ALIA*, (I) AUTHORIZE,
BUT NOT DIRECT, THE DEBTORS TO PAY PREPETITION WAGES,
COMPENSATION AND EMPLOYEE BENEFITS; (II) AUTHORIZE, BUT NOT
DIRECT, THE DEBTORS TO CONTINUE CERTAIN EMPLOYEE BENEFIT
PROGRAMS IN THE ORDINARY COURSE; AND (III) DIRECT ALL BANKS TO
HONOR PREPETITION CHECKS FOR PAYMENT OF
PREPETITION EMPLOYEE OBLIGATIONS**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), for entry of an interim order (the "Order"), pursuant to

Bankruptcy Code sections 105(a), 363, 507(a)(4), 507(a)(5), 541, 1107(a) and 1108, and

Bankruptcy Rules 6003 and 6004: (i) authorizing, but not directing, the Debtors to (a) pay or

otherwise honor various prepetition employee-related obligations, including, but not limited to,

wages, salaries, reimbursable employee expenses and employee benefits, (b) continue on a

postpetition basis certain of the Debtors' employee benefit plans and programs in effect

immediately prior to the filing of these bankruptcy cases; (ii) directing all banks to honor

prepetition checks for payment of the Debtors' prepetition employee-related obligations; and (iii)

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon
        Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon
        Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle,
        Washington 98101.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the
        First Day Declaration.

2

granting related relief as further described therein; and upon the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby,

**ORDERED, ADJUDGED AND DECREED that::**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The final hearing on this Motion is set for _____ ___, 2014, at __:__ [a.m./p.m.] (prevailing Eastern Time). Any objections or responses to entry of the proposed Final Order shall be filed and served, so as to be received by 4:00 p.m. (prevailing Eastern Time) no later than seven (7) days prior to the final hearing, upon: (i) the Debtors, care of Dendreon Corporation, 200 Crossing Boulevard, Bridgewater, NJ 08807, Attention: Robert L. Crotty, (ii) proposed counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: Kenneth S. Ziman and 155 North Wacker Drive, Chicago, Illinois 60606, Attention: Felicia Gerber Perlman and One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Sarah E. Pierce (iii) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, (iv) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention: John C. Longmire, and (v) the U.S. Trustee.

3.      The Debtors are authorized, but not directed, to pay and/or honor (including to any third parties that provide or aid in the monitoring, processing or administration of the Prepetition Employee Obligations), in their discretion, the Prepetition Employee

Obligations, as and when such obligations are due and consistent with the Debtors' ordinary course of business; provided, however, pursuant to this Interim Order (i) no employee may receive payment of amounts in excess of the limits provided for under 11 U.S.C. §§ 507(a)(4) or 507(a)(5) and (ii) no amounts will be paid on account of the FCICP, the Annual Bonus Plan, and the Retention Program.

4.      The Debtors are authorized, but not directed, in their discretion, to honor and continue their expense reimbursement and employee obligations that were in effect as of the Petition Date, including, but not limited to, the Paid Time Off, Reimbursable Expenses, Relocation Assistance Program, Medical and Insurance Benefits, Savings Plan, FSA, Health Savings Account, and Tuition Reimbursement Program; provided, however, that such relief shall not constitute or be deemed an assumption or an authorization to assume any of such Prepetition Employee Obligations, including, policies, plans, programs, practices and procedures, under section 365(a) of the Bankruptcy Code.

5.      The Debtors' banks shall be and hereby are authorized and directed to receive, process, honor and pay all prepetition and postpetition checks and fund transfers on account of the Prepetition Employee Obligations that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments. The Debtors' shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

6.      The Debtors may pay any and all withholding, including social security, FICA, federal and state income taxes, garnishments, health care payments, retirement fund withholding and other types of withholding, whether these relate to the period prior to the date of the Debtors' chapter 11 filings or subsequent thereto.

7.      The Debtors are authorized, but not directed, in their discretion, to pay all processing fees associated with, and all costs incident to, the foregoing.

8.      Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Order.

9.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in the Motion or this Order shall be deemed: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion (including any exhibits attached thereto); (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) to create any rights in favor of, or enhance the status of, any claim held by any person or entity.

10.     Notwithstanding any other provision of this Order, the Debtors are not authorized to make, and no employee is authorized to receive any payments which may implicate the provisions of 11 U.S.C. § 503(c) pursuant to this Interim Order.

11.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

12.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

13.     Notwithstanding any applicability of any Bankruptcy Rules, the terms and conditions of the Order shall be immediately effective and enforceable upon its entry.

14.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

15.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

16.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.


Dated: Wilmington, Delaware
_____, 2014


_____
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT B**

**Proposed Final Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| DENDREON CORPORATION, et al., | : | Case No. 14-12515 (___) |
| | : | |
| Debtors.[1] | : | Jointly Administered |
| | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    **Related Docket No.**

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, 507(a), 541, 1107(a) AND 1108, AND FED. R. BANKR. P. 6003 AND 6004, TO, *INTER ALIA*, (I) AUTHORIZE, BUT NOT DIRECT, THE DEBTORS TO PAY PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS; (II) AUTHORIZE, BUT NOT DIRECT, THE DEBTORS TO CONTINUE CERTAIN EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE; AND (III) DIRECT ALL BANKS TO HONOR PREPETITION CHECKS FOR <u>PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS</u>**

Upon the motion (the "<u>Motion</u>")[2] of the Debtors for a final order (the "<u>Order</u>"), pursuant to Bankruptcy Code sections 105(a), 363, 507(a)(4), 507(a)(5), 541, 1107(a) and 1108, and Bankruptcy Rules 6003 and 6004: (i) authorizing, but not directing, the Debtors to (a) pay or otherwise honor various prepetition employee-related obligations, including, but not limited to, wages, salaries, reimbursable employee expenses and employee benefits, (b) continue on a postpetition basis certain of the Debtors' employee benefit plans and programs in effect immediately prior to the filing of these bankruptcy cases; (ii) directing all banks to honor prepetition checks for payment of the Debtors' prepetition employee-related obligations; and (iii) granting related relief as further described therein; and upon the First Day Declaration; and due

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the First Day Declaration.

and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby,

**ORDERED, ADJUDGED AND DECREED that:**

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized, but not directed to pay and/or honor (including to any third parties that provide or aid in the monitoring, processing or administration of the Prepetition Employee Obligations), in their discretion, the Prepetition Employee Obligations (including commissions under the Debtors' FCICP, bonuses under the Annual Bonus Plan, payments pursuant to the Severance Plans and payments pursuant to the Retention Program), as and when such obligations are due and consistent with the Debtors' ordinary course of business.

3.      The Debtors are authorized, but not directed, in their discretion, to honor and continue their expense reimbursement and employee obligations that were in effect as of the Petition Date, including, but not limited to, the Paid Time Off, Reimbursable Expenses, Relocation Assistance Program, Medical and Insurance Benefits, Savings Plan, FSA, Health Savings Account, Tuition Reimbursement Program, FCICP, Annual Bonus Plan, Severance Plans and Retention Program; provided, however, that such relief shall not constitute or be deemed an assumption or an authorization to assume any of such Prepetition Employee Obligations, including, policies, plans, programs, practices, and procedures, under section 365(a) of the Bankruptcy Code.

3

4.      The Debtors' banks shall be and hereby are authorized and directed to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Prepetition Employee Obligations that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments. The Debtors' shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

5.      The Debtors may pay any and all withholding, including social security, FICA, federal and state income taxes, garnishments, health care payments, retirement fund withholding and other types of withholding, whether these relate to the period prior to the date of the Debtors' chapter 11 filings or subsequent thereto.

6.      The Debtors are authorized, but not directed, in their discretion, to pay all processing fees associated with, and all costs incident to, the foregoing.

7.      Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this order.

8.      The Debtors are authorized and empowered, to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

9.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in the Motion or this Order shall be deemed: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion (including any exhibits attached thereto); (e) a request or authorization to assume any agreement,

4

contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver of the Debtors'

rights under the Bankruptcy Code or any other applicable law; or (g) to create any rights in favor

of, or enhance the status of, any claim held by any person or entity.

10.     No provision of this Order shall be construed as authority to make any

payment which is subject to the provisions of Bankruptcy Code section 503(c).

11.     The Court finds and determines that the requirements of Bankruptcy Rule

6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable

harm.

12.     Notwithstanding any applicability of any Bankruptcy Rules, the terms and

conditions of the Order shall be immediately effective and enforceable upon its entry.

13.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are

satisfied by the contents of the Motion.

14.     The Debtors are authorized and empowered to take all actions necessary to

implement the relief granted in this Order.

15.     This Court shall retain jurisdiction with respect to all matters arising from

or related to the implementation or interpretation of this Order.

Dated: Wilmington, Delaware
_____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE