IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
In re:                                            :        Chapter 11
                                                  :
DENDREON CORPORATION, et al.,                     :        Case No. 14-12515 (____)
                                                  :
            Debtors.[1]                           :        Joint Administration Pending
                                                  :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' MOTION FOR ORDER AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a) AND 1108 AND FED. R. BANKR. P. 6003 AND 6004

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby move (this "Motion") this Court for entry of an order under sections 105(a), 363(b), 364, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing, but not directing, the Debtors to make payments toward the prepetition fixed, liquidated and undisputed claims of certain critical vendors, subject to the conditions described herein. In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration of Robert L. Crotty in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), filed with the Court concurrently herewith. In further support of this Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent:

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

**JURISDICTION AND VENUE**

1.        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.        The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 364, 1107(a), and 1108, and Bankruptcy Rules 6003 and 6004.

3.        Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

**BACKGROUND**

4.        On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5.        The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.        To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

7.      The Debtors and their non-debtor affiliates are biotechnology companies focused on the discovery, development and commercialization of novel therapies to significantly improve treatment options for cancer patients. The Debtors are primarily focused on commercializing PROVENGE® in the United States and around the world. PROVENGE is a first-in-class immunotherapy used to treat patients suffering from advanced-stage prostate cancer, which is the most common non-skin cancer and the second-leading cause of cancer deaths among men in the United States.

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, their capital raising and restructuring activities and the events leading to the Debtors' decision to file the Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## RELIEF REQUESTED

9.      The Debtors continue to do business with  vendors whose goods and services are essential to the Debtors' operations (the "Critical Vendors"). The Debtors believe they have substantially paid in full any and all invoices that were due and payable prepetition to the Critical Vendors; however, out of an abundance of caution, to the extent that certain prepetition amounts remain outstanding, by this Motion, the Debtors seek entry of an order granting them authority to make payments on account of the prepetition claims of the Critical Vendors (the "Critical Vendor Claims"), on the terms set forth below. The Debtors estimate that they have approximately 117 Critical Vendors that are owed approximately $3 million. The Debtors wish to pay such Critical Vendors up to $3 million, to be allocated at the Debtors' discretion, in consultation with the advisors to the Unaffiliated Noteholders, without prejudice to

seek additional relief on an emergency basis, and subject to an agreement to receive terms consistent with Customary Trade Terms (as defined herein) from the Critical Vendors.[2]

10.    For the reasons set forth herein, the Debtors submit that the relief requested is in the best interest of the Debtors, their estates, creditors, and other parties in interest, and therefore should be granted.

## BASIS FOR RELIEF

11.    The Debtors believe that most of their vendors will continue to do business with the Debtors after commencement of the Chapter 11 Cases because doing so simply makes good business sense. The Debtors, however, anticipate that certain vendors that supply goods or services that are necessary to their businesses, will: (a) refuse to deliver goods and services without payment of their prepetition claims; (b) refuse to deliver goods and services on reasonable credit terms absent payment of prepetition claims, thereby requiring the Debtors to use even greater liquidity and increase their operating costs; or (c) suffer significant financial hardship, such that the Debtors' non-payment of their prepetition claims could have a significant negative impact on a Critical Vendor's business and therefore its ability to supply the Debtors with needed goods and services. Accordingly, the Debtors request the Court's authority to pay the prepetition Critical Vendor Claims because payment of such claims is necessary to an effective reorganization.

---

[2]    The Debtors will provide a list of Critical Vendors and amounts to be allocated to such Critical Vendors to the Court, the U.S. Trustee and any official committee of unsecured creditors appointed in the Chapter 11 Cases.

**A.      Payment Of The Critical Vendor Claims Is Essential To The Debtors' Continued Operations During The Chapter 11 Cases.**

12.      The Debtors are biotechnology companies focused on the discovery, development and commercialization of novel therapeutics that may significantly improve cancer treatment options for patients. As described more fully in the First Day Declaration, PROVENGE is the Debtors' first commercialized product approved by the United States Food and Drug Administration ("FDA"), and is a first-in-class cellular immunotherapy for the treatment of advanced stage, hormone resistant prostate cancer.

13.      Although the Debtors desire to resume normal business relationships with all vendors, and all vendors and their goods and services are important to the Debtors' business and operations, the immediate need to continue to provide uninterrupted service so that consumers can continue to have access to PROVENGE is the Debtors' foremost concern. Thus, the Debtors request authority to pay, in part or in full and in their discretion, the Critical Vendors for goods and services that are in short supply or of the utmost importance to ensuring delivery of treatments to patients.

14.      **Identification of Critical Vendors.** To ensure that the Debtors identified only those vendors/providers that are actually critical to the Debtors' businesses, employees and professionals of the Debtors, who are familiar with the Debtors' vendor relationships, extensively analyzed and reviewed the Debtors' immediate service needs and supplier base. In order to determine which of the Debtors' vendors are critical to the Debtors' businesses, the Debtors used the following criteria: (a) whether the vendor in question is a "sole source" provider; (b) whether quality requirements or other specifications prevent the Debtors from obtaining a vendor's products or services from alternative sources within a reasonable timeframe; (c) whether a

vendor meeting the standards of (a) or (b) is likely to refuse to ship product to the Debtors

postpetition if its prepetition balances are not paid; (d) whether a vendor would suffer significant

financial hardship absent the Debtors' payment of prepetition claims; (e) the degree to which

replacement costs (including, pricing, transition expenses, professional fees and lost sales of

future revenue) exceed the amount of a vendor's prepetition claim; (f) whether an agreement

exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

and (g) for foreign vendors specifically, whether the vendor lacks minimum contacts with the

United States such that the vendor may not be subject to the jurisdiction of this Court or the

provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business

operations, or may simply be confused by the chapter 11 process. The Debtors are confident that

this process has appropriately identified only those vendors that meet some or all of the

foregoing stringent guidelines and that, if the Debtors failed to pay for the vital goods and

services they provided prepetition, would likely cease to provide them in the future.

15.     Applying the criteria set forth above, the Debtors have determined that

certain specialty manufacturers and suppliers, couriers, clinical trial sites and foreign vendors are

critical to the continuation of their operations during the Chapter 11 Cases. Each party identified

by the Debtors as a Critical Vendor provides a service that, if interrupted or delayed, could

significantly impact the Debtors' businesses.

16.     **Specialty Manufacturers and Suppliers.** To conduct their businesses,

the Debtors rely on manufacturers and suppliers, many of which are sole-source providers and

are already familiar with the Debtors' businesses, for components used in the manufacture and

distribution of PROVENGE. Problems with any of the manufacturers and suppliers could result

in the failure to produce, or a delay in production, of adequate supplies of the antigen or other

components necessary to manufacture PROVENGE. This could delay or reduce commercial

sales and materially harm the Debtors' businesses as well as negatively impact patients relying

on this life prolonging treatment.

17.    Further, in order to ensure the quality of drug products, the FDA carefully

monitors drug manufacturer's compliance with its Current Good Manufacturing Practice

("CGMP") regulations. For the Debtors to remain in compliance with the CGMP regulations,

each of its manufacturers and suppliers must also be in compliance. The Debtors' current

manufacturers and suppliers have each passed the CGMP audit and certification. To replace any

of these vendors would require the Debtors to undertake an exhaustive review process to ensure

the manufacturing facilities and processes of the new prospective vendor were also in

compliance with the CGMP regulations. Such process would take anywhere from six to twelve

months to complete. The Debtors do business with all of their specialty manufacturers and

suppliers identified as Critical Vendors without the benefit of contracts and, therefore, these

Critical Vendors generally are not obligated to do business with the Debtors or to honor

particular trade terms for future orders. Absent some payment of the prepetition Critical Vendor

Claims, these manufacturers and suppliers may cease doing business with the Debtors.

18.    **Couriers.** In addition, the Debtors utilize highly specialized commercial

couriers for the transport of the patients' cell material and final PROVENGE product. The

commercial couriers used are familiar with the Debtors' businesses and are experienced with the

requirements and conditions necessary for the secure transport of the patients' cell material and

final PROVENGE product, both of which are highly perishable given the nature of biomaterials.

The final PROVENGE product must also be administered to the patient within eighteen hours of

manufacture. Therefore, these specialized commercial couriers are integral to the Debtors'

business because if the cell material or final PROVENGE product are not properly transported, the Debtors cannot provide a safe and effective product. In addition, the Debtors currently utilize the only two couriers that have the ability and footprint necessary to transport this type of material. These couriers are also subject to the CGMP regulations discussed above. A disruption to the transport would have a serious negative impact on the Debtors' ability to conduct its businesses and to ensure consumers are able to obtain access to PROVENGE.

19.     **Clinical Trial Sites.** In connection with the approval of PROVENGE, in the United States and in the European Union, the Debtors conduct post-approval clinical trials to continue gathering safety and efficacy information about the treatment, as well as for marketing purposes. In fact, the Debtors are subject to post-marketing regulatory requirements from both the FDA and the European Medicines Agency that require the Debtors to conduct clinical trials supporting the safety and efficacy of PROVENGE. Failure to complete these required trials could result in a withdrawal of the Debtors' marketing authorizations or approval. The Debtors are dependent on a finite number of clinical trial sites with the requisite skill, training, staffing and equipment to conduct PROVENGE clinical trials. Clinical trial sites are generally not obligated to enroll or maintain a minimum number of patients in a clinical trial. Difficulty enrolling or maintaining patients in sufficient numbers will delay or terminate ongoing trials, negatively impacting the Debtors' business and effectively withdrawing treatment from patients currently enrolled in trials. Absent payment of the Clinical Trial Sites' prepetition claims, the Clinical Trial Sites may cease enrollment of new patients. It is imperative, therefore, that the Debtors maintain working relationships with these clinical trial sites.

20.     **Foreign Vendors.**  Although the Debtors believe that many of their foreign suppliers of goods and services (collectively, the "Foreign Vendors") may continue to do

business with the Debtors after commencement of the Chapter 11 Cases, certain Foreign Vendors may not. Importantly, the Debtors only seek to pay the Critical Vendor Claims of the Foreign Vendors that to the best of the Debtor's knowledge lack minimum contacts with the United States and, thus, may not be subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations—particularly the automatic stay. The Debtors believe that there is material risk that the Foreign Vendors holding Critical Vendor Claims against the Debtors may consider themselves to be beyond the jurisdiction of this Court, disregard the automatic stay and engage in conduct that disrupts the Debtors' operations, or may simply be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures. Notably, Foreign Vendors that believe the automatic stay does not govern their actions may exercise self-help (if permitted under local law), which could include shutting down the Debtors' access to essential goods and services.

21.     Foreign Vendors may also sue the Debtors in a foreign court to recover prepetition amounts owed to them. If they are successful in obtaining a judgment against the Debtors, the Foreign Vendors may seek to exercise post-judgment remedies including seeking to attach the Debtors' foreign assets or withhold vital supplies and services from the Debtors. Since the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), their businesses could be irreparably harmed by any such action to the detriment of the Debtors' estate and creditors.

**B.      Proposed Terms And Conditions Of Payment Of The Critical Vendor Claims.**

22.     To preserve liquidity during the Chapter 11 Cases and ensure that they continue to receive vital goods and services, the Debtors propose to condition any payment on account of Critical Vendor Claims on entry into an agreement between the Debtors and the

individual Critical Vendor, under which such Critical Vendor shall continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within one hundred eighty (180) days of the Petition Date (the "Customary Trade Terms"). The Debtors, however, reserve the right to negotiate different trade terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, whether or not memorialized by a Trade Agreement (as defined herein), to the extent the Debtors determine that such trade terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

23.     The Debtors further propose that in the event the Debtors are making a payment pursuant to this Motion, the Debtors will send a letter, substantially in the form attached hereto as Exhibit A, to each of the Critical Vendors to which they are making such payment, along with a copy of the order granting this Motion (the "Order"), including, without limitation the following terms:

(a) The amount of such Critical Vendor's estimated claim, after accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for purposes of the Order and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

(b) The amount of payment toward the Critical Vendor's estimated claim;

(c) The Critical Vendor's agreement to be bound by the Customary Trade Terms, or such other trade terms as mutually agreed to by the Debtors and such Critical Vendor;

(d) The Critical Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay the Critical Vendor postpetition in accordance with such terms;

(e) The Critical Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their respective assets or property (real or personal) any lien (a "Lien") regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods or services provided to the Debtors prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary action to release such Lien;

(f) The Critical Vendor's acknowledgement that it has reviewed the terms and provisions of the Order and consents to be bound thereby;

(g) The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation or Bankruptcy Code section 503(b)(9) claims; and

(h) If a Critical Vendor who has received payment toward a Critical Vendor Claim subsequently refuses to supply goods or services to the Debtors on Customary Trade Terms, any payments received by the Critical Vendor on account of its Critical Vendor Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor, and that such Critical Vendor shall immediately repay to the Debtors any payments received on account of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of setoff or reclamation.

24.     Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms (the "Trade Agreement").[3] The Debtors hereby seek authority to enter into Trade Agreements with the

---

[3]     The Debtors' entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims and shall not constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor

Critical Vendors if the Debtors determine, in their discretion, that such an agreement is necessary to their postpetition operations.

25.      If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority, in their discretion and without further order of the Court but with notice to the affected Critical Vendor (i) to declare such Trade Agreement immediately terminated (if applicable) and (ii) to declare any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor without further order of the Court.

26.      In the event that the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation. In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry of the Order in the event a Trade Agreement is terminated or a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any payment toward its Critical Vendor Claim.

## APPLICABLE AUTHORITY

A.    **Section 105 Of The Bankruptcy Code And The Doctrine Of Necessity Supports Payment Of The Critical Vendor Claims.**

27.    The proposed payments of Critical Vendor Claims should be authorized pursuant to section 105 of the Bankruptcy Code and under the "doctrine of necessity."  The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in Miltenberger v. Logansport Ry. Co., 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. See id. at 311. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in Miltenberger. See In re Lehigh & New Eng. Ry. Co., 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the continued operation of the [debtor] in serious jeopardy.").

28.    The doctrine of necessity "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment); In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation

when essential to the continued operation of the debtor."); In re Eagle-Picher Indus., Inc., 124

B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured

creditor, a debtor must show that the payment is necessary to avert a serious threat to the Chapter

11 process.").

29.    The doctrine of necessity is an accepted component of modern bankruptcy

jurisprudence. See Just For Feet, 242 B.R. at 826 (approving payment of key inventory suppliers'

prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new

inventory on eve of debtor's key sales season); In re Payless Cashways, Inc., 268 B.R. 543, 546-

47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when

such suppliers agree to provide postpetition trade credit); see also In re Columbia Gas Sys., Inc.,

171 B.R. 189, 191-92 (Bankr. D. Del. 1994); In re Ionosphere Clubs, Inc., 98 B.R. at 175-76.

30.    As stated above, payment of the Critical Vendor Claims is essential to the

continued operation of the Debtors' businesses. In turn, the maintenance of the Debtors'

businesses during these Chapter 11 Cases is crucial to the Debtors' ability to pursue restructuring

alternatives and preserve going concern value for the benefit of all of the Debtors' stakeholders.

Accordingly, this Court should allow the payment of the Critical Vendor Claims as requested

herein.

**B.     Payment Of The Critical Vendor Claims Is Authorized Under Sections 363 And 364 Of The Bankruptcy Code.**

31.    The relief requested in this Motion is appropriate under Bankruptcy Code

sections 363 and 364. See In re UAL Corp., Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002)

(essential trade motion relying upon Bankruptcy Code section 363 is "completely consistent with

the Bankruptcy Code;" payments to critical trade vendors have further support when debtor seeks

"the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation"); Armstrong World Indus., Inc. v. James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (under section 363, court authorized contractor to pay prepetition claims of some suppliers who were potential lien claimants, because payments were necessary for general contractors to release funds owed to debtors, thus benefiting estate).

32.    Certain of the relief requested in this Motion contemplates payments to be made to the Critical Vendors who agree to provide materials, goods or services on Customary Trade Terms resulting in a benefit to the estate. As a result, the payment of such Critical Vendor Claims is consistent with and appropriate under Bankruptcy Code sections 363 and 364. As detailed above, the goods and services provided by the Critical Vendors are vital to the continued operations of the Debtors' businesses.

33.    In addition, as noted above, the Debtors have determined that the Foreign Vendors may take drastic action if their Critical Vendor Claims are not paid. Indeed, non-U.S. entities have occasionally asserted that they are not subject to the jurisdiction of a United States bankruptcy court and, as such, not subject to the automatic stay provisions of 11 U.S.C. § 362(a). Although the Debtors would vigorously dispute any such contention, the Foreign Vendors could stop shipping goods or providing services to the Debtors on a timely basis, and foreign governmental and other entities may take action to seize assets of the Debtors or refuse to release shipments of goods to the Debtors, on the basis of such assertions. Irrespective of the accuracy of any Foreign Vendor's belief that the automatic stay does not apply to these actions, the consequences of such actions would be severe and irreparable. Simply put, absent the goods and services of the Foreign Vendors, the operations of the Debtors would be thrown into disarray. Therefore, even if the Foreign Vendors' legal arguments are completely without merit, it is

unlikely that the Debtors could seek and obtain orders from all the appropriate foreign courts forcing such Foreign Vendors to discontinue the offending activities within the time frame necessary to avoid irreparable harm to the Debtors' businesses – particularly since injunctive relief may not be available in all jurisdictions. Indeed, the impact on the Debtors' businesses would be disproportionate to the amount of the Critical Vendor Claims paid to Foreign Vendors.

34.     In light of these factors, payment of the Vendor Claims to Foreign Vendors is plainly in the best interests of the Debtors' estate and their creditors. Accordingly, even if payment of the Vendor Claims to Foreign Vendors is deemed to be outside the ordinary course of business, there is a sufficient business justification for such payments. Thus, the Debtors respectfully submit that this Court should grant the requested relief under section 363 of the Bankruptcy Code.

**C.     Payment Of The Critical Vendor Claims Is Authorized Under Sections 1107(a) And 1108 Of The Bankruptcy Code.**

35.     The Debtors, operating their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

36.     Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

enhancement of the estate," and also when the payment was to "sole suppliers of a given

product." Id. at 498. The court provided a three-pronged test for determining whether a preplan

payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

37.    Payment of the Critical Vendor Claims meets each element of the CoServ

court's standard. As described above, the Debtors have narrowly tailored the Critical Vendor

Claims to encompass only those suppliers that are the sole source of a particular good or service

without which the Debtors' operations would be severely impacted or those suppliers or service

providers who are critical because the time and expense that would be involved in transitioning

to a new supplier would be prohibitive and would significantly disrupt the Debtors' businesses.

The potential harm and economic disadvantage that would stem from the failure of any of the

Critical Vendors to perform is grossly disproportionate to the amount of any prepetition claim

that may be paid. Finally, with respect to each Critical Vendor, the Debtors have examined other

options short of payment of Critical Vendor Claims and have determined that to avoid significant

disruption of the Debtors' operations there exists no practical or legal alternative to payment of

the Critical Vendor Claims. Therefore, the Debtors can only meet their fiduciary duties as

debtors in possession under Bankruptcy Code sections 1107(a) and 1108 by payment of the

Critical Vendor Claims.

38.     This Court has granted similar critical vendor relief in other cases. <u>See,</u> <u>e.g.</u>, <u>In re Exide Techs.</u>, Case No. 13-11482 (KJC) (Bankr. D. Del. June 11, 2013); <u>In re A123</u> <u>Sys., Inc.</u>, No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8, 2012); <u>In re WP Steel Venture LLC</u>, Case No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012); <u>In re Trident Microsystems, Inc.</u>, Case No. 12-10069 (CSS) (Bankr. D. Del. Jan. 5, 2012).[4]

## RESERVATION OF RIGHTS

39.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (e) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to this Motion.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

40.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; <u>see also</u> <u>In re First NLC Fin. Servs., LLC</u>, 382 B.R. 547, 549-50 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.

---

[4]     Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders, however, are available on request.

See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 F. App'x. 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994). The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

41.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### NOTICE

42.    Notice of this Motion shall be given to: (i) the U.S. Trustee, (ii) the indenture trustee for the 2.875% Convertible Senior Notes due 2016, (iii) counsel to the Unaffiliated Noteholders, (iv) counsel to the Deerfield Noteholders, (v) the parties included on the Debtors' list of twenty (20) largest unsecured creditors and (vi) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m). The Debtors submit that, under the circumstances, no other or further notice is required.

**NO PRIOR REQUEST**

43.     No previous request for the relief sought herein has been made to this

Court or any other court

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form annexed hereto, granting the relief requested in the Motion and such

other and further relief as may be just and proper.

Dated: Wilmington, Delaware
       November 10, 2014

                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                          */s/ Sarah E. Pierce*
                          Anthony W. Clark (I.D. No. 2051)
                          Sarah E. Pierce (I.D. No. 4648)
                          One Rodney Square
                          P.O. Box 636
                          Wilmington, Delaware 19899-0636
                          Telephone: (302) 651-3000
                          Fax: (302) 651-3001

                          - and -

                          Kenneth S. Ziman (*pro hac vice admission pending*)
                          Raquelle L. Kaye (*pro hac vice admission pending*)
                          Four Times Square
                          New York, New York 10036-6522
                          Telephone: (212) 735-3000
                          Fax: (212) 735-2000

                          - and -

                          Felicia Gerber Perlman (*pro hac vice admission pending*)
                          155 N. Wacker Drive
                          Chicago, Illinois 60606-1720
                          Telephone: (312) 407-0700
                          Fax: (312) 407-0411

                          Proposed Counsel for Debtors and Debtors in Possession

**<u>EXHIBIT A</u>**

**PROPOSED LETTER**

**EXHIBIT A**

_____, 2014

TO:    **[Critical Vendor/Service Provider]**
        **[Name]**
        **[Address]**

Dear Valued Supplier/Service Provider:

As you are aware, Dendreon Corporation and its subsidiaries (collectively, the "Company") filed voluntary petitions (the "Bankruptcy Cases") for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") on November 10, 2014 (the "Petition Date"). On the Petition Date, in recognition of the importance of its relationship with such vendors and suppliers and its desire that the Bankruptcy Case have as little effect on such parties as possible, the Company requested the Bankruptcy Court's approval to pay the prepetition claims of certain critical vendors and suppliers, and/or to otherwise allow such critical vendors and suppliers to apply postpetition payments made by the Company (for postpetition deliveries of goods and/or services) against the oldest outstanding prepetition invoices of such critical vendors and suppliers. On [•], 2014, the Bankruptcy Court entered an order (the "Order") authorizing the Company, under certain conditions, to pay the prepetition claims, in accordance with the terms of the Order, of certain trade creditors that agree to the terms set forth below and agree to be bound by the terms of the Order. A copy of the Order is enclosed for your reference.

Under the Order, in order to receive payment of its prepetition claim, each selected trade creditor must agree to continue to supply goods and/or services to the Company based on "Customary Trade Terms." In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), which were most favorable to the Company and in effect between such trade creditor and the Company on a historical basis for the period within one-hundred eighty (180) days of the Petition Date, or such other trade terms as mutually agreed to by the Company and such trade creditor.

For purposes of administering this trade program, as authorized by the Bankruptcy Court and in accordance with the terms of the Order, the Company and **[Name of Trade Vendor]** agree as follows (the "Agreement"):

(a)  The estimated balance of the prepetition trade claim (net of any setoffs, credits or discounts) (the "Trade Claim") that the Company will pay to **[Name of Trade Vendor]** is $_____. Your Trade Claim does not constitute a claim allowed by the Bankruptcy Court in the Bankruptcy Cases, and signing this

Trade Agreement does not excuse you from any requirement of filing a proof of claim in the Bankruptcy Cases.

(b)  The Company shall pay $_____ towards the Trade Claim (the "Payment").

(c)  **[Name of Trade Vendor]** agrees to supply goods/services to the Company in accordance with the Customary Trade Terms, and the Company agrees to pay **[Name of Trade Vendor]** in accordance with such terms, provided that following the Payment, **[Name of Trade Vendor]** will supply postpetition goods/services to the Company on net thirty (30) day terms.

For purposes of this paragraph (c), the term "net thirty (30) day terms," as the case may be, shall refer to the number of days from the date that the particular goods/services are received by the Company.

(d)  The open trade balance or credit line that **[Name of Trade Vendor]** will extend to the Company for shipment of postpetition goods/services is $_____.

(e)  In consideration for the Payment, you agree not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien") or claim for reclamation ("Reclamation Claim") or claim under Bankruptcy Code section 503(b)(9) (a "503(b)(9) Claim"), regardless of the statute or other legal authority upon which such Lien or Reclamation Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent you have already obtained or otherwise asserted such a Lien, Reclamation Claim or 503(b)(9) Claim, you shall take (at your own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim unless your participation in the trade payment program authorized by the Order (the "Trade Payment Program") is terminated.

Your execution of this Agreement and return of the same to the Company constitutes an agreement by **[Name of Trade Vendor]** and the Company:

1.      to be bound by the Customary Trade Terms (as modified herein) and, subject to the reservations set forth in the Order, to the amount of the Trade Claim set forth above;

2. that **[Name of Trade Vendor]** will continue to supply the Company with goods and/or services pursuant to the Customary Trade Terms (as modified herein) and that the Company will pay for such goods and/or services in accordance with the Customary Trade Terms (as modified herein);

3. that **[Name of Trade Vendor]** has reviewed the terms and provisions of the Order and that it consents to the bound by such terms, except as modified herein;

4. that **[Name of Trade Vendor]** will not separately seek payment for Reclamation Claims, 503(b)(9) Claims and similar claims outside of the terms of the Order unless its participation in the trade payment program authorized by the Order (the "Trade Payment Program") is terminated;

5. that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Trade Claim will be deemed to have been in payment of postpetition obligations owed to you and you will immediately repay to the Debtors any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense;

6. that the Company will agree to pay **[Name of Trade Vendor]** on net thirty (30) day terms in accordance with paragraph (c), hereinabove; and

7. that if the Company shall be in default under this Agreement, **[Name of Trade Vendor]** shall have no obligation to supply goods and/or services to the Company on Customary Trade Terms (as modified herein) until the Company cures such default and **[Name of Trade Vendor]** shall have the right to terminate this Agreement upon written notice to the Company detailing the Company's defaults hereunder (which the Company shall have the right to dispute) and the Company's failure to cure such default within five (5) business days of such notice, in which event **[Name of Trade Vendor]** may retain all sums paid to it hereunder on account of its Trade Claim.

The Company and **[Name of Trade Vendor]** also hereby agree that any dispute with respect to this Agreement, the Order and/or **[Name of Trade Vendor]**'s participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or our financial restructuring, please do not hesitate to call **[Contact Person]** at (___) ___-____.

Very truly yours,

Dendreon Corporation

By: _____
　　　　Name: **[Name]**
　　　　Title: **[Title]**

Agreed and Accepted by:

**[Name of Trade Vendor]**

By: _____
     Name: [**Name**]
     Title: [**Title**]

Dated:_____, 2014

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :    Chapter 11
                                              :
DENDREON CORPORATION, <u>et al.</u>,          :    Case No. 14-12515 (___)
                                              :
                Debtors.[1]                   :    Jointly Administered
                                              :
                                              :    **Related Docket No. ____]**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CERTAIN
CRITICAL VENDORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a),
AND 1108 AND FED. R. BANKR. P. 6003 AND 6004**

Upon the motion (the "<u>Motion</u>")[2] of the Debtors for an order, under Bankruptcy Code

sections 105(a), 363(b), 364, 1107(a) and 1108 and Bankruptcy Rules 6003 and 6004,

authorizing, but not directing, the Debtors to make payments toward the prepetition fixed,

liquidated and undisputed claims of certain critical vendors; and upon the First Day Declaration;

and due and sufficient notice of the Motion having been given under the particular

circumstances; and it appearing that no other or further notice need be provided; and it appearing

that the relief requested by the Motion is in the best interests of the Debtors' estates, their

creditors, and other parties in interest; and after due deliberation thereon; and sufficient cause

appearing therefor, it is hereby,

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon
      Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon
      Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle,
      Washington 98101.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motions or
      the First Day Declaration.

**ORDERED, ADJUDGED, AND DECREED that:**

1.        The Motion is GRANTED as set forth herein.

2.        The Debtors are authorized, but not directed, in their discretion to make payments toward prepetition Critical Vendor Claims as described herein in amounts not to exceed $3 million in the aggregate, to be allocated at the Debtors' discretion, in consultation with the advisors to the Unaffiliated Noteholders, without prejudice to seek additional relief on an emergency basis.

3.        The Debtors are authorized, but not directed, to undertake appropriate efforts to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in their discretion, that such an agreement is necessary to their postpetition operations.

4.        If a Critical Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of any payment on account of its Critical Vendor Claim (regardless of whether such Critical Vendor has entered into a Trade Agreement), or fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors may, with notice to the affected Critical Vendor and on or before the date on which any plan or plans of reorganization are confirmed in the Chapter 11 Cases, declare (i) such Trade Agreement immediately terminated (if applicable), and (ii) any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor.  Nothing herein shall constitute a waiver of the Debtors' rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

5.        Notwithstanding the foregoing, the Debtors may, in their sole discretion, reinstate a Trade Agreement if the underlying default under the Trade Agreement is fully cured by the

2

Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor of such default; or the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor.

6.      The Debtors' banks shall be and hereby are authorized and directed to receive, process, honor and pay all prepetition and postpetition checks and fund transfers on account of the Critical Vender Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments. The Debtors' shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Critical Vender Claims to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

7.      Nothing herein shall be construed to limit, or in any way affect, the Debtors' ability to dispute any Critical Vendor Claim.

8.      Nothing contained in this Order shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor or to require the Debtors to make any of the payments authorized herein.

9.      The authorization granted hereby to pay Critical Vendor Claims shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to pay the Critical Vendor Claims, none of the foregoing persons shall have any liability on account of any decision by the Debtors not to pay a Critical Vendor Claim, and nothing contained in this order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect the Critical Vendor Claims to the extent they are not paid.

10.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

11.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

12.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

13.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

14.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

15.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation or interpretation of this Order.

Dated: Wilmington, Delaware

_____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

4