IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

In re:                          :     Chapter 11
                           :

DENDREON CORPORATION, et al.,    :     Case No. 14-12515 (___)
                           :

             Debtors.[1]      :     Joint Administration Pending
                           :
                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDERS: (A)(I) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) ESTABLISHING PROCEDURES FOR THE DEBTORS TO ENTER INTO STALKING HORSE AGREEMENT WITH BID PROTECTIONS IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (III) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (IV) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES AND AGREEMENTS, AND (V) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE, AND (B)(I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING CERTAIN RELATED RELIEF**

        The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby move (this "Motion") this Court, pursuant to sections 105, 363, 365 and 503 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit A, (i) approving the proposed auction and bidding procedures (the "Bidding Procedures"), which are

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

attached as <u>Exhibit B</u> hereto, for the potential sale of all or substantially all of the Debtors' non-cash assets (the "<u>Acquired Assets</u>"); (ii) establishing procedures (the "<u>Stalking Horse Procedures</u>") for the Debtors to enter into a stalking horse agreement (a "<u>Stalking Horse Agreement</u>") containing bid protections with respect to any stalking horse bidder (a "<u>Stalking Horse Bidder</u>"); (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "<u>Assumption and Assignment Procedures</u>"); (iv) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (v) scheduling a hearing (the "<u>Sale Hearing</u>") to approve such sale (the "<u>Sale Transaction</u>").  Further, in the event a Sale Hearing is held pursuant to the Bidding Procedures, the Debtors also hereby move the Court, pursuant to Bankruptcy Code sections 105, 363, 365 and 503 and Bankruptcy Rules 2002, 6004 and 6006, for entry of an order (the "<u>Sale Order</u>")[2], (i) approving the sale of the Acquired Assets free and clear of all liens, claims, interests and encumbrances (the "<u>Encumbrances</u>"), except to the extent set forth in the Acquisition Agreement (as defined herein); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases as set forth in the Acquisition Agreement (as defined herein); and (iii) granting related relief.[3]  In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration of Robert L. Crotty in Support of Chapter 11 Petitions and First Day Pleadings (the "<u>First Day Declaration</u>"), filed with the Court concurrently herewith.  In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

---

[2]    The form of Sale Order will be filed with the Court no later than two (2) days after the Bid Deadline.

[3]    This Motion contains the Debtors' request for entry of the Bidding Procedures Order and approval of the Sale Order.  The Debtors are seeking approval of the Bidding Procedures Order at the initial hearing to be conducted on this Motion. The Sale Order is requested to be considered at the Sale Hearing, should the Sale Hearing occur.

## JURISDICTION AND VENUE

1.        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.        The legal predicates for the relief requested herein are sections 105, 363, 365 and 503 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006 and 9014.

3.        Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

### A.    The Chapter 11 Filing

4.         On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5.        The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.        To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.

7.        The Debtors and their non-debtor affiliates (the "Company") are biotechnology companies focused on the discovery, development and commercialization of novel therapies to significantly improve treatment options for cancer patients. The Debtors are

primarily focused on commercializing PROVENGE® in the United States and around the world. PROVENGE is a first-in-class immunotherapy used to treat patients suffering from advanced-stage prostate cancer, which is the most common non-skin cancer and the second-leading cause of cancer deaths among men in the United States.

       8.     Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, their capital raising and restructuring activities and the events leading to the Debtors' decision to file the Chapter 11 Cases and pursue the Sale Transaction, is set forth in detail in the First Day Declaration.[4]

**B.      The Debtors' Marketing and Sales Efforts**

       9.     In September 2013 the Debtors retained J.P. Morgan Securities LLC ("JPM") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") to assist the Company with a potential sale or other transaction.  Between October and December 2013, JPM and Merrill conducted a broad confidential auction process to solicit potential buyers for the Company.  A significant number of parties conducted due diligence; however, no bids were ultimately submitted.  In February 2014, the Debtors retained Lazard Frères & Co. LLC ("Lazard") as their investment banker to provide general financial advisory services and evaluate potential strategic alternatives, including assisting the Company in any potential  restructuring, sale transaction or financing transaction.  The Company's initial goal in hiring Lazard was to gain assistance with addressing the 2016 Notes, possibly through a refinancing, an extension of the maturity or a conversion of the 2016 Notes to new debt or equity.  Soon thereafter, the Company also hired AlixPartners, LLP to, among other things, work with management to

---

[4]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration or the Acquisition Agreement.

identify further cost reductions.  Additionally, the Company engaged Trinity Partners, LLC, a life science strategic consulting firm, to prepare a valuation report and develop independent revenue forecast models.  In March and April 2014, the Company discussed the possibility of a strategic combination with two separate third-parties, however, these discussions did not advance beyond the preliminary stages.

10.     As discussed in the First Day Declaration, throughout the spring and summer of 2014, the Company continued to consider its strategic alternatives, refine its business plan, and examine its ability to implement additional cost reductions.  The Company concluded that given that it was highly levered and faced significant challenges in achieving positive free cash flows in the near term, the business likely would not be viable on a stand-alone basis absent a strategic transaction or a restructuring of its debt.  To that end, as described in further detail in the First Day Declaration, the Debtors initiated discussions, regarding, among other things, a restructuring of the debt or a potential sale process with the largest holder of the 2016 Notes, Deerfield Management Company, L.P. ("Deerfield") (holding approximately 36% of the 2016 Notes) and then with counsel to certain unaffiliated holders of approximately 48% of the 2016 Notes (collectively, the "Unaffiliated Noteholders"), each subject to NDAs.  The Debtors, subject to these NDAs, informed Deerfield and its counsel as well as the Unaffiliated Noteholders and their counsel of the Company's investigation of strategic alternatives.  In September 2014, the Company, Deerfield and the Unaffiliated Noteholders mutually agreed that, among the strategic alternatives considered, the appropriate path for the Company would involve pursuing a sale process that would be implemented through the filing of these Chapter 11 Cases.

11.     The Company believed that on account of the significant investments the Company had made in commercializing PROVENGE, the cutting edge technology, equipment

and process it had developed and the intellectual "know-how", that there might be additional value to a purchaser, particularly one with "synergies".  Therefore, the Debtors' board of directors directed the Company to conduct a marketing process, in parallel with discussions with holders of the 2016 Notes as an additional option to maximize value.

12.    To that end, and acknowledging that the in-court process would include a marketing process toward a potential sale, Lazard identified and developed a list of potentially interested parties and solicited such parties' interest in a sale transaction.  Beginning in mid-September 2014, Lazard contacted approximately forty (40) potential buyers, a number of which had been contacted in the auction process conducted by JPM and Merrill in the third quarter of 2013.  The goal in this pre-filing marketing process was to sign up potential buyers to NDAs and afford them time to evaluate the opportunity in advance of any in-court sale process.  A virtual data room was made available containing extensive information about the Company, including documents describing the Company's business and financial results in considerable detail, and Lazard gave potential purchases the opportunity to conduct due diligence via the electronic data room.

## C.    The Plan Support Agreements and Competitive Process

13.    Contemporaneous with the pre-filing marketing process, the Company continued discussions with Deerfield and counsel to the Unaffiliated Noteholders, as well as their financial advisors.  In September and October of 2014, the Debtors entered into NDAs with individual members of the Unaffiliated Noteholders.  The Debtors periodically updated counsel to the Unaffiliated Noteholders and Deerfield regarding the process and strategic alternatives.

14.    In addition, the Company continued discussions with Deerfield and the Unaffiliated Noteholders regarding a consensual stand-alone restructuring to right-size the Company's balance sheet.  Good faith, arm's length negotiations culminated in the execution of

6

two substantially similar agreements dated November 9, 2014 (the "Plan Support Agreements")
one among the Debtors and the Unaffiliated Noteholders and the other among the Debtors and
certain funds managed by Deerfield (the "Deerfield Noteholders") and together with the
Unaffiliated Noteholders (the "Supporting Noteholders").  Pursuant to the Plan Support
Agreements, the Debtors and the Supporting Noteholders agreed to the terms of a restructuring
in accordance with the terms of a term sheet attached to each of the Plan Support Agreements
(the "Plan Term Sheet").  The Plan Support Agreements contemplate a stand-alone plan of
reorganization, subject to a competitive bidding process for the sale of all or substantially all of
the non-cash assets of the Debtors.

        15.     Specifically, the Plan Support Agreements provide the framework for
a competitive process (the "Competitive Process") whereby prospective buyers may bid to
purchase all or substantially all of the Debtors' non-cash assets either (i) in a sale pursuant to
Bankruptcy Code section 363, or (ii) in the form of a recapitalization transaction effectuated
through a plan of reorganization.  A Qualified Bid (as defined below) in the Competitive Process
must have a value in excess of $275 million as determined by the Bidding Procedures.  The
Bidding Procedures also reserve the Debtors' right to enter into a Stalking Horse Agreement with
a Stalking Horse Bidder.  If two or more Qualified Bids are received in accordance with the
Bidding Procedures, or if one Qualified Bid other than that submitted by a Stalking Horse Bidder
is received, the Debtors will conduct an auction (the "Auction") to determine the highest or
otherwise best Qualified Bid.  The Debtors, pursuant to the Bidding Procedures, will sell the
Acquired Assets to the party submitting the Qualified Bid with the greatest value to the Debtors
at the Auction (the "Successful Bidder").

16.     If two or more Qualified Bids are not received by the Bid Deadline, or in the event the Debtors enter into a Stalking Horse Agreement, if one Qualified Bid other than that submitted by the Stalking Horse Bidder is not received by the Bid Deadline, the Debtors may determine not to conduct the Auction.  If the only Qualified Bid received by the Bid Deadline is not a Stalking Horse Bid, the Debtors may, in consultation with the Consultation Parties (as defined in the Bidding Procedures), accept the Qualified Bid and the party submitting such Qualified Bid will be the Successful Bidder.  If the only Qualified Bid received is a Stalking Horse Bid, the Stalking Horse Bidder will be the Successful Bidder.

17.     After the Bid Deadline or the Auction, as applicable, if the Successful Bidder has submitted a bid that proposes a sale pursuant to Bankruptcy Code section 363, the Debtors will move forward with the Sale Hearing.  If the Successful Bidder has proposed a purchase in the form of a recapitalization transaction effectuated through a plan of reorganization, the Debtors will cancel the Sale Hearing and seek to prosecute confirmation of the plan of reorganization consistent with such bid.  If the Competitive Process does not result in any Qualified Bid being received, a Sale Hearing will similarly not be necessary and the Debtors will prosecute the stand-alone plan of reorganization contemplated by the Plan Support Agreements (defined below) and emerge from bankruptcy as a reorganized entity.

18.     As such, the transaction contemplated by the Plan Support Agreements paves the way for a substantial deleveraging of the Debtors' balance sheet through a stand-alone plan of reorganization that equitizes the 2016 Notes, while allowing the Debtors to simultaneously pursue a competitive sale process in an effort ensure that the value of their estates will be maximized for the benefit of all stakeholders.  The Debtors believe that engaging in the Competitive Process to potentially effectuate a sale of substantially all of the Debtors' assets in

parallel ensures that the path ultimately pursued will maximize the value of the Debtors' estates for the benefit of all stakeholders.

**D.     The Acquisition Agreement**

19.     The Bidding Procedures provide that, unless the Debtors enter into a Stalking Horse Agreement, each bid for the Acquired Assets must be based on the proposed acquisition agreement (the "Acquisition Agreement"), which will be filed with the Bankruptcy Court no later than the day after the Stalking Horse Deadline (defined below).[5]  A summary of the principal terms of the Acquisition Agreement, including terms that are required to be highlighted pursuant to Local Bankruptcy Rule 6004-1 will be set forth in a notice of the filing of the Acquisition Agreement (the "Acquisition Agreement Notice").

<div style="text-align:center"><strong>RELIEF REQUESTED</strong></div>

20.     By this Motion, the Debtors first request entry of the Bidding Procedures Order, which will authorize and approve, among other things: (i) the Bidding Procedures for conducting the auction for the sale of the Debtors' assets; (ii) the procedures for designating a Stalking Horse Bidder included therein; (iii) the Assumption and Assignment Procedures; (iv) the form and manner of notice with respect to all procedures, protections, schedules and agreements; and (v) the scheduling of the Sale Hearing to approve any such Sale Transaction with respect to any bid accepted by the Debtors.

---

[5]     The Bidding Procedures provide that if the Debtors enter into a Stalking Horse Agreement, a bid must be based on the Stalking Horse Agreement.  The Bidding Procedures further provide that if the bid is a Chapter 11 Plan Bid (as defined in the Bidding Procedures) and the Debtors have not filed a form of proposed investment agreement with the Bankruptcy Court within at least ten (10) business days prior to the Bid Deadline (defined below), the bid must be based on the Acquisition Agreement and marked with appropriate changes.  If a proposed form of investment agreement has been filed with the Bankruptcy Court, any Chapter 11 bid must be based upon such proposed investment agreement.

21.    Second, in the event that the Sale Hearing is necessary in accordance with the Bidding Procedures, at the Sale Hearing, the Debtors will request entry of the Sale Order that will, *inter alia*, approve (i) the sale of the Debtors' assets in accordance with the terms of the Acquisition Agreement executed by the Successful Bidder, which shall be free and clear of all Encumbrances, including rights or claims based on any taxes or successor or transferee liability (other than certain expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the Acquisition Agreement); and (ii) the assumption and assignment of certain executory contracts and unexpired leases (as set forth in the Acquisition Agreement) related to the Debtors' assets and the Sale Transaction.

## BASIS FOR RELIEF

### A.    Necessity for Sale

22.    As discussed in further detail in the First Day Declaration, the Debtors are highly leveraged and face significant challenges in achieving positive free cash flows in the near term.  The Debtors have, throughout the last several years, pursued various initiatives to streamline their operations, including their manufacturing process, aggressively manage and cut operating costs and raise necessary capital.  They have also engaged in a comprehensive consideration of strategic alternatives.  Despite these efforts, the Company has concluded that even if it was able to successfully realize its current operating projections, it would likely be unable to repay or refinance the 2016 Notes when they mature and, as such, the business would not be viable on a stand-alone basis absent a strategic transaction or restructuring of its debt. Therefore, the Debtors have determined that the best course of action for them is to engage in the Competitive Process pursuant to the Plan Support Agreements and pursue a sale of the Acquired Assets.

23.    The Debtors' highest priority in the Chapter 11 Cases is to maximize the value of their business, insure the continued availability of PROVENGE and to pursue a strategic path that facilitates these goals.  The Bidding Procedures allow the Debtors to continue the sale process begun prior to the Petition Date in a further effort to maximize the value of the Debtors' estates.  The Debtors believe that this process will encourage third-party participation and protect the ongoing business, while also ensuring that PROVENGE can be made available to those patients that severely need and rely on the drug.

24.    Absent the sale process contemplated by the Motion, which is supported by the majority of the holders of the 2016 Notes, the Debtors believe they would be unable to ensure that they have maximized the value of their assets and business operations for the benefit of all stakeholders.  A prompt process to sell the Debtors' assets and business operations will minimize depletion of the Debtors' cash, while also avoiding any interruption to the Debtors' business.  In short, such a process will provide the greatest available protection to the Debtors' stakeholders and PROVENGE's target population and maximize value.

**B.    Approval of Bidding Procedures**

25.    The Bidding Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Plan Support Agreement.  The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing (the "Bidding Process").  The Debtors further believe, with the concurrence and support of the majority of the holders of the 2016 Notes, that the Bidding

11

Process affords the Debtors a sufficient opportunity to pursue a sale process that will maximize

the value of their estates.

        26.     Certain of the key terms of the Bidding Procedures are highlighted as

follows pursuant to Local Bankruptcy Rule 6004-1(c):[6]

- **Access to Diligence Materials:** To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors (i) an executed confidentiality agreement reasonably satisfactory to the Debtors and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Acquired Assets or a recapitalization transaction pursuant to a chapter 11 plan of reorganization (any such transaction, a "Transaction") as reasonably determined by the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures).

- **Qualified Bidder:** A party who qualifies for access to Diligence Materials shall be a "Qualified Bidder".

- **Procedures for the Designation of a Stalking Horse Bidder:** The Debtors, in consultation with the Consultation Parties, may select a Stalking Horse Bidder for the Acquired Assets for the purposes of establishing a minimum acceptable bid with which to begin the Auction (the "Stalking Horse Bid") and provide such Stalking Horse Bidder with the Bid Protections described herein. The Debtors shall have until December 29, 2014 (the "Stalking Horse Deadline") to select a Qualified Bid of a Qualified Bidder to be a Stalking Horse Bid. The Debtors shall finalize a purchase agreement with a Stalking Horse Bidder (the "Stalking Horse Agreement") by no later than the Stalking Horse Deadline. Within one (1) day following the Stalking Horse Deadline the Debtors shall file with the Bankruptcy Court a notice (the "Stalking Horse Notice") of such Stalking Horse Bid and a copy of the Stalking Horse Agreement. The Debtors shall serve such Stalking Horse Notice on (i) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past twelve (12) months, (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets, (iii) counsel to the Supporting Noteholders, and (iv) counsel to any official committee appointed in the Chapter 11 Cases, if any.

- **Bid Deadline:** The following parties must receive a Bid in writing, on or before January 27, 2014 at 5:00 p.m. (prevailing Eastern Time) or such earlier date as may be agreed to by each of the Debtors (the "Bid Deadline"): (1) the Debtors, 200 Crossing Boulevard, Bridgewater, New Jersey 08807, Attention: Robert L. Crotty;

---

[6]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

(2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attn: Ken Ziman, Esq. (ken.ziman@skadden.com), 155 N. Wacker Drive, Chicago, IL, 60606, Attn:  Felicia Perlman, Esq. (felicia.perlman@skadden.com), 500 Boylston Street, Boston, MA  02116, Attn: Graham Robinson, Esq. (graham.robinson@skadden.com) and One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Sarah E. Pierce; (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY  10020, Attn:  Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq. (spohl@brownrudnick.com) and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire (jlongmire@willkie.com).

- **Auction Qualification Process:** To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtors to satisfy each of the conditions set forth below.  A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

    (a)    Good Faith Deposit:  Each Bid must be accompanied by a deposit in the amount of ten percent (10%) of the purchase price contained in the Modified Acquisition Agreement, before any reductions for assumed liabilities, or, in the case of a Chapter 11 Plan Bid, ten percent (10%) of the amount of the capital investment contemplated by such bid, before any reductions for assumed liabilities, to an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit").

    (b)    Same or Better Terms: Each Bid must be on terms that the Debtors, in their business judgment and after consulting with the Consultation Parties, determine are the same or better than the terms of either (i) the Acquisition Agreement, or (ii) in the event the Debtors enter into a Stalking Horse Agreement, the Stalking Horse Agreement.

    (c)    Executed Agreement: Each Bid must be based on the Acquisition Agreement, which shall be prepared by the Debtors in Consultation with the Consultation Parties and shall be filed with the Bankruptcy Court no later than the day after the Stalking Horse Deadline and must include executed transaction documents, signed by an authorized representative of such Qualified Bidder, pursuant to which the Qualified Bidder proposes to effectuate a Transaction (a "Modified Acquisition Agreement").  Each Bid must also include a copy of the Acquisition Agreement marked against the Modified Acquisition Agreement to show all changes requested by the Qualified Bidder (including the inclusion of the purchase price).  Each Modified Acquisition Agreement must provide (1) a commitment to close within two business days after all closing conditions are met and (2) a representation that the Qualified Bidder will (a) make all necessary filings under the Hart Scott Rodino Antitrust Improvements Act of 1976, as

amended (the "HSR Act"), and (b) submit all necessary filings under the HSR Act within ten (10) days following the effective date of the Modified Acquisition Agreement.

(d)   Minimum Bid: A Bid (including a Chapter 11 Plan Bid) for all or substantially all of the Debtors' non-cash assets must propose a minimum purchase price, including any assumption of liabilities and any earnout or similar provisions, that in the Debtors' reasonable business judgment, after consulting with the Consultation Parties, has a value greater than $275,000,000[7].

In the event that the Debtors enter into a Stalking Horse Agreement, a Bid for all or substantially all of the Debtors' assets (or in the case of a Chapter 11 Plan Bid for the equity of reorganized Dendreon) must propose a minimum purchase price, including any assumption of liabilities and any earnout or similar provisions, that in the Debtors' reasonable business judgment, after consulting with the Consultation Parties, has a value greater than (i) the purchase price set forth in any Stalking Horse Purchase Agreement, (ii) the Break-Up Fee (as defined below), if any (iii) the Expense Reimbursement Amount (as defined below), if any, (iv) the Assumed Liabilities (as defined in the Stalking Horse Agreement), as applicable, and (v) the Overbid Amount[8], as applicable the sum of which shall be the "Stalking Horse Auction Minimum Bid Amount".

(e)   Designation of Assigned Contracts and Leases: A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Qualified Bidder wishes to be assumed and, with respect to any Bid that is not a Chapter 11 Plan Bid, assigned to the Qualified Bidder at closing, pursuant to a Transaction. A Bid must specify whether the Debtors or the Qualified Bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors).

(f)   Designation of Assumed Liabilities: A Bid must identify all liabilities which the Bidder proposes to assume.

(g)   Corporate Authority: A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Transaction; provided that, if the Qualified Bidder is an entity specially formed for the purpose of effectuating the Transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Transaction by

---

[7]   To the extent a Supporting Noteholder submits a Bid, such Bid must be a cash Bid.

[8]   The "Overbid Amount" shall be $1 million.

14

the equity holder(s) of such Qualified Bidder.

(h)     Disclosure of Identity of Qualified Bidder:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(i)     Proof of Financial Ability to Perform:  A Bid must include written evidence that the Debtors may reasonably conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to close the Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Transaction.  Such information must include, *inter alia*, the following:

(1)     contact names and numbers for verification of financing sources;

(2)     written evidence of the Qualified Bidder's internal resources and proof of any debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Transaction;

(3)     the Qualified Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

(4)     a description of the Qualified Bidder's pro forma capital structure (and, in the case of a Chapter 11 Plan Bid, the Debtors' pro forma capital structure); and

(5)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Qualified Bidder has the ability to close the Transaction.

(j)     Regulatory and Third Party Approvals:  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the Transaction, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals, and the Debtors, in consultation with the Consultation Parties, may consider the timing of such approvals, and any actions the Qualified Bidder will take to ensure receipt of such approval(s) as promptly as possible, when considering the other Bid Assessment Criteria (defined below).

15

(k)     <u>Contact Information and Affiliates</u>:  The Bid must provide the identity and contact information for the Qualified Bidder and full disclosure of any parent companies of the Bidder.

(l)     <u>Contingencies</u>:  Each Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(m)     <u>Irrevocable</u>:  A Bid must be irrevocable until the Good Faith Deposit associated with such Bid must be returned in accordance with the terms hereof (or, if the Successful Bid is a Chapter 11 Plan Bid, until confirmation of such plan of reorganization), provided that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined below), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(n)     <u>Compliance with Diligence Requests</u>.  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Debtors (as described in the Bidding Procedures) to the reasonable satisfaction of the Debtors.

(o)     <u>Confidentiality Agreement</u>.  To the extent not already executed, the Bid must include an executed confidentiality agreement reasonably satisfactory to the Debtors.

(p)     <u>Termination Fees</u>.  Except with respect to any Stalking Horse Bidder, the Bid must not entitle the Qualified Bidder to any break-up fee, termination fee or similar type of payment or reimbursement and, by submitting the Bid, the Qualified Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction (as defined below).

- **Qualified Bid:** A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements for the applicable assets shall constitute a "<u>Qualified Bid</u>" for such assets; <u>provided</u> that if the Debtors receive a Bid prior to the Bid Deadline that is not a Qualified Bid the Debtors may provide the Qualified Bidder with the opportunity to remedy any deficiencies prior to the Auction; <u>provided, further</u>, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors to the satisfaction of the Debtors, the Debtors may disqualify any Qualified Bidder and Qualified Bid in the Debtor's discretion, and such Qualified Bidder shall not be entitled to attend or participate in the Auction

- **Auction and Auction Procedures:**  If two or more Qualified Bids are received by the Bid Deadline, or in the event the Debtors enter into a Stalking Horse Agreement and one Qualified Bid other than that submitted by the Stalking Horse Bidder is received by the Bid Deadline, the Debtors will conduct an auction (the "<u>Auction</u>") to determine the highest or otherwise best Qualified Bid.  This determination shall take into account any factors the Debtors, in consultation with the Consultation Parties,

16

reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following: (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes to the Acquisition Agreement requested by each Qualified Bidder; (c) the extent to which such modifications or provisions are likely to delay closing of the sale of the Debtors' assets and the cost to the Debtors of such modifications or delay; (d) the total consideration to be received by the Debtors; (e) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (f) the net benefit to the Debtors' estates, taking into account, if applicable, any Stalking Horse Bidder's right to any Break Up Fee or Expense Reimbursement Amount, and (f) any other qualitative or quantitative factor the Debtors, in consultation with the Consultation Parties, deem reasonably appropriate under the circumstances (collectively, the "Bid Assessment Criteria").

If two or more Qualified Bids are not received by the Bid Deadline, or in the event the Debtors enter into a Stalking Horse Agreement, if one Qualified Bid other than that submitted by the Stalking Horse Bidder is not received by the Bid Deadline, the Debtors may determine not to conduct the Auction. If the Debtors have not entered into a Stalking Horse Agreement and only one Qualified Bid is received by the Bid Deadline, the Debtors may, in consultation with the Consultation Parties, select the Modified Acquisition Agreement of such Qualified Bidder to be the Successful Bid and such Qualified Bidder shall be the Successful Bidder. In the event the Debtors enter into a Stalking Horse Agreement, if a Qualified Bid other than that submitted by the Stalking Horse Bidder is not received by the Bid Deadline, the Stalking Horse Agreement shall become the Successful Bid and the Stalking Horse Qualified Bidder Shall be the Successful Bidder. In the event that the Debtors have not entered into a Stalking Horse Agreement and no Qualified Bids are received by the Bid Deadline, the Debtors shall pursue a restructuring with the Supporting Noteholders, as outlined in the Plan Support Agreement and the Plan Term Sheet attached thereto.

The Auction, if necessary, shall take place on or before February 3, 2015 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, or such other place and time as the Debtors shall notify all Qualified Bidders, the Supporting Noteholders and their counsel and any official committee appointed in the Debtors' chapter 11 cases and its counsel. The Auction shall be conducted according to the following procedures:

- **Participation:** Only the Debtors, the Consultation Parties, and any Qualified Bidder that has submitted a Qualified Bid (including the Stalking Horse Bidder, if any), in each case, along with their representatives and counsel, or such other parties as the Debtors shall determine, in consultation with the Consultation Parties, shall attend the Auction (such attendance to be in person) and only such Qualified Bidders (including the Stalking Horse Bidder, if any), or such other parties as the Debtors shall determine, in consultation with the Consultation Parties, will be entitled to make any Bids at the Auction.

**Debtors Shall Conduct the Auction:** The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed. Other than as

expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they reasonably determine will result in the highest or otherwise best Qualified Bid.  The Debtors shall use their best efforts to provide each participant in the Auction with a copy of the Modified Acquisition Agreement associated with the highest or otherwise best Qualified Bid received before the Bid Deadline (such highest or otherwise best Qualified Bid the "Auction Baseline Bid").  In addition, at the start of the Auction, the Debtors shall describe the terms of the Auction Baseline Bid.  Each Qualified Bidder (including the Stalking Horse Bidder, if any) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below).

- **Terms of Overbids:**  An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid.  Any Overbid for purposes of this Auction must comply with the following conditions:

    (a)    Minimum Overbid Increments: Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $250,000.  In order to maximize value, the Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the minimum incremental bids (or in valuing such bids) at any time during the Auction. Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or noncash consideration, provided, however, that the value for such non-cash consideration shall be determined by the Debtors, in consultation with the Consultation Parties, in their reasonable business judgment.

    (b)    Remaining Terms Are the Same as for Qualified Bids: Except as modified herein or by the Debtors at the Auction, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that (i) the Bid Deadline shall not apply, (ii) no additional Good Faith Deposit shall be required beyond the Good Faith Deposit previously submitted by a Qualified Bidder, provided that the Successful Bidder shall be required to make a representation at the end of the Auction that it will provide any additional deposit necessary so that its Good Faith Deposit is equal to the amount of ten percent (10%) of the purchase price, or ten percent 10% of the capital investment, contained in the Successful Bid, and (iii) each Overbid may be based on the Auction Baseline Bid, or any other form Modified Acquisition Agreement submitted prior to the Auction.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes (if any) requested by the Qualified Bidder to the Acquisition Agreement or a previously submitted Modified Acquisition Agreement, in connection therewith (including any changes to the designated assigned contracts and leases and assumed liabilities).  Any Overbid must remain open and binding on the Qualified Bidder.  Any Overbid must remain open and binding on the

18

Qualified Bidder.  At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Qualified Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) reasonably demonstrating such Qualified Bidder's ability to close the Transaction proposed by such Overbid.

- **Announcement and Consideration of Overbids**: (a) <u>Announcement of Overbids</u>: The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration and such other terms as the Debtors, in consultation with the Consultation Parties, reasonably determine will facilitate the Auction. (b) <u>Consideration of Overbids</u>: Subject to the deadlines set forth herein, the Debtors reserve the right, in consultation with the Consultation Parties, in their reasonable business judgment to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; or give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Transaction at the prevailing Overbid amount.

- **Backup Bidder:** Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment and after consulting with the Consultation Parties, will be designated as the backup bidder (the "<u>Backup Bidder</u>").  The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "Backup Bid") open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern Time) on the date that is sixty (60) days after the date of entry of the Sale Order, or, if the Successful Bid is a Chapter 11 Plan Bid, until the effective date of such plan of reorganization (the "<u>Outside Backup Date</u>"), or (ii) the closing of the transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtors will be authorized, but not required, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder.  In such case of a breach or failure to perform on the part of the Successful Bidder (including any Backup Bidder designated as a Successful Bidder), the defaulting Successful Bidder's deposit shall be forfeited to the Debtors.  The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful

Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

- **<u>Reservation of Rights of the Debtors</u>:** Except as otherwise provided in the Acquisition Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Consultation Parties to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine whether to enter into a Stalking Horse Agreement; (d) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (e) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties and are not inconsistent with any Bankruptcy Court order.

C.    **Procedures for the Designation of a Stalking Horse Bidder**

27.    By this Motion, the Debtors seek to establish procedures to enter into a Stalking Horse Agreement containing certain bid protections.  The Debtors believe their ability to maximize value may be enhanced by entering into a Stalking Horse Agreement.  Pursuant to the Bidding Procedures, the Debtors, in consultation with the Consultation Parties, may select a Stalking Horse Bidder for the Acquired Assets for the purposes of establishing a minimum acceptable bid with which to begin the Auction (the "<u>Stalking Horse Bid</u>") and provide such Stalking Horse Bidder with the Bid Protections.  The Debtors shall have until December 29, 2014 (the "<u>Stalking Horse Deadline</u>") to select a Qualified Bid of a Qualified Bidder to be a Stalking Horse Bid.  The Debtors shall finalize a purchase agreement with a Stalking Horse Bidder (the "<u>Stalking Horse Agreement</u>") by no later than the Stalking Horse Deadline.  Within one (1) day following the Stalking Horse Deadline the Debtors shall file with the Bankruptcy Court a notice (the "<u>Stalking Horse Notice</u>") of such Stalking Horse Bid and a copy of the

Stalking Horse Agreement.  The Debtors shall serve such Stalking Horse Notice on (i) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past twelve (12) months, (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets, (iii) counsel to the Supporting Noteholders, and (iv) counsel to any official committee appointed in the Chapter 11 Cases, if any.

           28.      The Debtors believe that in order to entice potential bidders to serve as a Stalking Horse Bidder and to establish a floor price above the Minimum Bid Amount, they will need to offer bidders a break-up fee in an amount up to 3% of the purchase price of the Acquired Assets (the "Break-up Fee") and to reimburse any such Stalking Horse Bidder for all reasonable expenses incurred with such Stalking Horse Bidder's attempted purchase of the Acquired Assets in an amount up to $1 million (the "Expense Reimbursement Amount" and together with the Break-up Fee, the "Bid Protections").  The Bid Protections are fair and reasonable in light of the circumstances because, in the event the Bid Protections were triggered, the Stalking Horse Bidder's efforts will have promoted more competitive bidding, and thereby increased the chances that the Debtors will receive the highest or otherwise best offer for the sale of all or substantially all of their assets, to the benefit of the Debtors' creditors.  As such, the Debtors seek authority to enter into a Stalking Horse Agreement containing such Bid Protections pursuant to the procedures described herein, without further order of the Court.

**D.**      **Notice Procedures**

           29.      <u>Notice of Sale Transaction and Sale Hearing</u>.  Within five (5) business days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "Mailing Date"), the Debtors (or their agents) shall serve this Motion, the Bidding Procedures Order and the Bidding Procedures by first-class mail, postage prepaid, upon (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Acquired

Assets at any time; (b) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets; (c) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the United States Attorney's office; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) counsel to any official committee appointed in the Chapter 11 Cases; (h) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP,  Attn: Steven D. Pohl ; (i) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, Attn: John C. Longmire (j) the indenture trustee under the 2016 Notes; (k) the parties included on the Debtors' list of twenty (20) largest unsecured creditors; and (l) those parties who have filed the appropriate notice requesting notice of all pleadings filed in the Chapter 11 Cases.  Such notice shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

        30.    <u>Sale Notice</u>.  On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, the sale notice (the "<u>Sale Notice</u>"), substantially in the form attached hereto as <u>Exhibit D</u>, upon all other known creditors of the Debtors.

        31.    <u>Publication Notice</u>.  The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004, that the publication of the Sale Notice, attached hereto as <u>Exhibit E</u>, in *The Wall Street Journal* on the Mailing Date or as soon as practicable thereafter, be deemed sufficient and proper notice of the Sale Transaction to any other interested parties whose identities are unknown to the Debtors.

32.     <u>Acquisition Agreement Notice and Stalking Horse Notice</u>.  Within one (1) day following the Stalking Horse Deadline the Debtors shall file with the Bankruptcy Court either the Acquisition Agreement Notice or the Stalking Horse Notice, as applicable.

33.     <u>Auction Notice</u>.  As soon as possible after the Bid Deadline the Debtors shall file, but not serve, a notice indicating whether the Auction will be held, and if applicable, the date and time of the Auction (the "<u>Auction Notice</u>").  If the Auction will not be held the Auction Notice will also provide notice of the cancellation of the Sale Hearing.

34.     <u>Sale Hearing Notice</u>.  As soon as possible after the conclusion of the Auction the Debtors shall file, but not serve, a notice identifying any Successful Bidder and indicating whether the Sale Hearing will be held (the "Sale Hearing Notice"), substantially in the form attached hereto as <u>Exhibit F</u>.  In the event that the Successful Bid is a Chapter 11 Plan Bid, the notice will indicate that Sale Hearing will not go forward and the Debtors will seek to prosecute confirmation of the plan of reorganization proposed by such Chapter 11 Plan Bid.  If the Successful Bidder has submitted a 363 Bid (defined below), the notice will indicate the deadline for objecting to the sale of the Acquired Assets to the Successful Bidder and the date and time of the Sale Hearing.

**E.     Assumption and Assignment Procedures**

35.     The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts.

36.     The Debtors contemplate that the Acquired Assets will include substantially all of the Debtors' material executory contracts (the "<u>Assigned Contracts</u>").   Within ten (10) days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable, the Debtors will file with this Court a notice of cure amount (the "<u>Cure Notice</u>"), substantially in the form attached hereto as <u>Exhibit C</u>, and serve the Cure Notice on all non-debtor parties to the

Assigned Contracts (the "Contract Notice Parties").  If the Debtors enter into a Stalking Horse

Agreement with a Stalking Horse Bidder, the Stalking Horse Notice shall set forth any additional

executory contracts to be included in the Acquired Assets, as defined in such Stalking Horse

Agreement, and such contracts will be deemed the Assigned Contracts.

   37. The Cure Notice shall (i) state the cure amounts that the Debtors believe

are necessary to assume such Assigned Contracts pursuant to section 365 of the Bankruptcy

Code (the "Cure Amount"); (ii) notify the non-debtor party that such party's contract or lease

may be assumed and assigned to a purchaser of the Acquired Assets at the conclusion of the

Auction; (iii) state the date of the Sale Hearing and that objections to any Cure Amount or to

assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined

by the Debtor; and (iv) state a deadline by which the non-Debtor party shall file an objection to

the Cure Amount or to the assumption and assignment of the Assigned Contracts; provided,

however, that the inclusion of a contract, lease or agreement on the Cure Notice shall not

constitute an admission that such contract, lease or agreement is an executory contract or lease.[9]

   38. The Debtors request that the Court set the deadline (the "Cure Objection

Deadline") to object to any Cure Amount or to assumption and assignment providing that any

such objection must be filed with the Court on or before twenty (20) days after the filing of the

Cure Notice and served on: (1) the Debtors, 200 Crossing Boulevard, Bridgewater, New Jersey

08807, Attention: Robert L. Crotty; (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher

& Flom LLP, Four Times Square, New York, NY 10036, Attn: Ken Ziman, Esq.

(ken.ziman@skadden.com), 155 N. Wacker Drive, Chicago, IL, 60606, Attn: Felicia Perlman,

---

[9] For an avoidance of doubt, the Debtors reserve all of their rights, claims and causes of action with respect to the contracts, leases and agreements listed on the Cure Notice.

Esq. (felicia.perlman@skadden.com), 500 Boylston Street, Boston, MA 02116, Attn: Graham

Robinson, Esq. (graham.robinson@skadden.com) and One Rodney Square, 920 N. King Street,

Wilmington, Delaware 19801, Attention: Sarah E. Pierce (sarah.pierce@skadden.com);

(3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York,

NY 10020, Attn: Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold

(brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick

LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq.

(spohl@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr &

Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire

(jlongmire@willkie.com).  Any such objection shall (i) be in writing; (ii) state the basis for such

objection; and (iii) state with specificity what cure amount the party to the Assigned Contract

believes is required (in all cases with appropriate documentation in support thereof).  If a

Successful Bidder prevails at the Auction, then the deadline to object to adequate assurance shall

be extended to the date of the Sale Hearing, but any such objection must be received before the

start of the Sale Hearing; provided, however, that the deadline to object to the Cure Amount shall

not be extended.

39.     If the Successful Bid at the Auction is a Bid to acquire the assets pursuant

to Section 363 of the Bankruptcy Code ("363 Bid"), as soon as possible after the conclusion of

the Auction, the Debtors shall file with the Bankruptcy Court a Sale Hearing Notice (as defined

below) that identifies any Successful Bidder and provides notice that the Debtors will seek to

assume and assign the Assigned Contracts at the Sale Hearing.  At the Sale Hearing, the Debtors

shall (i) present evidence necessary to demonstrate adequate assurance of future performance by

the Successful Bidder and (ii) request entry of an order granting approval of the assumption and

assignment of any Assigned Contracts to the Successful Bidder.

40.     Unless a non-Debtor party to any executory contract or unexpired lease,

including an unexpired real property lease, files an objection to the Cure Amount by the Cure

Objection Deadline, such counterparty shall be (i) forever barred from objecting to the Cure

Amount and (ii) forever barred and estopped from asserting or claiming any Cure Amount, other

than the Cure Amount listed on the Cure Notice against the Debtors, any Successful Bidder or

any other assignee of the relevant contract.

41.     In addition, to the extent  that a non-Debtor counterparty to an Assigned

Contract was not provided with a Cure Notice (any such contract or lease a "Previously Omitted

Contract"), the Debtors will notify the Successful Bidder within three Business Days (as defined

in the Acquisition Agreement) of the omission.  The Debtors shall serve a notice (the "Previously

Omitted Contract Notice") to the counterparties to the Previously Omitted Contract indicating

the Debtors' intent to assume and assign the Previously Omitted Contract.  The counterparties

will have fifteen (14) Business Days to object to the Cure Amount or the assumption.  If the

parties cannot agree on a resolution, the Debtors will seek an expedited hearing before the Court

to determine the Cure Amount and approve the assumption.  If there is no objection, then the

counterparties will be deemed to have consented to the assumption and assignment and the Cure

Amount, and such assumption and assignment and the Cure Amount shall be deemed approved

by the Sale Order without further order of this Court.

42.     The Debtors will file a notice with the Court listing the Assigned

Contracts, if any, that the Debtors have determined not to assume, prior to the Sale Hearing.

## APPLICABLE AUTHORITY

43.      "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008).  Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore.  See In re Delaware & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991).

44.      The Debtors have sound business justifications for selling all or substantially all of their assets as contemplated by this Motion.  The Debtors are highly leveraged and have continued to experience difficulties in achieving positive cash flow.  As a result, the Debtors' current capital needs are incompatible with their existing business model and operating needs, as well as their ability to repay the 2016 Notes when they mature.

45.      Accordingly, the Debtors have determined that the Competitive Process contemplated by the Plan Support Agreement, is the best way to maximize value.  Further, if the Debtors enter into a Stalking Horse Agreement, or otherwise receive a Qualified Bid, the Debtors submit that the sale of the all or substantially all of their assets to a Stalking Horse Bidder or a Successful Bidder pursuant to a Stalking Horse Agreement, the Acquisition Agreement or a Modified Acquisition Agreement (as defined in the Bidding Procedures), is in the Debtors' best interests and should be approved.

27

**A.      The Bidding Procedures Are Fair And Are Designed To Maximize The Value Received For The Acquired Assets.**

46.      Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.  The Bidding Procedures proposed herein are designed to maximize the value received for the Debtors' assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  Thus, the Debtors and all parties in interest can be assured that the consideration for the Acquired Assets will be fair and reasonable.  At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, and after consultation with the Consultation Parties (as defined in the Bidding Procedures), the highest and best offer for the Acquired Assets.

47.      Accordingly, the Debtors believe the Court should approve the Bidding Procedures.  Similar procedures have been previously approved by this Court.  See, e.g., In re Savient Pharm., Inc., Case No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013); In re Synagro Techs., Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013); In re ICL Holding Co., Inc., Case No. 12-13319 (KG) (Bankr. D. Del. Jan. 25, 2013); In re Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012).[10]

---

[10]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion. Copies of these orders, however, are available on request.

**B.      The Break-up Fee and Expense Reimbursement are Necessary to Preserve the Value of the Debtors' Estates**

48.      The Debtors believe that having the ability to offer the Bid Protections to a Stalking Horse Bidder will ensure the Debtors' ability to maximize the realizable value of the Acquired Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest. Approval of break-up fees and expense reimbursements and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become established practice in chapter 11 cases.  Such bidding protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with an opportunity to enhance the value received by its estate through an auction process.  Historically, bankruptcy courts have approved bidding incentives similar to the Bid Protections pursuant to the "business judgment rule."  See e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650 (S.D.N.Y. 1992); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

49.      The United States Court of Appeals for the Third Circuit, however, has established standards for determining the propriety of bidding incentives in the bankruptcy context.  In re Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999); see also In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir. 2010).  The Court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate.  See O'Brien 181 F.3d at 533.  The Third Circuit defined at least two instances in which bidding incentives may benefit the estate.  First a break-up fee or expense reimbursement may be necessary to preserve

29

the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." O'Brien, 181 F.3d at 537.  Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

50.     The Bid Protections are reasonable and appropriate in light of the size and nature of the transaction and the efforts that would be expended by any Stalking Horse Bidder. The Debtors will present facts that establish that the Bid Protections promote competitive bidding and are necessary to induce potential bidders to serve as a Stalking Horse Bidder.  The Debtors' ability to offer the Bid Protections enables them to promote a sale of the Acquired Assets with the greatest benefit to the estate.  Moreover, the Bid Protections will not diminish the estate.  The Debtors do not intend to terminate any Stalking Horse Purchaser Agreement if to do so would incur an obligation to pay the Bid Protections, unless to accept an alternative bid, which bid must exceed the consideration offered by the Stalking Horse Bidder by an amount sufficient to pay the Bid Protections.

51.     This Court has approved protections similar to the Bid Protections as reasonable and consistent with the type and range of bidding protection typically approved. See, e.g., In re Savient Pharm., Inc., Case No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013)(approving break-up fee and expense reimbursement); In re Synagro Techs., Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (approving break-up fee and expense reimbursement); In re ICL Holding Co., Inc., Case No. 12-13319 (KG) (Bankr. D. Del. Jan. 25,

30

2013) (authorizing stalking horse expense reimbursement); <u>In re Magic Brands, LLC</u>, Case No.

10-11310 (BLS) (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense

reimbursement); <u>In re Vertis Holdings, Inc.</u>, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2,

2012) (approving break-up fee and expense reimbursement).[11]

**C.    Approval Of The Sale Transaction Is Warranted Under Bankruptcy Code Section 363(b).**

52.    Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) provides in

relevant part: "The Court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

53.    A debtor should be authorized to sell assets outside of the ordinary course

of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed

plan of reorganization if it demonstrates a sound business purpose for doing so.  <u>See</u> <u>In re</u>

<u>Abbotts Dairies of Penn., Inc.</u>, 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the

"sound business judgment test" of <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel</u>

<u>Corp.)</u>, 722 F.2d 1063, 1070 (2d Cir. 1983)); <u>In re Dura Auto. Sys., Inc.</u>, Case No. 06-11202

(KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors

have demonstrated compelling circumstances and a good, sufficient, and sound business purpose

and justification for the Sale prior to, and outside of, a plan of reorganization."); <u>Dai-Ichi</u>

<u>Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding</u>

<u>Corp.)</u>, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or

---

[11]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion. Copies of these orders, however, are available on request.

lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions"); Delaware & Hudson Ry. Co., 124 B.R. at 176 (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); see also In re Lionel, 722 F.2d at 1070; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business purpose test" is appropriate).  Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable and (iii) the purchaser is proceeding in good faith. Delaware & Hudson, 124 B.R. at 176.

54.     The Debtors submit that the sale of the Acquired Assets is based upon the sound business judgment of the Debtors.  As explained above, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures and the Competitive Process, is not only in the best interests of the Debtors, their creditors, their estates and other parties in interest, but also current and future patients who rely on and significantly benefit from PROVENGE. Indeed, the Debtors have determined that their best viable option to maximize the value of their business, ensure that PROVENGE continues to be available to patients, to ensure that PROVENGE realizes its commercial potential worldwide, and maximize creditor recoveries, is to conduct the sale process contemplated by this Motion.

55.     The Debtors also meet the additional requirements necessary to approve a sale under section 363 of the Bankruptcy Code.  As stated herein, the Debtors will provide adequate notice of the Sale Transaction to interested parties, and the Debtors believe that the aforementioned notice procedures are reasonable and adequate under the circumstances.

Additionally, the Debtors entered into the Acquisition Agreement after a long, fulsome and

deliberate effort to market the Debtors' assets.  Accordingly, it is a valid exercise of the Debtors'

business judgment to seek the relief requested by this Motion.

**D.**     **The Proposed Sale Transaction Satisfies The Requirements Of Bankruptcy Code Section 363(f) For A Sale Free And Clear Of Interests.**

      56.     Bankruptcy Code section 363(f) provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

      57.     As Bankruptcy Code section 363(f) is stated in the disjunctive, when

proceeding pursuant to section 363(b), it is only necessary to meet one of the five (5) conditions

of section 363(f).  Because the Debtors do not have any secured debt and the only property of the

Debtors subject liens are inconsequential assets, such as equipment, any Qualified Bid received

by the Debtors would contemplate a Purchase Price for the Acquired Assets that is greater that

the aggregate value of all liens on the property.  Therefore the Debtors believe that they have

satisfied the requirements of section 363(f).  As such, pursuant to Bankruptcy Code section 363,

the Debtors may sell the Acquired Assets free and clear of all liens, claims, and encumbrances.

58.      The Debtors also submit that it is appropriate to sell the Acquired Assets free and clear of successor liability relating to the Debtors' businesses.  Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business.  See, e.g., In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); In re Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); see also, In re General Motors Corp., 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."), aff'd sub nom. In re Motors Liquidation Co., 428 B.R 44, and aff'd 430 B.R. 65 (S.D.N.Y. 2010); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."), aff'd, 576 F.3d 108 (2d Cir. 2009).

59.      The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if

claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts.  To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Acquired Assets free and clear.

**E.     A Successful Bidder Should Be Entitled To The Protections Of Bankruptcy Code Section 363(m).**

60.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); Abbotts Dairies of Penn., 788 F.2d at 147.

61.     The Debtors will present facts to demonstrate that the Successful Bidder's Acquisition Agreement was negotiated at arm's-length, with both parties represented by their own counsel.  Accordingly, the Debtors request that the Sale Order include a provision that the Successful Bidder for the Acquired Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Acquired Assets and closing of the same will occur promptly.

**F.     Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized.**

62.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing

bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp., 872 F.2d 36, 39-40 (3d Cir. 1989) (same).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  See Group of Institutional Investors v. Chicago, M., St. P. & P.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp, 872 F. 2d at 39-40.

63.    The business judgment test "'requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate.'"  Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure[ ], or provide[ ] adequate assurance that the [debtor] will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

64.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  See In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

65.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009); EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); see also In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("adequate assurance falls short of an absolute guaranty of payment"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

66.     Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

67.     To facilitate and effect the Sale Transaction, the Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assigned

Contracts to the Successful Bidder.  The Debtors further request that the Sale Order provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder notwithstanding any provisions in the Assigned Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

68.    The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any assigned executory contracts and leases because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction. Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Acquired Assets, the Successful Bidder will cure any such default prior to such assumption and assignment.

69.    The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder to perform under the Assigned Contracts.  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required under Bankruptcy Code section 365(b)(1)(C).  Further, as set forth above, the Debtors will give notice to all parties to the Assigned Contracts or the Previously Omitted Contracts of their intention to assume the Assigned Contracts or the Previously Omitted Contracts, as the case may be, and what the Debtors believe are the Cure Amounts.

70.    Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases.  The Court, therefore,

should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in the Successful Bidder's Acquisition Agreement.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

71.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Purchaser intend to close the Sale Transaction as soon as reasonably practicable.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**NOTICE**

72.     Notice of this Motion shall be given to: (i) the U.S. Trustee; (ii) the indenture trustee under the 2016 Notes; (iii) counsel to the Unaffiliated Noteholders; (iv) counsel to the Deerfield Noteholders; (v) the parties included on the Debtors' list of twenty (20) largest unsecured creditors; (vi) all entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in or on the Acquired Assets; (vii) all persons who expressed interest in purchasing the Acquired Assets within the last year; and (viii) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that, under the circumstances, no other or further notice is required.

**NO PRIOR REQUEST**

73.     No previous request for the relief sought herein has been made to this

Court or any other court.

**CONCLUSION**

WHEREFORE the Debtors respectfully request that the Court enter an order (i)

approving the Bidding Procedures; (ii) scheduling the Sale Hearing; (iii) approving the

Assumption and Assignment Procedures; and (iv) approving the form and manner of notice of all

procedures, protections, schedules, and agreements.   Further, in the event that a Sale Hearing is

necessary in accordance with the Bidding Procedures, the Debtors respectfully request that the

Court enter an order (i) authorizing the sale of the Acquired Assets to the Successful Bidder

pursuant to the Acquisition Agreement or to the Successful Bidder pursuant to a Modified

Acquisition Agreement as the Debtors may enter into prior to the Sale Hearing; (ii) authorizing

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

the assumption and assignment of the Assigned Contracts; and (iii) such other and further relief

as is just and proper.

Dated:  Wilmington, Delaware
        November 10, 2014

                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                              */s/ Sarah E. Pierce*
                              Anthony W. Clark (I.D. No. 2051)
                              Sarah E. Pierce (I.D. No. 4648)
                              One Rodney Square
                              P.O. Box 636
                              Wilmington, Delaware 19899-0636
                              Telephone: (302) 651-3000
                              Fax: (302) 651-3001

                              - and -

                              Kenneth S. Ziman (*pro hac vice admission pending*)
                              Raquelle L. Kaye (*pro hac vice admission pending*)
                              Four Times Square
                              New York, New York 10036-6522
                              Telephone: (212) 735-3000
                              Fax: (212) 735-2000

                              - and -

                              Felicia Gerber Perlman (*pro hac vice admission pending*)
                              155 N. Wacker Drive
                              Chicago, Illinois 60606-1720
                              Telephone: (312) 407-0700
                              Fax: (312) 407-0411

                              Proposed Counsel for Debtors and Debtors in Possession

## **EXHIBIT A**

**BIDDING PROCEDURES ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re:                                              :    Chapter 11
                                                    :
DENDREON CORPORATION, et al.,                       :    Case No. 14-12515 (____)
                                                    :
            Debtors.[1]                             :    Jointly Administered
                                                    :
                                                    :    **Related Docket No. ____**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER (I) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) ESTABLISHING PROCEDURES FOR THE DEBTORS TO ENTER INTO STALKING HORSE AGREEMENT WITH BID PROTECTIONS IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (III) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (IV) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES AND AGREEMENTS, (V) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; AND (VI) GRANTING CERTAIN RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for an order (the "Order") (i) approving the proposed auction and bidding procedures, which are attached as Exhibit 1 hereto (the "Bidding Procedures"), for the potential sale of all or substantially all of the Debtors' non-cash assets (the "Acquired Assets"); (ii) establishing procedures (the "Stalking Horse Procedures") for the Debtors to enter into a stalking horse agreement (a "Stalking Horse Agreement") containing bid protections with respect to any stalking horse bidder (a "Stalking

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

[2]     Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion, the Bidding Procedures or the Acquisition Agreement.

Horse Bidder"); (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iv) approving the form and manner of notice of all procedures, protections, schedules and agreements; and (v) scheduling a hearing (the "Sale Hearing") to approve such sale (the "Sale Transaction"); and this Court having considered the Motion, and the arguments of counsel made, and the evidence adduced, at the hearing on the Motion (the "Bidding Procedures Hearing"); and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby,

<p style="text-align:center"><strong>FOUND, CONCLUDED AND DETERMINED THAT:[3]</strong></p>

A.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 365 and 503.  Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9014.

B.     The relief granted herein is in the best interests of the Debtors, their estates and other parties in interest.

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The Debtors have articulated good and sufficient business reasons for the Court to (i) approve the Bidding Procedures, (ii) approve the Stalking Horse Procedures, (iii) approve the Break-Up Fee and Expense Reimbursement Amount (together, the "Bid Protections"), (iv) approve the Assumption and Assignment Procedures, (v) approve the form and manner of notice of the Motion, the Auction and the Sale Hearing and (vi) set the date of the Auction and the Sale Hearing.

D.      Due, sufficient, and adequate notice of the Bidding Procedures Hearing and the relief requested in the Motion and the relief granted herein has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required. The Debtors' notice of the Motion, the proposed entry of this Order, the Bidding Procedures, the Stalking Horse Procedures, the Bid Protections, the Assumption and Assignment Procedures, the Auction and the Bidding Procedures Hearing is appropriate and reasonably calculated to provide all interested parties with timely and proper notice under Bankruptcy Rules 2002, 4001, 6004 and 6006, and no other or further notice of, or hearing on, the Motion or this Order is required.

E.      The Debtors' proposed notices of (i) the Sale Transaction, (ii) the assumption and assignment of, and Cure Amounts (as defined below) for, the executory contracts and unexpired leases to be assumed and assigned to any Successful Bidder, (iii) the Successful Bidder and (iv) the Bidding Procedures, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of each, and no further notice of, or hearing on, each is necessary or required.

F.      The Bidding Procedures, substantially in the form attached hereto, and incorporated herein by reference as if fully set forth in this Order, are fair, reasonable and

appropriate, and represent the best method for maximizing the value of the Debtors' estates in connection with the sale.

G.    The Debtors have demonstrated a compelling and sound business justification for approving the Bid Protections under the circumstances and timing set forth in the Motion.

H.    The Bid Protections, to the extent applicable and payable, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (ii) are of substantial benefit to the Debtors' estates (iii) are reasonable and appropriate, including in light of the size and nature of the Sale Transaction and the efforts that would be expended by any Stalking Horse Bidder and (iv) enable the Debtors to promote a sale of the Acquired Assets with the greatest benefit to the estate

I.    The Assumption and Assignment Procedures are reasonable and appropriate.

**IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is GRANTED, as set forth herein.

2.    Any objections filed in response to the Motion and the relief granted herein, to the extent not resolved as set forth herein or at the Bidding Procedures Hearing, are hereby overruled.

3.    The Bidding Procedures, as attached hereto, are approved.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures.

## Procedures for Designation of a Stalking Horse Bidder

4.      The Debtors, in consultation with the Consultation Parties, may select a Stalking Horse Bidder for the Acquired Assets for the purposes of establishing a minimum acceptable bid with which to begin the Auction (the "Stalking Horse Bid") and provide such Stalking Horse Bidder with the Bid Protections.  The Debtors shall have until December 29, 2014 (the "Stalking Horse Deadline") to select a Qualified Bid of a Qualified Bidder to be a Stalking Horse Bid.  The Debtors shall finalize a purchase agreement with a Stalking Horse Bidder (the "Stalking Horse Agreement") by no later than the Stalking Horse Deadline.  Within one (1) day following the Stalking Horse Deadline the Debtors shall file with the Bankruptcy Court a notice (the "Stalking Horse Notice") of such Stalking Horse Bid and a copy of the Stalking Horse Agreement.  The Debtors shall serve such Stalking Horse Notice on (i) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past twelve (12) months, (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets, (iii) counsel to each of the Supporting Noteholders, and (iv) counsel to any official committee appointed in the Chapter 11 Cases, if any.

5.      Pursuant to Bankruptcy Code sections 105, 363 and 503, the Debtors are hereby authorized to pay the Bid Protections and the Bid Protections are hereby approved.

## The Bid Deadline

6.      Qualified Bids must be received in writing, **on or before January 27, 2015 at 5:00 p.m. (prevailing Eastern Time)** or such earlier date as may be agreed to by each of the Debtors and the Consultation Parties (the "Bid Deadline"): (1) the Debtors, care of Dendreon Corporation, 200 Crossing Boulevard, Bridgewater, New Jersey 08807, Attention:

5

Robert L. Crotty (rcrotty@dendreon.com); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attention: Ken Ziman, Esq. (ken.ziman@skadden.com), and Graham Robinson, Esq. (graham.robinson@skadden.com); Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chigaco, IL, 60606, Attention:  Felicia Perlman, Esq. (felicia.perlman@skadden.com); and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Sarah E. Pierce (sarah.pierce@skadden.com); (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY  10020, Attention:  Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq. (spohl@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire (jlongmire@willkie.com).

### Notice of the Sale Transaction and the Sale Hearing

7.    Within five (5) Business Days after the entry of this Order, or as soon thereafter as practicable (the "Mailing Date"), the Debtors (or their agents) shall serve the Motion, this Order and the Bidding Procedures by first-class mail, postage prepaid, upon (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Acquired Assets at any time; (b) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets; (c) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the United States Attorney's office; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) counsel to any official committee appointed in

the Chapter 11 Cases; (h) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, Attention: Steven D. Pohl; (i) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, Attn: John C. Longmire (j) the indenture trustee under the 2016 Notes; (k) the parties included on the Debtors' list of twenty (20) largest unsecured creditors; and (l) those parties who have filed the appropriate notice requesting notice of all pleadings filed in the Chapter 11 Cases.

8.      On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, the Sale Notice upon all other known creditors of the Debtors.

9.      The Debtors shall publish notice of the proposed Sale Transaction in *The Wall Street Journal* on the Mailing Date or as soon as practicable thereafter.  Such publication notice shall be deemed sufficient and proper notice of the Sale Transaction to any other interested parties whose identities are unknown to the Debtors.

10.      Within one (1) day following the Stalking Horse Deadline the Debtors shall file with the Bankruptcy Court either the Acquisition Agreement Notice or the Stalking Horse Notice, as applicable.

11.      As soon as possible after the Bid Deadline the Debtors shall file, but not serve, a notice indicating whether the Auction will be held, and if applicable, the date and time of the Auction (the "Auction Notice"). If the Auction will not be held the Auction Notice will also provide notice of the cancellation of the Sale Hearing.

12.      As soon as possible after the conclusion of the Auction the Debtors shall file, but not serve, a notice identifying any Successful Bidder, and indicating whether the Sale Hearing will be held.

13.     The Sale Hearing to approve the Sale of the Acquired Assets shall be held on [•] at [•] (**Prevailing Eastern Time**).

14.     Objections, if any to the sale of the Acquired Assets to a Successful Bidder or Stalking Horse Purchaser must be filed and served on counsel for the Debtors by [•] at [•] (**Prevailing Eastern Time**).

### The Auction

15.     The Debtors are authorized to conduct an auction (the "<u>Auction</u>") with respect to the Acquired Assets. The Auction shall take place **on or before February 3, 2015 at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, or such other place and time as the Debtors shall notify all Qualified Bidders, the Unaffiliated Noteholders and their counsel and any official committee appointed in the Debtors' chapter 11 cases and its counsel. The Debtors are authorized, subject to the terms of this Order, to take actions reasonably necessary, in the discretion of the Debtors, to conduct and implement the Auction.

16.     Only the Debtors, the Consultation Parties  and any other Qualified Bidder, in each case, along with their representatives and counsel, or such other parties as the Debtors shall determine, in consultation with the Consultation Parties, shall attend the Auction (such attendance to be in person) and only the Qualified Bidders (including the Stalking Horse Bidder, if any), or such other parties as the Debtors shall determine, in consultation with the Consultation Parties, will be entitled to make any Bids at the Auction.  The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed. Each Qualified Bidder (including the Stalking Horse Bidder, if any) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of

the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of this Court and to the entry of a final order by this Court on any matter related to this Order, the Sale Transaction or the Auction if it is determined that this Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

17.    Subject to the rights of parties in interest to (i) challenge the sale or the sale process, (ii) challenge the Debtors' decisions with respect to the sale process and (iii) argue that such decisions are not governed by the "business judgment" standard, or (iv) such other rights as such parties may have under applicable law, the Debtors may, after consultation with the Consultation Parties, (I) select, in their business judgment, pursuant to the Bidding Procedures, the highest or otherwise best offer(s) and the Successful Bidder or Bidders, and (II) reject any bid that, in the Debtors' business judgment, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bidding Procedures or (c) contrary to the best interests of the Debtors and their estates, creditors, interest holders or parties-in-interest.

18.    The failure to specifically include or reference any particular provision, section or article of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

**Assumption and Assignment Procedures**

19.    The Assumption and Assignment Procedures are APPROVED.

20.    Within ten (10) business days after the entry of this Order, the Debtors shall file with this Court and serve on each party to an Assigned Contract a Cure Notice that shall

(i) state the cure amounts that the Debtors believe are necessary to assume such Assigned

Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"); (ii) notify the

non-Debtor party that such party's contract or lease may be assumed and assigned to a purchaser

of the Acquired Assets at the conclusion of the Auction; (iii) state the date of the Sale Hearing

and that objections to any Cure Amount or to assumption and assignment will be heard at the

Sale Hearing or at a later hearing, as determined by the Debtor; and (iv) state a deadline by

which the non-Debtor party shall file an objection to the Cure Amount or to the assumption and

assignment of the Assigned Contracts; provided, however, that the inclusion of a contract, lease

or agreement on the Cure Notice shall not constitute an admission that such contract, lease or

agreement is an executory contract or lease.  The Debtors reserve all of their rights, claims and

causes of action with respect to the contracts, leases and agreements listed on the Cure Notice. If

the Debtors enter into a Stalking Horse Agreement with a Stalking Horse Bidder, the Stalking

Horse Notice shall set forth any additional executory contracts to be included in the Acquired

Assets, as defined in such Stalking Horse Agreement, and such contracts will be deemed the

Assigned Contracts.

21.     The Debtors' inclusion of an executory contract or unexpired lease as an

Assigned Contract on the Cure Notice or the Stalking Horse Notice shall not be a guarantee that

such executory contract or unexpired lease will ultimately be assumed and assigned to the

Successful Bidder.  Should it be determined that an Assigned Contract will not be assumed and

assigned the Debtors shall notify such party to the Assigned Contract in writing of such decision.

22.     Any objection to the Cure Amount or to assumption and assignment must

be filed with the Court on or before twenty (20) days after the filing of the Cure Notice (the

"Cure Objection Deadline") and served on: (1) care of Dendreon Corporation, 200 Crossing

10

Boulevard, Bridgewater, New Jersey 08807, Attention: Robert L. Crotty (rcrotty@dendreon.com); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attention: Ken Ziman, Esq. (ken.ziman@skadden.com), 155 N. Wacker Drive, Chicago, IL, 60606, Attention:  Felicia Perlman, Esq. (felicia.perlman@skadden.com), and 500 Boylston Street, Boston, MA  02116, Attention: Graham Robinson, Esq. (graham.robinson@skadden.com); (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY  10020, Attention: Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq. (spohl@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire (jlongmire@willkie.com).  Any such objection must (i) be in writing; (ii) state the basis for such objection; and (ii) state with specificity what cure amount the party to the Assigned Contract believes is required (in all cases with appropriate documentation in support thereof).  If a Successful Bidder other than a Stalking Horse Bidder prevails at the Auction, then the deadline to object to adequate assurance shall be extended to the date of the Sale Hearing, but any such objection must be received before the start of the Sale Hearing; provided, however, that the deadline to object to the Cure Amount shall not be extended.

23.     If the Successful Bid at the Auction is a Bid to acquire the assets pursuant to Section 363 of the Bankruptcy Code, as soon as possible after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court a Sale Hearing Notice that identifies any Successful Bidder and provides notice that the Debtors will seek to assume and assign the

Assigned Contracts at the Sale Hearing.  At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder and (ii) request entry of an order granting approval of the assumption and assignment of any Assigned Contracts to the Successful Bidder.

24.    Unless a non-Debtor party to any executory contract or unexpired lease, including an unexpired real property lease, files an objection to the Cure Amount by the Cure Objection Deadline, such counterparty shall be (i) forever barred from objecting to the Cure Amount and (ii) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the Cure Notice against the Debtors, any Successful Bidder or any other assignee of the relevant contract.

25.    To the extent that a non-Debtor counterparty to an Assigned Contract was not provided with a Cure Notice (any such contract or lease a "Previously Omitted Contract"), the Debtors will notify the Successful Bidder within three Business Days (as defined in the Acquisition Agreement) of the omission.  The Debtors shall serve a notice (the "Previously Omitted Contract Notice") to the counterparties to the Previously Omitted Contract indicating the Debtors' intent to assume and assign the Previously Omitted Contract.  The counterparties will have fourteen (14) days to object to the Cure Amount or the assumption.  If the parties cannot agree on a resolution, the Debtors will seek an expedited hearing before the Court to determine the Cure Amount and approve the assumption.  If there is no objection, then the counterparties will be deemed to have consented to the assumption and assignment and the Cure Amount, and such assumption and assignment and the Cure Amount shall be deemed approved by the Sale Order without further order of this Court.

26.     The Debtors shall file a notice with the Court listing the Assigned

Contracts, if any, that the Debtors have determined not to assume, prior to the Sale Hearing.

**<u>Related Relief</u>**

27.     Any obligations of the Debtors set forth in the Acquisition Agreement that

are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order are

authorized as set forth herein.

28.     The Debtors are hereby authorized and empowered to take such actions as

may be reasonably necessary to implement and effect the terms and requirements established this

Order.

29.     This Order shall constitute findings of fact and conclusions of law and

shall take effect immediately upon execution hereof.

30.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h),

6006(d), 7052, 9014 or otherwise, the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry.

31.     This Court shall retain jurisdiction with respect to all matters arising from

or related to the implementation or interpretation of this Order, including, but not limited to, any

matter, claim or dispute arising from or relating to the Bid Protections, the Acquisition

Agreement, the Bidding Procedures and the implementation of this Order.

Dated:  Wilmington, Delaware
            _____, 2014


            _____
            UNITED STATES BANKRUPTCY JUDGE

13

**<u>Exhibit 1</u>**

**Bidding Procedures**

## BIDDING PROCEDURES[1]

By the Motion, Dendreon Corporation and its direct and indirect subsidiaries that are debtors and debtors in possession in the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 14-12515 (together the "Debtors"),[2] sought approval of, among other things, the procedures through which they will determine the highest or otherwise best offer for the sale of substantially all of their non-cash assets (the "Acquired Assets").

On [•], 2014 the Bankruptcy Court entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to determine the highest or otherwise best offer for the Acquired Assets through the process and procedures set forth below (the "Bidding Procedures"). The Bidding Procedures provide that the Debtors may also consider bids in the form of a recapitalization transaction effectuated through a chapter 11 plan of reorganization, subject to the requirements set forth herein (a "Chapter 11 Plan Bid"). In addition, the Debtors may designate a stalking horse bidder (the "Stalking Horse Bidder") in accordance with the procedures set forth below.

### Acquired Assets to Be Sold

The Debtors are offering for sale all of the Acquired Assets. Except in the case of a Chapter 11 Plan Bid and except as otherwise provided in the Acquisition Agreement or a Modified Acquisition Agreement (both as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto) all of the Debtors' right, title and interest in and to the Acquired Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests") to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Acquired Assets with the same validity and priority as such Interests applied against the Acquired Assets. More detail regarding the Acquired Assets will be posted in the electronic data room.

### Bidding Process

The Debtors and their advisors shall, subject to the other provisions of these Bidding Procedures, including the consultation obligations set forth herein and the Bidding Procedures Order, (i) determine whether any person is a Qualified Bidder (as defined below), (ii) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, (iii) receive

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the motion for approval of, among other things, the Bidding Procedures (the "Motion").

[2]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

offers from Qualified Bidders, (iv) negotiate any offers made to purchase the Acquired Assets, and (v) determine if any Qualified Bidder should be selected as a Stalking Horse Bidder.

## Key Dates For Potential Competing Bidders

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in an auction to be conducted by the Debtors (the "Auction") and to submit competing bids for the Acquired Assets. The Debtors shall assist Qualified Bidders in conducting their respective due diligence investigations and shall accept Bids (as defined below) until **January 27, 2015 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

The key dates for the sale process are as follows:

| | |
|---|---|
| December 29, 2014 | Stalking Horse Deadline |
| January 27, 2015 at 5:00 P.M. EST | Bid Deadline - Due Date for Bids and Deposits |
| February 3, 2015 at 10:00 A.M. EST | Auction |
| January 27, 2015 at 10:00 A.M. EST | Objection Deadline in Connection with Sale of Acquired Assets to a Successful Bidder[3] |
| On or before February 10, 2015 at [●] EST | Sale Hearing |

In the event that the Successful Bid is a Chapter 11 Plan Bid, the Sale Hearing will not occur and the Debtors will prosecute confirmation of a plan of reorganization consistent with such Chapter 11 Plan Bid.

## Procedures for the Designation of a Stalking Horse Bidder

The Debtors, in consultation with the Consultation Parties (as defined herein), may select a Stalking Horse Bidder for the Acquired Assets for the purposes of establishing a minimum acceptable bid with which to begin the Auction (the "Stalking Horse Bid") and provide such Stalking Horse Bidder with the Bid Protections described in the Sale Motion. The Debtors shall have until December 29, 2014 (the "Stalking Horse Deadline") to select a Qualified Bid of a Qualified Bidder to be a Stalking Horse Bid. The Debtors shall finalize a purchase agreement with a Stalking Horse Bidder (the "Stalking Horse Agreement") by no later than the Stalking Horse Deadline. Within one (1) day following the Stalking Horse Deadline the Debtors shall file with the Bankruptcy Court a notice (the "Stalking Horse Notice") of such Stalking Horse Bid and

---

[3]    This objection deadline applies to all objections to the Sale Motion and the Sale of the Acquired Assets to a Successful Bidder, with the exception of objections related to adequate assurance performance by the Successful Bidder or any changes to the Acquisition Agreement.

a copy of the Stalking Horse Agreement.  The Debtors shall serve such Stalking Horse Notice on (i) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past twelve (12) months, (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets, (iii) counsel to the Supporting Noteholders, and (iv) counsel to any official committee appointed in the Chapter 11 Cases, if any.

## Due Diligence

### *Access to Diligence Materials.*

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors (i) an executed confidentiality agreement substantially in the form attached hereto as Exhibit A or such other form reasonably satisfactory to the Debtors, and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Acquired Assets or a recapitalization transaction pursuant to a chapter 11 plan of reorganization (any such transaction, a "Transaction") as reasonably determined by the Debtors, in consultation with the Consultation Parties.  A party who qualifies for access to Diligence Materials pursuant to the prior sentence shall be a "Qualified Bidder."

The Debtors will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence, as determined by the Debtors, including reasonable access to management, access to the electronic data room and other information that a Qualified Bidder may reasonably request; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below).  The Debtors reserve the right to withhold any Diligence Materials that the Debtors determine are business-sensitive or otherwise not appropriate for disclosure to a Qualified Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Qualified Bidder.

All due diligence requests must be directed to Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY 10020, to the attention of Sven Pfeiffer (sven.pfeiffer@lazard.com; Phone: 212-632-6583; Fax: 212-332-8365).

### *Due Diligence from Qualified Bidders.*

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding the ability of such Qualified Bidder, as applicable, to consummate its contemplated transaction.  Failure by a Qualified Bidder to comply with requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that such bidder is no longer a Qualified Bidder.  Failure by a Qualified Bidder to comply with requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that a bid made by such Qualified Bidder is not a Qualified Bid.

## Auction Qualification Process

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), must be reasonably determined by the Debtors to satisfy each of the following conditions:

(a)     Good Faith Deposit:  Each Bid must be accompanied by a deposit in the amount of ten percent (10%) of the purchase price contained in the Modified Acquisition Agreement (defined below), before any reductions for assumed liabilities, or, in the case of a Chapter 11 Plan Bid, ten percent (10%) of the amount of the capital investment contemplated by such bid, before any reductions for assumed liabilities, to an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit").

(b)     Same or Better Terms:  Each Bid must be on terms that the Debtors, in their business judgment and after consulting with the Consultation Parties, determine are the same or better than the terms of either (i) the Acquisition Agreement, or (ii) in the event the Debtors enter into a Stalking Horse Agreement, the Stalking Horse Agreement.

(c)     Executed Agreement:   Each Bid must be based on the proposed acquisition agreement, which shall be prepared by the Debtors in Consultation with the Consultation Parties and shall be filed with the Bankruptcy Court no later than the day after the Stalking Horse Deadline (the "Acquisition Agreement") and must include executed transaction documents, signed by an authorized representative of such Qualified Bidder, pursuant to which the Qualified Bidder proposes to effectuate a Transaction (a "Modified Acquisition Agreement").[4]  Each Bid must also include a copy of the Acquisition Agreement marked against the Modified Acquisition Agreement to show all changes requested by the Qualified Bidder (including the inclusion of the purchase price).  Each Modified Acquisition Agreement must provide (1) a commitment to close within two business days after all closing conditions are met and (2) a representation that the Qualified Bidder will (a) make all necessary filings under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and (b) submit all necessary filings under the HSR Act within ten (10) days following the effective date of the Modified Acquisition Agreement.

---

[4]     If the Bid is a Chapter 11 Plan Bid and the Debtors have not filed a form of investment agreement with the Bankruptcy Court within at least ten (10) business days prior to the Bid Deadline, any Qualified Bidder submitting a Chapter 11 Plan Bid shall submit a Modified Acquisition Agreement marked as appropriate.  If a form of investment agreement has been filed, any Qualified Bidder submitting a Chapter 11 Plan Bid shall submit a modified investment agreement (a "Modified Investment Agreement").  All requirements of these Bid Procedures that apply to a Modified Acquisition Agreement shall apply to a Modified Investment Agreement.

In the event the Debtors enter into a Stalking Horse Agreement each Bid must include a copy of the Modified Acquisition Agreement marked against the Stalking Horse Agreement.

(d)   Minimum Bid:  A Bid (including a Chapter 11 Plan Bid) for all or substantially all of the Debtors' non-cash assets must propose a minimum purchase price, including any assumption of liabilities and any earnout or similar provisions, that in the Debtors' reasonable business judgment, after consulting with the Consultation Parties, has a value greater than $275,000,000[5].

In the event that the Debtors enter into a Stalking Horse Agreement, a Bid for all or substantially all of the Debtors' assets (or in the case of a Chapter 11 Plan Bid for the equity of reorganized Dendreon) must propose a minimum purchase price, including any assumption of liabilities and any earnout or similar provisions, that in the Debtors' reasonable business judgment, after consulting with the Consultation Parties, has a value greater than (i) the purchase price set forth in any Stalking Horse Purchase Agreement, (ii) the Break-Up Fee (as defined in the Sale Motion), if any (iii) the Expense Reimbursement Amount (as defined in the Sale Motion), if any, (iv) the Assumed Liabilities (as defined in the Stalking Horse Agreement), as applicable, and (v) the Overbid Amount[6], as applicable the sum of which shall be the "Stalking Horse Auction Minimum Bid Amount".

(e)   Designation of Assigned Contracts and Leases:  A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Qualified Bidder wishes to be assumed and, with respect to any Bid that is not a Chapter 11 Plan Bid, assigned to the Qualified Bidder at closing, pursuant to a Transaction.  A Bid must specify whether the Debtors or the Qualified Bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors).

(f)   Designation of Assumed Liabilities:  A Bid must identify all liabilities which the Qualified Bidder proposes to assume.

(g)   Corporate Authority:  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Transaction; provided that, if the Qualified Bidder is an entity specially formed for the purpose of effectuating the Transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Transaction by the equity holder(s) of such Qualified Bidder.

---

[5]   To the extent a Supporting Noteholder submits a Bid, such Bid must be a cash Bid.

[6]   The "Overbid Amount" shall be $1 million.

(h)     <u>Disclosure of Identity of Qualified Bidder</u>:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(i)     <u>Proof of Financial Ability to Perform</u>:  A Bid must include written evidence that the Debtors may reasonably conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Qualified Bidder has the necessary financial ability to close the Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Transaction. Such information must include, *inter alia*, the following:

　　(1)     contact names and numbers for verification of financing sources;

　　(2)     written evidence of the Qualified Bidder's internal resources and proof of any debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Transaction;

　　(3)     the Qualified Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

　　(4)     a description of the Qualified Bidder's pro forma capital structure (and, in the case of a Chapter 11 Plan Bid, the Debtors' pro forma capital structure); and

　　(5)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Qualified Bidder has the ability to close the Transaction.

(j)     <u>Regulatory and Third Party Approvals</u>:  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the Transaction, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals, and the Debtors, in consultation with the Consultation Parties, may consider the timing of such approvals, and any actions the Qualified Bidder will take to ensure receipt of such approval(s) as promptly as possible, when considering the other Bid Assessment Criteria (defined below).

(k)     <u>Contact Information and Affiliates</u>:  A Bid must provide the identity and contact information for the Qualified Bidder and full disclosure of any parent companies

of the Qualified Bidder.

(l)    <u>Contingencies</u>:  A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(m)    <u>Irrevocable</u>:  A Bid must be irrevocable until the Good Faith Deposit associated with such Bid must be returned in accordance with the terms hereof (or, if the Successful Bid is a Chapter 11 Plan Bid, until confirmation of such plan of reorganization), <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined below), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(n)    <u>Compliance with Diligence Requests</u>.  The Qualified Bidder submitting a Bid must have complied with reasonable requests for additional information and due diligence access from the Debtors (as described above) to the reasonable satisfaction of the Debtors.

(o)    <u>Confidentiality Agreement</u>.  To the extent not already executed, a Bid must include an executed confidentiality agreement substantially in the form attached hereto as <u>Exhibit A</u> or otherwise in form and substance reasonably satisfactory to the Debtors.

(p)    <u>Termination Fees</u>.  Except with respect to any Stalking Horse Bidder, a Bid must not entitle the Qualified Bidder to any break-up fee, termination fee or similar type of payment or reimbursement and, by submitting a Bid, the Qualified Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction (as defined below).

A Bid received from a Qualified Bidder that meets the above requirements for the applicable assets, as determined by the Debtors in their sole discretion after consulting with the Consultation Parties, shall constitute a "<u>Qualified Bid</u>" for such assets; <u>provided</u> that if the Debtors receive a Bid prior to the Bid Deadline that is not a Qualified Bid the Debtors may provide the Qualified Bidder with the opportunity to remedy any deficiencies prior to the Auction; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors to the satisfaction of the Debtors, the Debtors may, after consulting with the Consultation Parties, disqualify any Qualified Bidder and Qualified Bid in the Debtor's discretion, and such Qualified Bidder shall not be entitled to attend or participate in the Auction.

## <u>Bid Deadline</u>

The following parties must receive a Bid in writing, on or before January 27, 2015 at 5:00 p.m. (prevailing Eastern Time) or such earlier date as may be agreed to by each of the Debtors, after consulting with the Consultation Parties (the "<u>Bid Deadline</u>"): (1) the Debtors, 200 Crossing Boulevard, Bridgewater, NJ 08807, Attn: Robert Crotty (<u>rcrotty@dendreon.com</u>); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attn: Ken Ziman (<u>ken.ziman@skadden.com</u>), 155 N. Wacker Drive, Chicago, IL, 60606,

Attn:   Felicia Perlman (felicia.perlman@skadden.com), and 500 Boylston Street, Boston, MA 02116, Attn: Graham Robinson (graham.robinson@skadden.com); (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY 10020, Attn:  Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl (spohl@brownrudnick.com) and Seven Times Square, New York, NY 10036, Attention: John F. Storz (jstorz@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire (jlongmire@willkie.com).

## Auction

If two or more Qualified Bids are received by the Bid Deadline, or in the event the Debtors enter into a Stalking Horse Agreement and one Qualified Bid other than that submitted by the Stalking Horse Bidder is received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid.  This determination shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following:  (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes to the Acquisition Agreement requested by each Qualified Bidder; (c) the extent to which such modifications or provisions are likely to delay closing of the sale of the Debtors' assets and the cost to the Debtors of such modifications or delay; (d) the total consideration to be received by the Debtors; (e) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (f) the net benefit to the Debtors' estates, taking into account, if applicable, any Stalking Horse Bidder's right to any Break Up Fee or Expense Reimbursement Amount, and (f) any other qualitative or quantitative factor the Debtors, in consultation with the Consultation Parties, deem reasonably appropriate under the circumstances (collectively, the "Bid Assessment Criteria").

If two or more Qualified Bids are not received by the Bid Deadline, or in the event the Debtors enter into a Stalking Horse Agreement, if one Qualified Bid other than that submitted by the Stalking Horse Bidder is not received by the Bid Deadline, the Debtors may determine not to conduct the Auction.  If the Debtors have not entered into a Stalking Horse Agreement and only one Qualified Bid is received by the Bid Deadline, the Debtors may, in consultation with the Consultation Parties, select the Modified Acquisition Agreement of such Qualified Bidder to be the Successful Bid and such Qualified Bidder shall be the Successful Bidder.  In the event the Debtors enter into a Stalking Horse Agreement, if a Qualified Bid other than that submitted by the Stalking Horse Bidder is not received by the Bid Deadline, the Stalking Horse Agreement shall become the Successful Bid and the Stalking Horse Qualified Bidder Shall be the Successful Bidder.  In the event that the Debtors have not entered into a Stalking Horse Agreement and no Qualified Bids are received by the Bid Deadline, the Debtors shall pursue a restructuring with the Supporting Noteholders, as outlined in the Plan Support Agreement and the Plan Term Sheet attached thereto.

**<u>Procedures for Auction</u>**

The Auction, if necessary, shall take place on or before February 3, 2015 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, or such other place and time as the Debtors shall notify all Qualified Bidders that have submitted Qualified Bids (including the Stalking Horse Bidder, if any), the Supporting Noteholders and their counsel and any official committee appointed in the Debtors' chapter 11 cases and its counsel.  The Auction shall be conducted according to the following procedures:

*Participation.*

Only the Debtors, the Consultation Parties, and any Qualified Bidder that has submitted a Qualified Bid (including the Stalking Horse Bidder, if any), in each case, along with their representatives and counsel, or such other parties as the Debtors shall determine, in consultation with the Consultation Parties, shall attend the Auction (such attendance to be in person) and only such Qualified Bidders (including the Stalking Horse Bidder, if any), or such other parties as the Debtors shall determine, in consultation with the Consultation Parties, will be entitled to make any Bids at the Auction.

*The Debtors Shall Conduct the Auction.*

The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed.   Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they reasonably determine will result in the highest or otherwise best Qualified Bid.  The Debtors shall use their best efforts to provide each participant in the Auction with a copy of the Modified Acquisition Agreement associated with the highest or otherwise best Qualified Bid received before the Bid Deadline (such highest or otherwise best Qualified Bid the "<u>Auction Baseline Bid</u>").  In addition, at the start of the Auction, the Debtors shall describe the terms of the Auction Baseline Bid.  Each Qualified Bidder (including the Stalking Horse Bidder, if any) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below).

*Terms of Overbids.*

An "<u>Overbid</u>" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid.  Any Overbid for purposes of this Auction must comply with the following conditions:

(a)    <u>Minimum Overbid Increments</u>:  Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $250,000.   In order to maximize value, the Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the minimum incremental bids (or in valuing such bids) at any time during the Auction. Additional consideration in excess of the amount set forth in the

respective Auction Baseline Bid may include cash and/or noncash consideration, provided, however, that the value for such non-cash consideration shall be determined by the Debtors, in consultation with the Consultation Parties, in their reasonable business judgment.

(b)     Remaining Terms Are the Same as for Qualified Bids:  Except as modified herein or by the Debtors at the Auction, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that (i) the Bid Deadline shall not apply, (ii) no additional Good Faith Deposit shall be required beyond the Good Faith Deposit previously submitted by a Qualified Bidder, provided that the Successful Bidder shall be required to make a representation at the end of the Auction that it will provide any additional deposit necessary so that its Good Faith Deposit is equal to the amount of ten percent (10%) of the purchase price, or ten percent 10% of the capital investment, contained in the Successful Bid, and (iii) each Overbid may be based on the Auction Baseline Bid, or any other form Modified Acquisition Agreement submitted prior to the Auction.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes (if any) requested by the Qualified Bidder to the Acquisition Agreement or a previously submitted Modified Acquisition Agreement, in connection therewith (including any changes to the designated assigned contracts and leases and assumed liabilities).  Any Overbid must remain open and binding on the Qualified Bidder.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Qualified Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) reasonably demonstrating such Qualified Bidder's ability to close the Transaction proposed by such Overbid.

***Announcement and Consideration of Overbids.***

(a)     Announcement of Overbids:  The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration and such other terms as the Debtors, in consultation with the Consultation Parties, reasonably determine will facilitate the Auction.

(b)     Consideration of Overbids:  Subject to the deadlines set forth herein, the Debtors reserve the right, in consultation with the Consultation Parties, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; or give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has

received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Transaction at the prevailing Overbid amount.

***Backup Bidder.***

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment and after consulting with the Consultation Parties, will be designated as the backup bidder (the "Backup Bidder").  The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "Backup Bid") open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern Time) on the date that is sixty (60) days after the date of entry of the Sale Order, or, if the Successful Bid is a Chapter 11 Plan Bid, until the effective date of such plan of reorganization (the "Outside Backup Date"), or (ii) the closing of the transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtors will be authorized, but not required, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder.  In such case of a breach or failure to perform on the part of the Successful Bidder (including any Backup Bidder designated as a Successful Bidder), the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

***Additional Procedures.***

The Debtors (after consulting with the Consultation Parties) may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, so long as such rules are not inconsistent in any material respect with the Bidding Procedures.

***Consent to Jurisdiction and Authority as Condition to Bidding.***

All Qualified Bidders (including the Stalking Horse Bidder, if any) shall be deemed to have (1) consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the Chapter 11 Cases, the Bidding Procedures, the Auction, any Modified Acquisition Agreement, or the construction and enforcement of documents relating to any Transaction, (2) waived any right to a jury trial in connection with any disputes relating to the Debtors, the Chapter 11 Cases, the Bidding Procedures, the Auction, any Modified Acquisition Agreement, or the construction and enforcement of documents relating to any Transaction and (3) consented to the entry of a final order or judgment in any way related to the Debtors, the Chapter 11 Cases, the Bidding Procedures, the Auction, any Modified Acquisition Agreement, or the construction and enforcement of documents relating to any Transaction if it is determined that the Bankruptcy

Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

*Sale Is As Is/Where Is.*

Except as otherwise provided in the Modified Acquisition Agreement or the Sale Order, the Acquired Assets or any other assets of the Debtors sold pursuant to the Bidding Procedures, shall be conveyed at the closing of a transaction with a Successful Bidder in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

*Closing the Auction.*

The Auction shall continue until there is one Qualified Bid for the Acquired Assets or a Chapter 11 Plan Bid that the Debtors determine in their reasonable business judgment, after consulting with the Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction. Thereafter, the Debtors shall select such Qualified Bid, in consultation with the Consultation Parties, as the overall highest or otherwise best Qualified Bid (such Bid, the "Successful Bid," and the Qualified Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

Unless otherwise required pursuant to the Debtors' fiduciary duties, the Debtors shall not consider any Bids submitted after the conclusion of the Auction.

## Return of Good Faith Deposits

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder and (b) the Outside Backup Date. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards the purchase price.

## The Consultation Parties

The Debtors shall consult with the Supporting Noteholders and any official committee appointed in the Debtors' chapter 11 cases and each of their respective advisors (collectively, the

"<u>Consultation Parties</u>" and each, a "<u>Consultation Party</u>") as explicitly provided for in the Bidding Procedures; <u>provided</u>, <u>however</u>, that the Debtors shall not be required to consult with any Consultation Party (and its advisors) that is a Qualified Bidder unless such Qualified Bidder does not submit a bid by the Bid Deadline, at which time, such Supporting Noteholder shall become a Consultation Party; <u>provided</u>, <u>further</u> that if any individual Supporting Noteholder becomes a Qualified Bidder, the consultation rights of any Supporting Noteholder that has not become a Qualified Bidder shall not be affected.

### <u>Reservation of Rights of the Debtors</u>

Except as otherwise provided in the Acquisition Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Consultation Parties to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine whether to enter into a Stalking Horse Agreement; (d) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (e) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties and are not inconsistent with any Bankruptcy Court order.

**<u>EXHIBIT B</u>**

**BIDDING PROCEDURES**

## BIDDING PROCEDURES[1]

By the Motion, Dendreon Corporation and its direct and indirect subsidiaries that are debtors and debtors in possession in the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 14-12515 (together the "Debtors"),[2] sought approval of, among other things, the procedures through which they will determine the highest or otherwise best offer for the sale of substantially all of their non-cash assets (the "Acquired Assets").

On [•], 2014 the Bankruptcy Court entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to determine the highest or otherwise best offer for the Acquired Assets through the process and procedures set forth below (the "Bidding Procedures"). The Bidding Procedures provide that the Debtors may also consider bids in the form of a recapitalization transaction effectuated through a chapter 11 plan of reorganization, subject to the requirements set forth herein (a "Chapter 11 Plan Bid"). In addition, the Debtors may designate a stalking horse bidder (the "Stalking Horse Bidder") in accordance with the procedures set forth below.

### Acquired Assets to Be Sold

The Debtors are offering for sale all of the Acquired Assets. Except in the case of a Chapter 11 Plan Bid and except as otherwise provided in the Acquisition Agreement or a Modified Acquisition Agreement (both as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto) all of the Debtors' right, title and interest in and to the Acquired Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests") to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Acquired Assets with the same validity and priority as such Interests applied against the Acquired Assets. More detail regarding the Acquired Assets will be posted in the electronic data room.

### Bidding Process

The Debtors and their advisors shall, subject to the other provisions of these Bidding Procedures, including the consultation obligations set forth herein and the Bidding Procedures Order, (i) determine whether any person is a Qualified Bidder (as defined below), (ii) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, (iii) receive

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the motion for approval of, among other things, the Bidding Procedures (the "Motion").

[2]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

offers from Qualified Bidders, (iv) negotiate any offers made to purchase the Acquired Assets, and (v) determine if any Qualified Bidder should be selected as a Stalking Horse Bidder.

## Key Dates For Potential Competing Bidders

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in an auction to be conducted by the Debtors (the "Auction") and to submit competing bids for the Acquired Assets. The Debtors shall assist Qualified Bidders in conducting their respective due diligence investigations and shall accept Bids (as defined below) until **January 27, 2015 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

The key dates for the sale process are as follows:

| | |
|---|---|
| December 29, 2014 | Stalking Horse Deadline |
| January 27, 2015 at 5:00 P.M. EST | Bid Deadline - Due Date for Bids and Deposits |
| February 3, 2015 at 10:00 A.M. EST | Auction |
| January 27, 2015 at 10:00 A.M. EST | Objection Deadline in Connection with Sale of Acquired Assets to a Successful Bidder[3] |
| On or before February 10, 2015 at [●] EST | Sale Hearing |

In the event that the Successful Bid is a Chapter 11 Plan Bid, the Sale Hearing will not occur and the Debtors will prosecute confirmation of a plan of reorganization consistent with such Chapter 11 Plan Bid.

## Procedures for the Designation of a Stalking Horse Bidder

The Debtors, in consultation with the Consultation Parties (as defined herein), may select a Stalking Horse Bidder for the Acquired Assets for the purposes of establishing a minimum acceptable bid with which to begin the Auction (the "Stalking Horse Bid") and provide such Stalking Horse Bidder with the Bid Protections described in the Sale Motion. The Debtors shall have until December 29, 2014 (the "Stalking Horse Deadline") to select a Qualified Bid of a Qualified Bidder to be a Stalking Horse Bid. The Debtors shall finalize a purchase agreement with a Stalking Horse Bidder (the "Stalking Horse Agreement") by no later than the Stalking Horse Deadline. Within one (1) day following the Stalking Horse Deadline the Debtors shall file with the Bankruptcy Court a notice (the "Stalking Horse Notice") of such Stalking Horse Bid and

---

[3]   This objection deadline applies to all objections to the Sale Motion and the Sale of the Acquired Assets to a Successful Bidder, with the exception of objections related to adequate assurance performance by the Successful Bidder or any changes to the Acquisition Agreement.

a copy of the Stalking Horse Agreement.  The Debtors shall serve such Stalking Horse Notice on (i) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past twelve (12) months, (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets, (iii) counsel to the Supporting Noteholders, and (iv) counsel to any official committee appointed in the Chapter 11 Cases, if any.

## Due Diligence

### *Access to Diligence Materials.*

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors (i) an executed confidentiality agreement substantially in the form attached hereto as Exhibit A or such other form reasonably satisfactory to the Debtors, and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Acquired Assets or a recapitalization transaction pursuant to a chapter 11 plan of reorganization (any such transaction, a "Transaction") as reasonably determined by the Debtors, in consultation with the Consultation Parties.  A party who qualifies for access to Diligence Materials pursuant to the prior sentence shall be a "Qualified Bidder."

The Debtors will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence, as determined by the Debtors, including reasonable access to management, access to the electronic data room and other information that a Qualified Bidder may reasonably request; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below).  The Debtors reserve the right to withhold any Diligence Materials that the Debtors determine are business-sensitive or otherwise not appropriate for disclosure to a Qualified Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Qualified Bidder.

All due diligence requests must be directed to Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY 10020, to the attention of Sven Pfeiffer (sven.pfeiffer@lazard.com; Phone: 212-632-6583; Fax: 212-332-8365).

### *Due Diligence from Qualified Bidders.*

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding the ability of such Qualified Bidder, as applicable, to consummate its contemplated transaction.  Failure by a Qualified Bidder to comply with requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that such bidder is no longer a Qualified Bidder.  Failure by a Qualified Bidder to comply with requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that a bid made by such Qualified Bidder is not a Qualified Bid.

## Auction Qualification Process

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), must be reasonably determined by the Debtors to satisfy each of the following conditions:

(a)   <u>Good Faith Deposit</u>:  Each Bid must be accompanied by a deposit in the amount of ten percent (10%) of the purchase price contained in the Modified Acquisition Agreement (defined below), before any reductions for assumed liabilities, or, in the case of a Chapter 11 Plan Bid, ten percent (10%) of the amount of the capital investment contemplated by such bid, before any reductions for assumed liabilities, to an interest-bearing escrow account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>").

(b)   <u>Same or Better Terms</u>:  Each Bid must be on terms that the Debtors, in their business judgment and after consulting with the Consultation Parties, determine are the same or better than the terms of either (i) the Acquisition Agreement, or (ii) in the event the Debtors enter into a Stalking Horse Agreement, the Stalking Horse Agreement.

(c)   <u>Executed Agreement</u>:  Each Bid must be based on the proposed acquisition agreement, which shall be prepared by the Debtors in Consultation with the Consultation Parties and shall be filed with the Bankruptcy Court no later than the day after the Stalking Horse Deadline (the "<u>Acquisition Agreement</u>") and must include executed transaction documents, signed by an authorized representative of such Qualified Bidder, pursuant to which the Qualified Bidder proposes to effectuate a Transaction (a "<u>Modified Acquisition Agreement</u>").[4]  Each Bid must also include a copy of the Acquisition Agreement marked against the Modified Acquisition Agreement to show all changes requested by the Qualified Bidder (including the inclusion of the purchase price).  Each Modified Acquisition Agreement must provide (1) a commitment to close within two business days after all closing conditions are met and (2) a representation that the Qualified Bidder will (a) make all necessary filings under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), and (b) submit all necessary filings under the HSR Act within ten (10) days following the effective date of the Modified Acquisition Agreement.

---

[4]   If the Bid is a Chapter 11 Plan Bid and the Debtors have not filed a form of investment agreement with the Bankruptcy Court within at least ten (10) business days prior to the Bid Deadline, any Qualified Bidder submitting a Chapter 11 Plan Bid shall submit a Modified Acquisition Agreement marked as appropriate.  If a form of investment agreement has been filed, any Qualified Bidder submitting a Chapter 11 Plan Bid shall submit a modified investment agreement (a "<u>Modified Investment Agreement</u>").  All requirements of these Bid Procedures that apply to a Modified Acquisition Agreement shall apply to a Modified Investment Agreement.

In the event the Debtors enter into a Stalking Horse Agreement each Bid must include a copy of the Modified Acquisition Agreement marked against the Stalking Horse Agreement.

(d)    <u>Minimum Bid</u>:  A Bid (including a Chapter 11 Plan Bid) for all or substantially all of the Debtors' non-cash assets must propose a minimum purchase price, including any assumption of liabilities and any earnout or similar provisions, that in the Debtors' reasonable business judgment, after consulting with the Consultation Parties, has a value greater than $275,000,000[5].

In the event that the Debtors enter into a Stalking Horse Agreement, a Bid for all or substantially all of the Debtors' assets (or in the case of a Chapter 11 Plan Bid for the equity of reorganized Dendreon) must propose a minimum purchase price, including any assumption of liabilities and any earnout or similar provisions, that in the Debtors' reasonable business judgment, after consulting with the Consultation Parties, has a value greater than (i) the purchase price set forth in any Stalking Horse Purchase Agreement, (ii) the Break-Up Fee (as defined in the Sale Motion), if any (iii) the Expense Reimbursement Amount (as defined in the Sale Motion), if any, (iv) the Assumed Liabilities (as defined in the Stalking Horse Agreement), as applicable, and (v) the Overbid Amount[6], as applicable the sum of which shall be the "<u>Stalking Horse Auction Minimum Bid Amount</u>".

(e)    <u>Designation of Assigned Contracts and Leases</u>:  A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Qualified Bidder wishes to be assumed and, with respect to any Bid that is not a Chapter 11 Plan Bid, assigned to the Qualified Bidder at closing, pursuant to a Transaction.  A Bid must specify whether the Debtors or the Qualified Bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors).

(f)    <u>Designation of Assumed Liabilities</u>:  A Bid must identify all liabilities which the Qualified Bidder proposes to assume.

(g)    <u>Corporate Authority</u>:  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Transaction; <u>provided</u> that, if the Qualified Bidder is an entity specially formed for the purpose of effectuating the Transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Transaction by the equity holder(s) of such Qualified Bidder.

---

[5]    To the extent a Supporting Noteholder submits a Bid, such Bid must be a cash Bid.

[6]    The "<u>Overbid Amount</u>" shall be $1 million.

(h)      <u>Disclosure of Identity of Qualified Bidder</u>:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(i)      <u>Proof of Financial Ability to Perform</u>:  A Bid must include written evidence that the Debtors may reasonably conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Qualified Bidder has the necessary financial ability to close the Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Transaction. Such information must include, *inter alia*, the following:

    (1)      contact names and numbers for verification of financing sources;

    (2)      written evidence of the Qualified Bidder's internal resources and proof of any debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Transaction;

    (3)      the Qualified Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

    (4)      a description of the Qualified Bidder's pro forma capital structure (and, in the case of a Chapter 11 Plan Bid, the Debtors' pro forma capital structure); and

    (5)      any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Qualified Bidder has the ability to close the Transaction.

(j)      <u>Regulatory and Third Party Approvals</u>:  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the Transaction, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals, and the Debtors, in consultation with the Consultation Parties, may consider the timing of such approvals, and any actions the Qualified Bidder will take to ensure receipt of such approval(s) as promptly as possible, when considering the other Bid Assessment Criteria (defined below).

(k)      <u>Contact Information and Affiliates</u>:  A Bid must provide the identity and contact information for the Qualified Bidder and full disclosure of any parent companies

6

of the Qualified Bidder.

(l)    <u>Contingencies</u>:  A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(m)    <u>Irrevocable</u>:  A Bid must be irrevocable until the Good Faith Deposit associated with such Bid must be returned in accordance with the terms hereof (or, if the Successful Bid is a Chapter 11 Plan Bid, until confirmation of such plan of reorganization), <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined below), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(n)    <u>Compliance with Diligence Requests</u>.  The Qualified Bidder submitting a Bid must have complied with reasonable requests for additional information and due diligence access from the Debtors (as described above) to the reasonable satisfaction of the Debtors.

(o)    <u>Confidentiality Agreement</u>.  To the extent not already executed, a Bid must include an executed confidentiality agreement substantially in the form attached hereto as <u>Exhibit A</u> or otherwise in form and substance reasonably satisfactory to the Debtors.

(p)    <u>Termination Fees</u>.  Except with respect to any Stalking Horse Bidder, a Bid must not entitle the Qualified Bidder to any break-up fee, termination fee or similar type of payment or reimbursement and, by submitting a Bid, the Qualified Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction (as defined below).

A Bid received from a Qualified Bidder that meets the above requirements for the applicable assets, as determined by the Debtors in their sole discretion after consulting with the Consultation Parties, shall constitute a "<u>Qualified Bid</u>" for such assets; <u>provided</u> that if the Debtors receive a Bid prior to the Bid Deadline that is not a Qualified Bid the Debtors may provide the Qualified Bidder with the opportunity to remedy any deficiencies prior to the Auction; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors to the satisfaction of the Debtors, the Debtors may, after consulting with the Consultation Parties, disqualify any Qualified Bidder and Qualified Bid in the Debtor's discretion, and such Qualified Bidder shall not be entitled to attend or participate in the Auction.

## <u>Bid Deadline</u>

The following parties must receive a Bid in writing, on or before January 27, 2015 at 5:00 p.m. (prevailing Eastern Time) or such earlier date as may be agreed to by each of the Debtors, after consulting with the Consultation Parties (the "<u>Bid Deadline</u>"): (1) the Debtors, 200 Crossing Boulevard, Bridgewater, NJ 08807, Attn: Robert Crotty (<u>rcrotty@dendreon.com</u>); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attn: Ken Ziman (<u>ken.ziman@skadden.com</u>), 155 N. Wacker Drive, Chicago, IL, 60606,

Attn:  Felicia Perlman (felicia.perlman@skadden.com), and 500 Boylston Street, Boston, MA 02116, Attn: Graham Robinson (graham.robinson@skadden.com); (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY 10020, Attn:  Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl (spohl@brownrudnick.com) and Seven Times Square, New York, NY 10036, Attention: John F. Storz (jstorz@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire (jlongmire@willkie.com).

## Auction

If two or more Qualified Bids are received by the Bid Deadline, or in the event the Debtors enter into a Stalking Horse Agreement and one Qualified Bid other than that submitted by the Stalking Horse Bidder is received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid.  This determination shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following:  (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes to the Acquisition Agreement requested by each Qualified Bidder; (c) the extent to which such modifications or provisions are likely to delay closing of the sale of the Debtors' assets and the cost to the Debtors of such modifications or delay; (d) the total consideration to be received by the Debtors; (e) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (f) the net benefit to the Debtors' estates, taking into account, if applicable, any Stalking Horse Bidder's right to any Break Up Fee or Expense Reimbursement Amount, and (f) any other qualitative or quantitative factor the Debtors, in consultation with the Consultation Parties, deem reasonably appropriate under the circumstances (collectively, the "Bid Assessment Criteria").

If two or more Qualified Bids are not received by the Bid Deadline, or in the event the Debtors enter into a Stalking Horse Agreement, if one Qualified Bid other than that submitted by the Stalking Horse Bidder is not received by the Bid Deadline, the Debtors may determine not to conduct the Auction.  If the Debtors have not entered into a Stalking Horse Agreement and only one Qualified Bid is received by the Bid Deadline, the Debtors may, in consultation with the Consultation Parties, select the Modified Acquisition Agreement of such Qualified Bidder to be the Successful Bid and such Qualified Bidder shall be the Successful Bidder.  In the event the Debtors enter into a Stalking Horse Agreement, if a Qualified Bid other than that submitted by the Stalking Horse Bidder is not received by the Bid Deadline, the Stalking Horse Agreement shall become the Successful Bid and the Stalking Horse Qualified Bidder Shall be the Successful Bidder.  In the event that the Debtors have not entered into a Stalking Horse Agreement and no Qualified Bids are received by the Bid Deadline, the Debtors shall pursue a restructuring with the Supporting Noteholders, as outlined in the Plan Support Agreement and the Plan Term Sheet attached thereto.

### Procedures for Auction

The Auction, if necessary, shall take place on or before February 3, 2015 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, or such other place and time as the Debtors shall notify all Qualified Bidders that have submitted Qualified Bids (including the Stalking Horse Bidder, if any), the Supporting Noteholders and their counsel and any official committee appointed in the Debtors' chapter 11 cases and its counsel.  The Auction shall be conducted according to the following procedures:

*Participation.*

Only the Debtors, the Consultation Parties, and any Qualified Bidder that has submitted a Qualified Bid (including the Stalking Horse Bidder, if any), in each case, along with their representatives and counsel, or such other parties as the Debtors shall determine, in consultation with the Consultation Parties, shall attend the Auction (such attendance to be in person) and only such Qualified Bidders (including the Stalking Horse Bidder, if any), or such other parties as the Debtors shall determine, in consultation with the Consultation Parties, will be entitled to make any Bids at the Auction.

*The Debtors Shall Conduct the Auction.*

The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed.  Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they reasonably determine will result in the highest or otherwise best Qualified Bid.  The Debtors shall use their best efforts to provide each participant in the Auction with a copy of the Modified Acquisition Agreement associated with the highest or otherwise best Qualified Bid received before the Bid Deadline (such highest or otherwise best Qualified Bid the "Auction Baseline Bid").  In addition, at the start of the Auction, the Debtors shall describe the terms of the Auction Baseline Bid.  Each Qualified Bidder (including the Stalking Horse Bidder, if any) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below).

*Terms of Overbids.*

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid.  Any Overbid for purposes of this Auction must comply with the following conditions:

(a)     Minimum Overbid Increments:  Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $250,000.  In order to maximize value, the Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the minimum incremental bids (or in valuing such bids) at any time during the Auction. Additional consideration in excess of the amount set forth in the

respective Auction Baseline Bid may include cash and/or noncash consideration, provided, however, that the value for such non-cash consideration shall be determined by the Debtors, in consultation with the Consultation Parties, in their reasonable business judgment.

(b)    Remaining Terms Are the Same as for Qualified Bids:  Except as modified herein or by the Debtors at the Auction, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that (i) the Bid Deadline shall not apply, (ii) no additional Good Faith Deposit shall be required beyond the Good Faith Deposit previously submitted by a Qualified Bidder, provided that the Successful Bidder shall be required to make a representation at the end of the Auction that it will provide any additional deposit necessary so that its Good Faith Deposit is equal to the amount of ten percent (10%) of the purchase price, or ten percent 10% of the capital investment, contained in the Successful Bid, and (iii) each Overbid may be based on the Auction Baseline Bid, or any other form Modified Acquisition Agreement submitted prior to the Auction.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes (if any) requested by the Qualified Bidder to the Acquisition Agreement or a previously submitted Modified Acquisition Agreement, in connection therewith (including any changes to the designated assigned contracts and leases and assumed liabilities).  Any Overbid must remain open and binding on the Qualified Bidder.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Qualified Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) reasonably demonstrating such Qualified Bidder's ability to close the Transaction proposed by such Overbid.

### Announcement and Consideration of Overbids.

(a)    Announcement of Overbids:  The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration and such other terms as the Debtors, in consultation with the Consultation Parties, reasonably determine will facilitate the Auction.

(b)    Consideration of Overbids:  Subject to the deadlines set forth herein, the Debtors reserve the right, in consultation with the Consultation Parties, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; or give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has

received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Transaction at the prevailing Overbid amount.

***Backup Bidder.***

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment and after consulting with the Consultation Parties, will be designated as the backup bidder (the "<u>Backup Bidder</u>").  The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern Time) on the date that is sixty (60) days after the date of entry of the Sale Order, or, if the Successful Bid is a Chapter 11 Plan Bid, until the effective date of such plan of reorganization (the "<u>Outside Backup Date</u>"), or (ii) the closing of the transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtors will be authorized, but not required, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder.  In such case of a breach or failure to perform on the part of the Successful Bidder (including any Backup Bidder designated as a Successful Bidder), the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

***Additional Procedures.***

The Debtors (after consulting with the Consultation Parties) may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, so long as such rules are not inconsistent in any material respect with the Bidding Procedures.

***Consent to Jurisdiction and Authority as Condition to Bidding.***

All Qualified Bidders (including the Stalking Horse Bidder, if any) shall be deemed to have (1) consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the Chapter 11 Cases, the Bidding Procedures, the Auction, any Modified Acquisition Agreement, or the construction and enforcement of documents relating to any Transaction, (2) waived any right to a jury trial in connection with any disputes relating to the Debtors, the Chapter 11 Cases, the Bidding Procedures, the Auction, any Modified Acquisition Agreement, or the construction and enforcement of documents relating to any Transaction and (3) consented to the entry of a final order or judgment in any way related to the Debtors, the Chapter 11 Cases, the Bidding Procedures, the Auction, any Modified Acquisition Agreement, or the construction and enforcement of documents relating to any Transaction if it is determined that the Bankruptcy

Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

*Sale Is As Is/Where Is.*

Except as otherwise provided in the Modified Acquisition Agreement or the Sale Order, the Acquired Assets or any other assets of the Debtors sold pursuant to the Bidding Procedures, shall be conveyed at the closing of a transaction with a Successful Bidder in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

*Closing the Auction.*

The Auction shall continue until there is one Qualified Bid for the Acquired Assets or a Chapter 11 Plan Bid that the Debtors determine in their reasonable business judgment, after consulting with the Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction.  Thereafter, the Debtors shall select such Qualified Bid, in consultation with the Consultation Parties, as the overall highest or otherwise best Qualified Bid (such Bid, the "Successful Bid," and the Qualified Bidder submitting such Successful Bid, the "Successful Bidder").  In making this decision, the Debtors shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

Unless otherwise required pursuant to the Debtors' fiduciary duties, the Debtors shall not consider any Bids submitted after the conclusion of the Auction.

## Return of Good Faith Deposits

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court.  The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing.  The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder and (b) the Outside Backup Date.  Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon.  If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards the purchase price.

## The Consultation Parties

The Debtors shall consult with the Supporting Noteholders and any official committee appointed in the Debtors' chapter 11 cases and each of their respective advisors (collectively, the

"Consultation Parties" and each, a "Consultation Party") as explicitly provided for in the Bidding Procedures; provided, however, that the Debtors shall not be required to consult with any Consultation Party (and its advisors) that is a Qualified Bidder unless such Qualified Bidder does not submit a bid by the Bid Deadline, at which time, such Supporting Noteholder shall become a Consultation Party; provided, further that if any individual Supporting Noteholder becomes a Qualified Bidder, the consultation rights of any Supporting Noteholder that has not become a Qualified Bidder shall not be affected.

### Reservation of Rights of the Debtors

Except as otherwise provided in the Acquisition Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Consultation Parties to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine whether to enter into a Stalking Horse Agreement; (d) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (e) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties and are not inconsistent with any Bankruptcy Court order.

13

**<u>EXHIBIT C</u>**

**CURE NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :    Chapter 11
                                          :
DENDREON CORPORATION, et al.,             :    Case No. 14-12515 (___)
                                          :
                        Debtors.[1]       :    Jointly Administered
                                          :
                                          :    Related Docket No. _____
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS OR
UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED**

PLEASE TAKE NOTICE THAT:

      1.  Pursuant to the **Order (I) Establishing Bidding Procedures Relating to the
Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the
Debtors to Enter Into Stalking Horse Agreement With Bid Protections in Connection With
a Sale of Substantially All of the Debtors' Assets; (III) Establishing Procedures Relating to
the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases,
Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice
of All Procedures, Protections, Schedules and Agreements, (V) Scheduling a Hearing to
Consider the Proposed Sale, and (VI) Granting Certain Related Relief** entered by the United
States Bankruptcy Court for the District of Delaware on [●], 2014 (the "Bidding Procedures
Order") [Docket No. [●]], the above-captioned debtors and debtors in possession (collectively,
the "Debtors") hereby provide notice that they are seeking to assume and assign the executory
contracts or unexpired leases (each, an "Assigned Contract") listed on Exhibit A attached hereto
to the Successful Bidder.[2]

      2.  When the Debtors assume and assign an Assigned Contract to which you are a
party, on the closing date of the Sale, or as soon thereafter as practicable, the Successful Bidder,
if any, will pay you the amount the Debtors' records reflect is owing for prepetition arrearages as
set forth on Exhibit A (the "Cure Amount").  The Debtors' records reflect that all postpetition
amounts owing under your Assigned Contract have been paid and will continue to be paid until

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and
Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd
Avenue, Seattle, Washington 98101.

[2]    Capitalized terms not otherwise defined in this notice shall have the meanings given to them in the Bidding
Procedures approved as part of the Bidding Procedures Order.

the assumption and assignment of the Assigned Contract, and that other than the Cure Amount, there are no other defaults under the Assigned Contract.

      3.  Inclusion of an executory contract or unexpired lease as an Assigned Contract on <u>Exhibit A</u> is not a guarantee that such executory contract or unexpired lease will ultimately be assumed and assigned to the Successful Bidder, if any.  Should it be determined that the Assigned Contract to which you are a party will not be assumed and assigned, you will be notified in writing of such decision.

      4.  Objections, if any, to the proposed Cure Amount or assumption and assignment must be made in writing and (i) state the basis for such objection and (ii) state with specificity what cure amount you believe is required (in all cases with appropriate documentation in support thereof) and be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware 19801, and served on: (1) the Debtors, 200 Crossing Boulevard, Bridgewater, New Jersey 08807, Attention: Robert L. Crotty; (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attention: Ken Ziman, Esq. (ken.ziman@skadden.com), 155 N. Wacker Drive, Chicago, IL, 60606, Attention: Felicia Perlman, Esq. (felicia.perlman@skadden.com), 500 Boylston Street, Boston, MA  02116, Attention: Graham Robinson, Esq. (graham.robinson@skadden.com) and One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Sarah E. Pierce (sarah.pierce@skadden.com); (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY  10020, Attention:  Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq. (spohl@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire, Esq. (jlongmire@willkie.com), **so as to be received on or before [●], 2015 at [●] p.m. (Prevailing Eastern Time)** (the "<u>Cure Objection Deadline</u>").

      5.  If an objection to the Cure Amount or assumption and assignment is timely filed and not resolved by the parties, a hearing with respect to the objection will take place before the Honorable [●], in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●] Floor, [●], Wilmington, Delaware 19801 at the Sale Hearing to be held at ____ __.m. (prevailing Eastern Time) on _____, 2015, or at a later hearing, as determined by the Debtors.  A hearing regarding the Cure Amount, if any, may be continued at the sole discretion of the Debtors until after the Closing.

      6.  After the Auction, the Debtors will file, but not serve, a notice that identifies the Successful Bidder.

      7.  You will have the opportunity to evaluate and, if necessary, challenge the ability of any Stalking Horse Purchaser or Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts.  At the Sale Hearing, the Debtors shall present evidence necessary to demonstrate adequate assurance of future performance by the Stalking Horse Purchaser or the Successful Bidder.  If the Successful Bidder that prevails at the Auction

is not a Stalking Horse Purchaser, then the deadline to object to adequate assurance performance by a Successful Bidder or any changes to the Acquisition Agreement shall be extended to the date of the Sale Hearing, but any such objection must be received before the start of the Sale Hearing; <u>provided</u>, <u>however</u>, that the deadline to object to the Cure Amount shall not be extended.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

8. The Debtors, any Stalking Horse Purchaser and/or any Successful Bidder reserve all of their rights, claims and causes of action with respect to the contracts and agreements listed on <u>Exhibit A</u> hereto. Notwithstanding anything to the contrary herein or in the Acquisition Agreement, the proposed assumption and assignment of each of the Assigned Contracts listed on <u>Exhibit A</u> hereto (a) shall not be an admission as to whether any such Assigned Contract was executory or unexpired as of the Petition Date or remains executory or unexpired postpetition within the meaning of Bankruptcy Code section 365; and (b) shall be subject to the Debtors', any Stalking Horse Purchaser's and/or any Successful Bidder's right to conduct further confirmatory diligence with respect to the Cure Amount of each Assigned Contract and to modify such Cure Amount accordingly. In the event that the Debtors, any Stalking Horse Purchaser and/or any Successful Bidder determine that your Cure Amount should be modified, you will receive a notice, which will provide for additional time to object to such modification.

Dated: Wilmington, Delaware
       [_____], 2014

                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                /s/_____
                Anthony W. Clark (I.D. No. 2051)
                Sarah E. Pierce (I.D. No. 4648)
                One Rodney Square
                P.O. Box 636
                Wilmington, Delaware 19899-0636
                Telephone: (302) 651-3000
                Fax: (302) 651-3001

                - and -

                Kenneth S. Ziman (*pro hac vice admission pending*)
                Raquelle L. Kaye (*pro hac vice admission pending*)
                Four Times Square
                New York, New York 10036-6522
                Telephone: (212) 735-3000
                Fax: (212) 735-2000

                - and -

                Felicia Gerber Perlman (*pro hac vice admission pending*)
                155 N. Wacker Drive
                Chicago, Illinois 60606-1720
                Telephone: (312) 407-0700
                Fax: (312) 407-0411

                Proposed Counsel for Debtors and Debtors in Possession

4

**<u>EXHIBIT D</u>**

**SALE NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
               :

In re:                            :     Chapter 11
               :

DENDREON CORPORATION, et al.,    :     Case No. 14-12515 (___)
               :

              Debtors.[1]    :     Jointly Administered
               :

               :     Related Docket No. _____
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

      1.     On November 10, 2014, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), each filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

      2.     On November 10, 2014, the Debtors filed a motion (the "Sale and Bidding Procedures Motion"), pursuant to sections 105, 363, 365 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 seeking entry of an order (the "Bidding Procedures Order")[2] (i) approving the proposed auction and bidding procedures (the "Bidding Procedures") for the potential sale of all or substantially all of the Debtors' non-cash assets (the "Acquired Assets"); (ii) establishing procedures for the Debtors to enter into a stalking horse agreement (a "Stalking Horse Agreement") containing bid protections with respect to any stalking horse bidder (a "Stalking Horse Bidder"); (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iv) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (v) scheduling a hearing (the "Sale Hearing") to approve such sale (the "Sale Transaction") [Docket No. [●]].

      3.     On [●], 2014, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. [●]].  Pursuant to the Bidding Procedures Order, if two or more Qualified Bids are

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale and Bidding Procedures Motion or the Bidding Procedures Order.

received in accordance with the Bidding Procedures, or in the event the Debtors enter into a Stalking Horse Agreement, and one Qualified Bid other than that submitted by the Stalking Horse Bidder is received, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid, beginning on _____, 2015 at ____ __.m. (prevailing Eastern Time) at the offices of Skadden, Arps, Slate, Meagher & Flom, 4 Times Square, New York, NY 10036, or such other place and time as the Debtors shall notify all Qualified Bidders that have submitted Qualified Bids (including the Stalking Horse Bidder, if any), the Supporting Noteholders and their counsel and any official committee appointed in the Debtors' chapter 11 cases and its counsel. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than _____, 2015 at 5:00 p.m. (prevailing Eastern Time) or such earlier date as may be agreed to by each of the Debtors and the Consultation Parties (the "Bid Deadline") may participate at the Auction.  Any party that wishes to take part in this process and submit a bid for the Debtors' assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures. If two or more Qualified Bids are not received by the Bid Deadline, or in the event the Debtors enter into a Stalking Horse Agreement, if one Qualified Bid other than that submitted by the Stalking Horse Bidder is not received by the Bid Deadline, the Debtors may not conduct the Auction. As soon as possible after the Bid Deadline, the Debtors will file, but not serve, a notice indicating whether the Auction will be held.

4.      A hearing to approve the Sale Transaction (the "Sale Hearing"), if needed, will be held at _____ __.m. (prevailing Eastern Time) on _____, 2015, unless otherwise continued by the Debtors pursuant to terms of the Bidding Procedures.  The Sale Hearing will be held before the Honorable [●], in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●] Floor, [●], Wilmington, Delaware 19801.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.      Objections, if any, to the sale, must: (a) be in writing; (b) comply with the Bankruptcy Rules and Local Bankruptcy Rules; and (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware 19801, on or before [●] (prevailing Eastern Time) on [●]; and be served upon: (1) the Debtors, care of Dendreon Corporation, 200 Crossing Boulevard, Bridgewater, New Jersey 08807, Attention: Robert L. Crotty (rcrotty@dendreon.com); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attention: Ken Ziman, Esq. (ken.ziman@skadden.com), and Graham Robinson, Esq. (graham.robinson@skadden.com); Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chigaco, IL, 60606, Attention:  Felicia Perlman, Esq. (felicia.perlman@skadden.com); and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Sarah E. Pierce (sarah.pierce@skadden.com); (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY 10020, Attention:  Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq. (spohl@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire, Esq.

(jlongmire@willkie.com).  UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

       6.     This Notice and the Sale Hearing is subject to the fuller terms and conditions of the Sale and Bidding Procedures Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety.  Parties interested in receiving more information regarding the sale of all or substantially all of the Debtors' non-cash assets and/or copies of any related document, including the Sale and Bidding Procedures Motion, or the Bidding Procedures Order, may make a written request to counsel for the Debtors, (Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attention: Ken Ziman, Esq. and 155 North Wacker Drive, Chicago, Illinois 60606, Attention: Felicia Gerber Perlman, Esq.).  In addition, copies of the Sale and Bidding Procedures Motion, the Bidding Procedures Order and this Notice can be found on (i) the Court's website, www.deb.uscourts.gov; and (ii) https://cases.primeclerk.com/dendreon, and are on file with the Clerk of the Bankruptcy Court, Third Floor, 824 Market Street, Wilmington, Delaware 19801.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated: Wilmington, Delaware
       [_____], 2014

<div style="margin-left:40%">

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ _____
Anthony W. Clark (I.D. No. 2051)
Sarah E. Pierce (I.D. No. 4648)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman (*pro hac vice admission pending*)
Raquelle L. Kaye (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

Felicia Gerber Perlman (*pro hac vice admission pending*)
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession

</div>

1127955-NYCSR03A - MSW

## **EXHIBIT E**

**PUBLICATION NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re:                                                        :        Chapter 11
                                                              :
DENDREON CORPORATION, et al.,                                 :        Case No. 14-12515 (___)
                                                              :
              Debtors.[1]                                     :        Jointly Administered
                                                              :
                                                              :        Related Docket No. _____
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF SALE OF CERTAIN ASSETS

PLEASE TAKE NOTICE OF THE FOLLOWING:

        1.      Pursuant to the **Order (I) Establishing Bidding Procedures Relating to
the Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the
Debtors to Enter Into Stalking Horse Agreement With Bid Protections in Connection With
a Sale of Substantially All of the Debtors' Assets; (III) Establishing Procedures Relating to
the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases,
Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice
of All Procedures, Protections, Schedules and Agreements, (V) Scheduling a Hearing to
Consider the Proposed Sale, and (VI) Granting Certain Related Relief** (the "Bidding
Procedures Order") entered by the United States Bankruptcy Court for the District of Delaware
(the "Bankruptcy Court") on [●], 2014, the above-captioned debtors and debtors in possession
(collectively, the "Debtors") are selling all or substantially all of their non-cash assets (the
"Acquired Assets").

        2.      All interested parties are invited to make offers to purchase any of the
Acquired Assets in accordance with the terms and conditions approved by the Bankruptcy Court
(the "Bidding Procedures").  Pursuant to the Bidding Procedures, if two or more Qualified Bids
are received, or in the event the Debtors enter into a Stalking Horse Agreement, if one Qualified
Bid other than that submitted by the Stalking Horse Bidder is received, the Debtors will conduct
an auction for the sale of the Debtors' assets (the "Auction"), beginning on _____, 2015 at
_____ __.m. (prevailing Eastern Time) at the offices of Skadden, Arps, Slate, Meagher & Flom, 4
Times Square, New York, NY 10036, or such other place and time as the Debtors decide.

        3.      Participation at the Auction is subject to the Bidding Procedures and the
Bidding Procedures Order.  Any person that wishes to participate in the bidding process must

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon
        Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon
        Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle,
        Washington 98101.

become a "Qualified Bidder" (as defined under the Bidding Procedures). The procedures for being deemed a Qualified Bidder are contained in the Bidding Procedures. A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to: (1) the Debtors, care of Dendreon Corporation, 200 Crossing Boulevard, Bridgewater, New Jersey 08807, Attention: Robert L. Crotty (rcrotty@dendreon.com); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attention: Ken Ziman, Esq. (ken.ziman@skadden.com), and Graham Robinson, Esq. (graham.robinson@skadden.com); Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chigaco, IL, 60606, Attention:  Felicia Perlman, Esq. (felicia.perlman@skadden.com); and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Sarah E. Pierce (sarah.pierce@skadden.com); (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY  10020, Attention:  Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq. (spohl@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention John C. Longmire, Esq. (jlongmire@willkie.com), not later than _____ __.m. (prevailing Eastern Time) on December ___, 2015 or such earlier date as may be agreed to by each of the Debtors and the Consultation Parties (the "Bid Deadline").

       4.     A hearing to approve the Sale Transaction (the "Sale Hearing") will be held, if needed, at _____ __.m. (prevailing Eastern Time) on _____, 2015, unless otherwise continued by the Debtors pursuant to terms of the Bidding Procedures. The Sale Hearing will be held before the Honorable [●], in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●] Floor, [●], Wilmington, Delaware 19801.

       5.     If you have any questions relating to this Notice or the Chapter 11 proceeding, please feel free to contact Prime Clerk, the Debtors' court-appointed noticing and claims agent, at (Toll Free) 1-844-794-3479 or by email at dendreoninfo@primeclerk.com.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

6.     This notice is qualified in its entirety by the Bidding Procedures Order.

Dated: Wilmington, Delaware
       [_____], 2014

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/_____
Anthony W. Clark (I.D. No. 2051)
Sarah E. Pierce (I.D. No. 4648)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman (*pro hac vice admission pending*)
Raquelle L. Kaye (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

Felicia Gerber Perlman (*pro hac vice admission pending*)
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession

**<u>EXHIBIT F</u>**

**SALE HEARING NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

In re:                       :     Chapter 11
                    :

DENDREON CORPORATION, et al.,   :     Case No. 14-12515 (___)
                    :

            Debtors.[1]     :     Jointly Administered
                    :
                    :     **Related Docket No. ____**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF SUCCESSFUL BIDDER AND OF ASSUMPTION
## AND ASSIGNMENT OF EXECUTORY CONTRACT OR UNEXPIRED LEASE

PLEASE TAKE NOTICE THAT:

       1.     Pursuant to the Order (I) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the Debtors to Enter Into Stalking Horse Agreement With Bid Protections in Connection With a Sale of Substantially All of the Debtors' Assets; (III) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements, (V) Scheduling a Hearing to Consider the Proposed Sale, and (VI) Granting Certain Related Relief [Docket No. [●]] (the "Bidding Procedures Order") entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on [●], 2014, the above captioned debtors and debtors in possession (collectively, the "Debtors") have accepted the bid of [●] for the purchase of all or substantially all of the Debtors' assets.  The terms of the bid are set forth in the acquisition agreement (the "Acquisition Agreement"), dated as of [●], 2015 between the Debtors and [●] (the "Purchaser"), substantially in the form attached hereto as Exhibit A.

       2.     At the Sale Hearing to be held on _____, 2015 at _____ __.m. (prevailing Eastern Time) before the Honorable [●], in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●] Floor, [●], Wilmington, Delaware 19801, the Debtors will seek (i) entry of an order (the "Sale Order"), approving the sale of all or substantially all of the Debtors' assets free and clear of all liens, claims, interests and encumbrances and (ii) pursuant to the terms of the Acquisition Agreement, to assume and assign

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

the executory contracts and unexpired leases set forth on <u>Exhibit B</u> hereto.  For avoidance of doubt, the Debtors will no longer seek authority at the Sale Hearing to assume and assign the executory contracts and unexpired leases set forth on <u>Exhibit C</u> hereto.

       3.      Objections, if any, to the adequate assurance performance by the Successful Bidder or changes to the Acquisition Agreement, must: (a) be in writing; (b) comply with the Bankruptcy Rules and Local Bankruptcy Rules; and (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware 19801, on or before [●] (prevailing Eastern Time) on [●], 2015; and be served upon: (1) the Debtors, 200 Crossing Boulevard, Bridgewater, New Jersey 08807, Attention: Robert L. Crotty; (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036, Attention: Ken Ziman, Esq. (ken.ziman@skadden.com), 155 N. Wacker Drive, Chicago, IL, 60606, Attention: Felicia Perlman, Esq. (felicia.perlman@skadden.com), 500 Boylston Street, Boston, MA  02116, Attention: Graham Robinson, Esq. (graham.robinson@skadden.com) and One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Sarah E. Pierce (sarah.pierce@skadden.com); (3) financial advisor to the Debtors, Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, NY  10020, Attention:  Sven Pfeiffer (sven.pfeiffer@lazard.com) and Brandon Aebersold (brandon.aebersold@lazard.com); (4) counsel to the Unaffiliated Noteholders, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq. (spohl@brownrudnick.com); and (5) counsel to the Deerfield Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention: John C. Longmire, Esq. (jlongmire@willkie.com).  UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Pursuant to 11 U.S.C. § 365 there is adequate assurance of the Purchaser's future performance under the executory contract or unexpired lease to be assumed and assigned because of the demonstrated financial wherewithal of the Purchaser.  Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Purchaser, and their willingness and ability to perform under the contracts to be assumed and assigned by them.

Dated: Wilmington, Delaware
[_____], 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/_____
Anthony W. Clark (I.D. No. 2051)
Sarah E. Pierce (I.D. No. 4648)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman (*pro hac vice admission pending*)
Raquelle L. Kaye (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

Felicia Gerber Perlman (*pro hac vice admission pending*)
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession

**<u>EXHIBIT A</u>**

**Acquisition Agreement**

**<u>EXHIBIT B</u>**

**Schedule of Executory Contracts and Unexpired Leases
to be Assumed and Assigned Under Acquisition Agreement**

**EXHIBIT C**

**Schedule of Executory Contracts and Unexpired Leases No Longer
Sought to be Assumed and Assigned Under Acquisition Agreement**