IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| DENDREON CORPORATION, et al., | : | Case No. 14-12515 (___) |
| Debtors.[1] | : | Joint Administration Pending |

**DECLARATION OF JOHN DEMPSEY IN SUPPORT OF DEBTORS'
MOTION FOR ORDER APPROVING THE IMPLEMENTATION
OF THE KEY EMPLOYEE INCENTIVE PLAN**

I, John Dempsey, hereby declare and state as follows:

1.  I am a partner at Mercer (US) Inc. ("**Mercer**"). My business address is 155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606. Mercer is a global professional compensation services firm that was engaged by the above-captioned debtors and debtors in possession (the "**Debtors**").

2.  I respectfully submit this declaration (the "**Declaration**") in support of the *Debtors' Motion for Order Approving the Implementation of the Key Employee Incentive Plan*, filed contemporaneously herewith (the "**Motion**").[2] The Debtors have duly authorized me to do so.

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

[2]   Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information provided to me by the Debtors' management and other advisors.

4. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

A. **Employment and Background**

5. I joined Mercer following my graduation from Yale University, and have worked out of the firm's offices in Chicago, Cleveland and London. I received an MBA in 1992 from the Ohio State University. I have been a Principal or Partner at Mercer for approximately 14 years. Mercer offers a wide variety of services to private and public clients, including expert analysis of executive and management compensation. Mercer has access to a broad range of market compensation data, including data specific to companies in chapter 11 proceedings, and has substantial expertise in designing such programs from companies in the midst of restructuring or bankruptcy.

6. I have extensive experience advising organizations undergoing major financial transitions including bankruptcies, IPOs, LBOs and acquisitions, on compensation issues, and with designing annual and multi-year incentive programs, change in control arrangements and employment agreements. My recent bankruptcy-related engagements include James River, Exide Technologies, RIH Acquisitions NJ, Residential Capital, Overseas Shipholding Group, Allied Systems Holdings, Patriot Coal, Borders, Synagro Technologies, Nortel Networks, Tribune Company, Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion, Dana, Owens Corning, Kaiser Aluminum,

Solutia, Oglebay Norton, Citation, Intermet, Venture Holdings, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation and FLAG Telecom.

      7.      Additionally, I published an article entitled *Bankruptcy Blues: Retaining Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of Workspan, and an update, *The New Challenge of Chapter 11*, with Elizabeth Stephens in August 2008. I have been frequently quoted on issues relating to effective transitional compensation practices in such publications as HR Magazine, Cox News and the Atlanta Journal Constitution. In addition, I have been quoted in the Dallas Morning News, the Chicago Tribune and the Milwaukee Journal Sentinel. I have also presented at the National Meeting of the Conference Board, the National Association of Stock Plan Professionals and the National Center for Employee Ownership.

      8.      In 2010, my testimony was proffered and accepted in connection with the approval of Nortel's "Special Incentive Plan" and Tribune's 2010 Management Incentive Plan. On March 11, 2011, my testimony was proffered and accepted during Tribune's confirmation hearing. On February 2, 2013 I testified in connection with a review of the compensation of the CEO of Fastbucks. On March 21, 2013, I testified in connection with the approval of a non-executive incentive plan and other compensation and benefit arrangements for Overseas Shipholding Group. On April 11, 2013, my testimony was proffered in connection with the approval of the estate KEIP in Residential Capital. In Exide, my testimony was proffered on August 15, 2013 in connection with the approval of the AIP and KERP and on September 17, 2013 in connection with the KEIP. On December 16, 2013, I testified in connection with the approval of the KEIP for RIH Acquisitions NJ LLC. On January 30, 2014 my testimony was

proffered in connection with the approval of the Chief Restructuring Officer's success fee in Residential Capital.

**B.     Overview**

9.     I am an expert in executive and management compensation with over 20 years of experience in the field. I have familiarized myself with the Debtors' operations and unique challenges, provided assistance in developing and reviewing the Debtors' "Key Employee Incentive Plan," or "KEIP," gathered relevant market compensation data, and analyzed whether the KEIP is consistent with market practice.

10.    Based on my analysis, the KEIP is reasonably designed and consistent with market practice for the Debtors' key employees (collectively, the "**Key Employees**"). My conclusion is based on several factors:

(a)     the KEIP awards certain of the most senior Key Employees with an incentive payment if the Debtors' sale process results in recoveries that meet or exceed the goals set by the Board of Directors of Dendreon Corporation (the "**Board of Directors**"), thereby directly tying incentive payouts to the success of the Company and benefit to the Debtors' estates in line with any incentive payout;

(b)     the KEIP provides the Debtors with a competitive compensation structure, compared to other similarly situated businesses; and

(c)     the estimated level of potential compensation provided under the KEIP, when considered within the context of total compensation, is reasonable in comparison to market-based compensation of other similarly sized businesses; absent the additional compensation provided by the KEIP, Participants' total compensation would be below market.

**C.     The Debtors' Key Employee Incentive Plan**

11.    The KEIP is designed to provide incentives to nine (9) eligible executives (the "**Participants**") to pursue a timely and successful reorganization or sale. The KEIP provides for variable payouts to the Participants based upon the sale price received from the ongoing sale process. Eligible executives shall receive payouts only upon the occurrence of a sale or

recapitalization of the Debtors' business resulting in a change of control in which the total value received for the Debtors' assets (the "**Total Value**") is more than $325 million (a "**Payment Event**").

12. Given the KEIP's purpose of incentivizing a value-maximizing sale process, it is vital that key employees with direct involvement in the sales process and the determination of Total Value be included. These individuals all have direct involvement in the sale of the Company through buyer negotiations and "pitching" the Debtors and their assets and operations, and all could have a tangible impact on Total Value. It is noteworthy that the CEO is not a participant in the KEIP.

13. At the "Minimum Threshold" of $325 million, the Participants will not receive a KEIP payment even if a transaction closes. The "Maximum Threshold" is satisfied if the Debtors obtain a Total Value of $620 million, which reflects the amount necessary to pay off the Debtors' debt. At a Total Value between $325 million and $620 million, the amounts to be paid are determined on a straight-line basis as demonstrated in the chart below. A Total Value above the Maximum Threshold will not result in additional payments to the Participants. The maximum aggregate payments under the KEIP would be $3.1 million.[3] The payments, if any, would be due on the date that is thirty (30) days after the Payment Event (the "**Bonus Payment Date**").

---

[3] The maximum payout cost of $3.1 million includes a $750,000 discretionary pool, which will be allocated for future awards to other individuals contributing to the transaction; the discretionary pool at the Minimum Threshold is $250,000, and is increased to the maximum of $750,000 in line with Total Value. No awards to insiders will be allocated without notice to stakeholders.



14.     In the event that a that a Participant is terminated by the Debtors without cause or for reasons of death or disability, such Participant will be entitled to payment of a pro-rata portion of such Participant's award based on the number of days the Participant was employed after the Petition Date through the date of termination, divided by the number of days from the Petition Date through the date of the Payment Event. If a Participant voluntarily terminates his or her employment or if the Participant's employment with the Debtors is terminated for cause prior to the Bonus Payment Date, he or she will forfeit any right to a payment under the KEIP.

15.     It is important to note that the KEIP is not a "pay to stay" retention plan. Absent achievement of a Total Value above $325 million, Participants will not be eligible for a KEIP payment, even if a transaction closes and the Participants have stayed with the Debtors through the closing. Accordingly, the KEIP successfully aligns the interests of the Debtors, their employees, and their creditors and is a true incentive plan.

D. **Mercer's Independent Review Of The Reasonableness Of The Key Employee Incentive Plan**

16. Mercer was engaged in September 2014 by the Company under the leadership of the Compensation Committee of the Board of Directors to work with the Company and outside advisors to design a KEIP that is consistent with market practices and that address the need of the Debtors to motivate and retain their Key Employees. At the start of our engagement, Mercer discussed the Debtors' operational history and challenges with the Company and its advisors. Subsequent to these initial discussions, Mercer reviewed the Debtors' existing base salary, annual and long-term incentive compensation programs. Mercer also discussed performance goals, and actual performance against those goals, established under existing incentive plans. Through this review, Mercer was able to understand the Debtors' recent compensation history and evaluate the KEIP with appropriate consideration for the specific and reasonable objectives of the Debtors in this instance.

17. In assessing the design of the KEIP, the Debtors and Mercer sought to ensure that the resulting compensation levels for Participants would be appropriate based on market comparisons (considering the Debtors' industry and market for talent) as well as ensure that the KEIP design is in line with typical chapter 11 practice. To guide the design of the KEIP and assess the design relative to market practice, Mercer conducted a comprehensive review of incentive-based programs implemented in other chapter 11 cases. Mercer examined a population of 28 companies that filed for bankruptcy protection since January 1, 2009, underwent a sale of their assets, and that implemented key employee incentive plans linked to the results of the sale process while in bankruptcy. The proposed KEIP was compared to the results of this market analysis based on: KEIP eligibility, total cost, metrics, and payout timing.

    (a) Specifically, Mercer found that the proposed KEIP falls slightly above the market median with respect to the number of participants.

(b) The proposed maximum cost of the KEIP is below the market median for companies that underwent a 363 sale within the same range of sale proceeds as the Debtors ($250M - $750M). As a percentage of sale proceeds the maximum cost of the Debtors' proposed KEIP is below the 25th percentile.

(c) The metrics used in the proposed KEIP are consistent with majority practice among the comparator companies and properly align Participants' incentives with creditor recoveries. Sale proceeds is a common performance metric used in KEIPs implemented in the context of a section 363 sale. In addition, the awards are scalable based on Total Value and no awards will be paid for Total Value that is at or below the Minimum Threshold.

(d) The payout timing for the KEIP is consistent with market practice and maximizes the motivation of Participants to enhance Total Value during the sale process.

18. To examine companies most similar to the Debtors, Mercer analyzed a subset of the 28 company database which included only companies with sale proceeds between $250 million and $750 million, which yields a median proceeds level of $289 million for the sample. The results of this analysis are displayed in **Table 1** below. As Table 1 outlines, the proposed KEIP is below the market median as a dollar amount and below the 25th percentile as a percentage of sale proceeds (which normalizes for size).

**Table 1: Total Cost of Compensation Plans Compared with Sale Proceeds**

|  | Max Cost of Plan | % Sale Proceeds |
|---|---|---|
| **Proposed KEIP** | $3,092,871 | 0.50%[4] |
| *Market Data:* | | |
| **75th Percentile** | $5,500,000 | 1.29% |
| **50th Percentile** | $3,750,000 | 1.21% |
| **25th Percentile** | $2,750,000 | 0.73% |

19. In addition, Mercer analyzed the compensation opportunities of the Debtors' top executives with opportunities at similarly-sized companies in the same industry. Without any bankruptcy compensation plans, Mercer concluded that the total compensation of the Participants was 56% below the market median. Even when the maximum amount of the KEIP is included in compensation, the total compensation package remains 10% below the market median.

20. Mercer presented its findings to the Compensation Committee of the Board of Directors on October 1, 2014 together with a draft of the KEIP plan design, and responded to questions from the Directors regarding the results of our analysis. The Directors approved the KEIP. In addition, on November 5, 2014, the Debtors' management and Mercer provided the Board of Directors with an update on implementation of the KEIP, including the determination of thresholds thereunder. The KEIP has also been discussed extensively with the advisors to certain of the Debtors' noteholders.

---

[4] Calculated using the Maximum Threshold value of $620 million.

E.  **The Debtors' Need for the KEIP**

21. Without the expertise of the senior management team to efficiently and effectively operate the Debtors' business and the proper incentives to induce them to commit the additional time necessary to successfully navigate the Debtors through the Chapter 11 Cases, the Debtors' ability to achieve a successful sale will be greatly hampered. The success of the Debtors' restructuring and sale efforts is dependent upon the goodwill and support of their employees. As the Debtors implement the sale, it is imperative that the Debtors' key personnel are appropriately incentivized to maximize the financial performance of the Debtors' operations and, as such, the price of any sale transaction to ensure optimum recovery for all stakeholders. Moreover, the Participants have been, and will continue to be, called upon to expend significantly more hours during the chapter 11 and sale process than contemplated by the normal terms of their employment.

22. In order to effectively and efficiently accomplish an orderly sale process that maximizes recovery for all stakeholders, the Debtors determined that formulating the KEIP was in the best interest of their estates and all parties in interest. The KEIP will help ensure that key executives who are essential to the chapter 11 and sale process are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.

23. As a general matter, the use of KEIPs is common practice in chapter 11 cases. The structure of the plans varies based on the unique circumstances of each case but the general terms and conditions are consistent with the Key Employee Incentive Plan proposed by the Debtors.

F.  **The Debtors' KEIP Is Reasonable And Justified By Market Practices**

24. Based on my education, experience and the work I have done on this matter, it is my opinion that the KEIP is designed to be consistent with market practice, is

10

reasonable given the facts and circumstances, provides anticipated value that is appropriate to competitively motivate talented staff and is required to maximize the value of the Debtors' estates for all parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:  November 10, 2014

*/s/ John Dempsey*                                 .
John Dempsey