IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| DENDREON CORPORATION, et al., | : | Case No. 14-12515 (LSS) |
| Debtors.[1] | : | Jointly Administered |
| | : | **Related Docket Nos. 17, 62, 124, 188, 195, 230, 314, 330, 332, 355** |

**DECLARATION OF BRANDON AEBERSOLD IN SUPPORT OF DEBTORS' MOTION FOR ORDER (I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING CERTAIN RELATED RELIEF**

1. My name is Brandon Aebersold. I am over the age of 18 and competent to testify.

2. I am a Managing Director at Lazard Frères & Co. LLC ("Lazard"), the primary U.S. operating subsidiary of a preeminent international investment banking, financial advisory and asset management firm with its principal office located at 30 Rockefeller Plaza, New York, New York. I have been one of the principal engagement personnel working on Lazard's engagement with the above-captioned debtors and debtors-in-possession (collectively, the "Debtors", and together with their non-debtor affiliates, the "Company") since February 2014. The Debtors' application with respect to the Debtors' retention of Lazard as the investment

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

banker to the Debtors (the "Lazard Retention Application") [Docket No. 73] was approved by the Court pursuant to an order entered on December 9, 2014 [Docket No. 156].

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, personal knowledge gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management or members of the Lazard team, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial affairs. I am authorized to submit this Declaration. If called upon to testify, I could and would testify competently to the facts set forth herein.

4. I submit this declaration in support of the Debtors' Motion for Order (I) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief [Docket No. 17] (the "Sale Motion"), filed with the Court on November 10, 2014.[2]

## A. Qualifications[3]

5. I graduated from Furman University (*summa cum laude* and *phi beta kappa*) and also received a J.D. from The University of Virginia School of Law and an M.B.A. from The University of Chicago Booth School of Business. I have been employed at Lazard since 2007, where I have provided advice regarding restructurings, reorganizations, workouts and a variety of other transactions, including refinancing and distressed mergers and acquisitions.

---

2 Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the Bidding Procedures Order (as defined herein).

3 For a more detailed description of Lazard's qualifications, experience and role in the Chapter 11 Cases, please refer to the Lazard Retention Application.

Prior to joining Lazard, I was an attorney at the law firm of Simpson, Thacher & Bartlett LLP, where I focused on merger and acquisition and leverage finance transactions.

6. Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority. Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 150 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. Since 1990, Lazard professionals have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

**B. The Prepetition Sales and Marketing Process[4]**

7. In February 2014, the Debtors retained Lazard as their investment banker to provide general financial advisory services and evaluate potential strategic alternatives, including assisting the Company in any potential restructuring, sale or financing transaction. Lazard was initially hired to provide assistance with addressing the 2016 Notes[5], possibly through a refinancing, an extension of the maturity or a conversion of the 2016 Notes to new debt or equity.

8. The Company, with the assistance of Lazard and its other professionals, spent the Spring and Summer of 2014 considering strategic alternatives, refining its business

[4] Further details regarding the Debtors' comprehensive sale and marketing process and the Proposed Sale (as defined herein) are set forth in the Declaration of Robert L. Crotty in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 3] (the "First Day Declaration").

[5] The 2016 Notes are the $620 million aggregate principal amount of 2.875% Convertible Senior Notes with a maturity date of January 15, 2016 issued by Dendreon Corporation pursuant to that certain First Supplemental Indenture dated January 20, 2011.

plan and examining its ability to implement additional cost reductions. The Company concluded that given that it was highly levered and faced significant challenges in achieving positive free cash flows in the near term, the business likely would not be viable on a stand-alone basis absent a strategic transaction or a restructuring of its debt. To that end, Lazard assisted the Debtors in initiating discussions, regarding, among other things, a restructuring of the debt or a potential sale process with the largest holder of the 2016 Notes, Deerfield Management Company, L.P. ("Deerfield") and then with counsel to certain unaffiliated holders of the 2016 Notes (the "Unaffiliated Noteholders"), each subject to NDAs. The Debtors, subject to these NDAs, informed Deerfield and its counsel as well as the Unaffiliated Noteholders and their counsel of the Company's investigation of strategic alternatives. In September 2014, the Company, Deerfield and the Unaffiliated Noteholders mutually agreed that, among the strategic alternatives considered, the appropriate path for the Company would involve pursuing a sale process that would be implemented through the filing of these Chapter 11 Cases.

9. To that end, and acknowledging that the in-court process would include a marketing process toward a potential sale, the Company instructed Lazard to identify and develop a list of potentially interested parties and solicited such parties' interest in a sale transaction. Beginning in mid-September 2014, Lazard contacted approximately forty (40) potential buyers. The goal in this pre-filing marketing process was to sign up potential buyers to NDAs and afford them time to evaluate the opportunity in advance of any in-court sale process. A virtual data room was made available containing extensive information about the Company, including documents describing the Company's business and financial results in considerable detail, and Lazard gave potential purchasers the opportunity to conduct due diligence via the electronic data room.

10. Contemporaneously with the pre-filing marketing process, Lazard assisted the Company with continued discussions with Deerfield and counsel to the Unaffiliated Noteholders, as well as their financial advisors. As a result of these discussions, on November 9, 2014, the Debtors entered into two substantially similar agreements (the "Plan Support Agreements") with certain holders of the 2016 Notes to support their restructuring process. One Plan Support Agreement is by and between the Debtors and certain funds managed by Deerfield (the "Deerfield Noteholders"). The other Plan Support Agreement is by and between the Debtors and the Unaffiliated Noteholders (together with the Deerfield Noteholders, the "Supporting Noteholders"). The Plan Support Agreements contemplated that the Debtors would, with the support of the Supporting Noteholders, pursue a dual path of third-party sale or plan transaction with a "stand alone plan" backstop. On the Petition Date, the Debtors filed a motion to assume the Plan Support Agreements [Docket No. 20]. The motion was granted and the Plan Support Agreements were assumed by the Debtors pursuant to an order entered on December 23, 2014 [Docket No. 15].

**C. The Sale Motion and Bidding Procedures Order**

11. The Plan Support Agreements provided the framework for the competitive process (the "Competitive Process") whereby prospective buyers could bid to purchase all or substantially all of the Debtors' non-cash assets either (i) in a sale pursuant to Bankruptcy Code section 363, or (ii) in the form of a recapitalization transaction effectuated through a plan of reorganization. A Qualified Bid in the Competitive Process was required to have a value in excess of $275 million as determined by the Bidding Procedures (defined below).

12. In order to effectuate the Competitive Process, on the Petition Date, the Debtors filed the Sale Motion seeking, entry of an order (A)(i) establishing bidding procedures (the "Bidding Procedures") relating to the sale of substantially all of the Debtors' assets (the

"Acquired Assets"), (ii) establishing procedures for the Debtors to enter into stalking horse agreement with bid protections in connection with a sale of the Acquired Assets, (iii) establishing procedures relating to the assumption and assignment of certain executory contracts and unexpired leases, including notice of proposed cure amounts, (iv) approving form and manner of notice of all procedures, protections, schedules and agreements, (v) scheduling a hearing to consider the proposed sale; and (B)(i) approving the sale of the Debtors' assets free and clear of all liens claims, encumbrances and interests; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting certain related relief.

13. On December 17, 2014, the Court entered an order approving the Bidding Procedures [Docket No. 195] (the "Bidding Procedures Order"). Among other things, the Bidding Procedures Order allowed the Debtors, in consultation with the Supporting Noteholders, the Committee, and any other official committee appointed in the Chapter 11 Cases, to select a stalking horse bidder for the Acquired Assets for the purposes of establishing a minimum acceptable bid with which to begin an auction (the "Auction"). The Bidding Procedures Order set (i) December 29, 2014, as the deadline by which the Debtors were required to select a stalking horse bidder (the "Stalking Horse Deadline"); and (ii) January 27, 2015, as the deadline to submit qualified bids (the "Bid Deadline").

## D. The Postpetition Sale and Marketing Process and Selection of a Stalking Horse Bidder

14. Postpetition, Lazard continued to work closely with the Debtors and their advisors to continue the pre-filing marketing process it began in September 2014. As a result, since the pre-filing marketing process began and during the Debtors' Chapter 11 Cases, Lazard has, in the aggregate, contacted approximately sixty (60) potential buyers. Twenty (20) of these

parties entered into NDAs with the Debtors to further explore the potential acquisition of the Company's assets and business. To that end, similar to the prepetition sale process, Lazard provided such additional parties with: (i) access to the virtual data room containing extensive information about the Company, including, among other things, the Company's significant contracts and other documents describing the Company's business and financial results in considerable detail; (ii) a copy of the Court-approved Bidding Procedures; (iii) access to a copy of the proposed acquisition agreement for their review and markup; and (iv) the opportunity to meet with the Debtors' senior management and advisors (including Lazard) to discuss due diligence questions. As the initial Stalking Horse Deadline approached, the Debtors had active participation in the sale process by a number of bidders and determined, in light of all of the circumstances, not to select a Stalking Horse Bidder at that time.

15. As the original Bid deadline approached, the Debtors received both conforming and non-conforming bids relative to the bid standards, seeking to qualify as Qualified Bids. As such, Lazard and the Debtors continued to work with interested parties. On January 23, 2015, just prior to the Bid Deadline, the Debtors became aware that Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Purchaser"), a large pharmaceutical company with a market capitalization exceeding $55 billion, was interested in participating in the process. On January 26, 2015, Valeant requested that the bid deadline be extended for approximately two weeks. In order to balance the Debtors' interest in accommodating Valeant's participation with the complaints that surfaced of others that had participated throughout the process, the Debtors agreed to work closely with one other interested party towards becoming a Stalking Horse Bidder. To that end, the Debtors determined to extend the Bid Deadline for two

days until January 29th. The Debtors informed all interested parties of the extension of the Bid Deadline and filed an 8-K and a press release announcing the extension.

16. Subsequently, Valeant also informed the Debtors that they were interested in becoming the Stalking Horse Bidder. Over the ensuing two days, from January 27th to January 29th, significant negotiations occurred between the Debtors and each of the parties interested in becoming the Stalking Horse Bidder. The Debtors ultimately determined that Valeant submitted the highest and best offer at the time to become the Stalking Horse Bidder for the Acquired Assets. Notably, the Valeant Acquisition Agreement included preferable contract provisions, including offers of employment for all employees. The alternative bidder's agreement did not include such provisions.

17. On January 29, 2015, the Debtors filed the Emergency Motion for Order (A) Approving Stalking Horse Bidder and Authorizing Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Rescheduling the Hearing to Approve Such Sale and (C) Granting Related Relief [Docket No. 330] (the "Stalking Horse Selection Motion"). Pursuant to this motion, the Debtors' sought to approve Valeant as the Stalking Horse Bidder at a purchase price of $296 million. The Debtors also sought authorization of the same Bid Protections approved in the Bidding Procedures Order.

18. In addition, on January 29, 2015, the Debtors extended the Bid Deadline until February 10, 2015 at 5:00 p.m. and rescheduled the Auction to February 12, 2015. The Debtors provided notice of these new deadlines to parties in interest and filed a notice of these deadlines with the Court.

**E. The Subsequent Bidding**

19. Subsequent bidding occurred after the filing of the Stalking Horse Selection Motion. The subsequent bidding began on February 3, 2015 when the other bidder that had been

interested in becoming the Stalking Horse Bidder informed the Debtors that they would be submitting a new bid later that day or the following morning. They did in fact, submit a fully executed and financed bid late in the evening on February 3rd. The net value of that bid (after deductions from the face value of the bid due to terms in the contract that differed from the Valeant contract) was materially higher than the value of the bid of the Stalking Horse Bidder.

20. The Debtors engaged in five (5) rounds of bidding with the Stalking Horse Bidder and the other bidder over the course of the day on February 4, 2015. At the conclusion of this bidding, Valeant's last bid was materially higher and better than the last bid received from the other bidder. The other bidder advised the Debtors that it would not bid again.

21. The final Valeant bid provided a purchase price of $400 million, reflecting an increase of more than $100 million of value over the original bid filed with the Court in the Stalking Horse Selection Motion. In addition, the bid reflected several valuable intangible benefits that made it preferable to the other bid, including : (i) that Valeant does not require financing to close the transaction; (ii) the ability to close the transaction quickly; and (iii) not only an offer of employment to all employees, but a change in the Acquisition Agreement that provides for the assumption of all contracts on the Amended Notice Of Cure Amount With Respect To Executory Contracts And Unexpired Leases To Be Assumed And Assigned [Docket No. 314], filed with the Court on January 26, 2015 (as may be or has been amended, the "Cure Notice").

22. Accordingly, the Debtors entered into an Amended and Restated Acquisition Agreement with Valeant and sought approval of Valeant as the Stalking Horse Bidder. After a hearing before this Court on February 5, 2015, the Court entered an order granting the Stalking Horse Selection Motion approving Valeant as the Stalking Horse Bidder and authorizing the Bid

Protections. On the Bid Deadline, the Debtors did not receive any Qualified Bids other than that submitted by the Stalking Horse Bidder. Therefore the Debtors cancelled the Auction and accepted the bid of Valeant for the purchase of all or substantially all of the Debtors' assets.

23. Based on the foregoing, I believe the present proposed sale of substantially all of the Debtors' assets (the "Proposed Sale") to Valeant pursuant to the asset purchase agreement, dated February 4, 2015, between the Debtors and Valeant (the "Asset Purchase Agreement") is the highest and best offer attainable at this time for the Acquired Assets. Indeed, the approximately $400 million gross purchase price under the Asset Purchase Agreement is $125 million more than the base value for a Qualified Bid and includes valuable intangible benefits, reflecting the significant value that the Debtors' estates have derived from the postpetition sale process. Specifically, the Asset Purchase Agreement provides that Valeant will make an offer of employment to all employees and will assume all contracts on the Cure Notice.

24. Moreover, I believe that, in light of the comprehensive sale and marketing process and the arm's length negotiations with the Purchaser and its advisors, a longer sale process would not have resulted in a higher or otherwise better offer for the Acquired Assets.

**F. Adequate Assurance**

25. As noted above, the Asset Purchase Agreement provides that Valeant will assume all contracts on the Cure Notice. As more fully detailed in its filings with the U.S. Securities and Exchange Commission ("SEC"), Valeant is a multinational, specialty pharmaceutical and medical device company that develops, manufactures, and markets a broad range of products and medical devices which are marketed directly or indirectly in over 100 countries. As noted, Valeant is a public company with a market capitalization exceeding $55 billion that is traded on the New York Stock Exchange and the Toronto Stock Exchange under the ticker symbol VRX. Based on my review of Valeant's public filings, it is my understanding that Valeant, together

with its affiliates, has more than $808 million of cash and cash equivalents as of September 30, 2014, as reflected in its most recent Form 10-Q, which was filed with the SEC on or around October 24, 2014. As of today and based on this publicly available information, I believe that Valeant and its affiliates have adequate financial wherewithal to perform the future obligations under these contracts.

**G. Conclusion**

26. Prior to the commencement of the Debtors' Chapter 11 Cases, the Debtors and their advisors undertook a fulsome evaluation of their potential strategic alternatives for maximizing value. Through that evaluation, the Debtors determined that engaging in the Competitive Process pursuant to the Plan Support Agreements and pursuing a sale of substantially all of the Debtors' assets was the best and most viable alternative for the Company to maximize the value of their estates. Through a prompt and comprehensive section 363 sale process, the Debtors have been able to subject their assets to a competitive bidding process that substantially improved the value available for creditors, while ensuring the continued availability of PROVENGE to those patients that severely need and rely on the drug. Accordingly, for the reasons set forth herein, I believe that the Debtors, with the help of their advisors, including Lazard, have executed a comprehensive sale and marketing process that, through the Proposed Sale, will allow the Debtors to attain their goal of maximizing the value of their estates for the benefit of all stakeholders.

[**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
February 17, 2015

By: *__/s/ Brandon Aebersold__*
Name: Brandon Aebersold