IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | x : | Chapter 11 |
| DENDREON CORPORATION, et al.,[1] | : : | Case No. 14-12515 (PJW) |
| Debtors. | : : x | Jointly Administered |

## MOTION TO STAY THE EFFECTIVENESS OF THE SALE ORDER AND THE CLOSING OF THE SALE PENDING REVIEW BY THIS COURT AND/OR APPEAL TO THE DISTRICT COURT

Now comes the 'Donahue Group" of ad hoc equity shareholders and hereby moves this Court for an order staying the effectiveness and closing of the sale as set forth in the Court's Confirmation Order of February 20, 2015 so it can be reviewed by this Court and/or the District Court.

Previously the Donahue Group requested that the U.S. Trustee appoint an official equity committee to represent the interests of the Debtor's common stock holders. That initial request letter is attached hereto as "Exhibit A". Following the submittal of that letter the Debtor sent a letter to the Trustee in opposition to that request. In response to the Debtor's letter the Donahue Group sent a responsive letter to the U.S. Trustee, which letter is attached hereto as "Exhibit B". The request was made because it appeared that the Debtor, forgetting its fiduciary duty to the stockholder, was not taking all reasonable steps to maximize shareholder value. The denial by the Trustee caused the Donahue Group to be without counsel experienced

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 1301 2nd Avenue, Seattle, Washington 98101.

{00926687;v1 }

in Bankruptcy matters and it continues to hinder the equity holders from being properly heard by this Court. It also allowed what the shareholders were concerned about, and that was the sale of the company for much less than its true value by a process rife with conflict.

Less than one year before the Debtor's Bankruptcy petition was filed the stock in this company was trading at over $2.25 a share. At its peak shares traded at over $55.00 a share and were trading in the $11-$12 range in recent years. The share price started dropping when the large institutional investors s and inside note holders became aware that Dendreon was intent on filing for Bankruptcy, despite not being insolvent. Even after the above letters were sent, Dendreon announced its *first profitable quarter since the company was founded in 1996*. The company was completely funded by the stakeholders through approval of its main drug (immunotherapy) Provenge by the FDA, a process that took over a decade. Because of its newly found profitability and the already commenced expansion into Europe, Dendreon profits are set to soar. Dendreon's notes due the note holders are not due until July 2016. As set forth to the Trustee:

> Most Biotech deals, in the size range of Dendreon, have been consummated at over 10.5 X gross margin. These companies have generally realized their launches throughout the world, as anticipated by Dendreon and which process appears to have been slowed down for reasons unknown. Typically in the early growth stage of a biotech (which Dendreon is in) about 50% of sales are from outside the U.S. The structures of these deals become complicated by the royalty payments, the milestone payments and the associated accounting for these "partial sales" during the development stages. The very large deals, with very mature end markets have traded at slightly

lower multiples reflecting the difficulty a buyer would have in dramatically improving the sales effort.

In 2014 Quarter One Dendreon had gross revenue of $94.2 million, rebates and charge backs of $12 million, net revenue of $82.2 million and gross margin of $44.3 million. Assuming the GPO charge backs are reduced to zero as the price increases lap the 6 month time period, we could see the gross margin increase to $48.8 million, as the temporary payments to offset the reimbursement issues go away. This would leave the company with "pro forma run rate" gross margin close to $200 million. This is an increase of almost $70 million from the reported run rate level in Q1 2014 which was $129 million. Price increases, seasonal factors and some year over year growth in procedures push the improvement. This is the "number" that the buyer usually looks at when setting the price of the acquisition. The rational for this is the pharmaceutical company will absorb the company into their overhead, and elimination of SGA and R&D are assumed in the analysis by the Pharmaceutical companies.

The other number that the buyer and seller need to resolve is the value of the cash, debt and "other non cash assets". The cash and the debt are very straight forward. Here, the debt will be $620 million in 2016, cash is $137 million, so net debt is about $485 million.

The "value of other non-cash assets" is harder to pin down. EU has approved Provenge, but it has not yet launched. Also there are several other pipeline products that may have a real value to a buyer. Determining how to access that value is admittedly difficult. Dendreon places savings from automation at $7,000,000 per year but as a cost of gross sales number the savings depends on and is related to the sales and cannot be fixed.

Conservatively, we have a net debt equal to $485 million. Any value for EU, Rest of World (ROW), pipeline or automation would reduce the value we use for net debt. If we apply the average multiple paid over the last 8 years to companies of similar size (about 10.5 times gross margin), we get a value of about $2.0 billion. Reducing that figure by the net debt results in about $1.5 billion, or roughly $10 per share. This includes no value for any "other assets" that Dendreon has. Given the tremendous interest in immunotherapy by pharmaceutical companies we believe something within this range of value is achievable

Even if one applies a multiple of 8 times gross margin results in a valuation of about $1.6 billion, which less the net debt results in about $1.12 billion in

value for the stock. That translates to over $7.00 per share with no consideration of any other assets, besides the US market. Most Biotech deals, in the size range of Dendreon, have been consummated at over 10.5 X gross margin. These companies have generally realized their launches throughout the world, as anticipated by Dendreon and which process appears to have been slowed down for reasons unknown. Typically in the early growth stage of a biotech (which Dendreon is in) about 50% of sales are from outside the U.S. The structures of these deals become complicated by the royalty payments, the milestone payments and the associated accounting for these "partial sales" during the development stages. The very large deals, with very mature end markets have traded at slightly lower multiples reflecting the difficulty a buyer would have in dramatically improving the sales effort.

Even this valuation fails to consider that some have estimated the net operating losses (NOLS) available for tax write off to a buying Pharma company to be as high as 1.3 billion dollars. Even without that added value and even if one applies a multiple of 8 times gross margin it results in a valuation of about $1.6 billion, which less the net debt results in about $1.12 billion in value for the stock. That translates to over $7.00 per share with no consideration of any other assets, besides the US market. The sale to Valeant was for $296 Million dollars.

As attached to the reply letter to the U.S. Trustee the following examples are a reasonable effort to compare valuation methods and use product revenue over licensing rev. The numbers for gross margin will tend to over state the level because of the milestone payments. This will cause the multiple to be under stated.

1. CV therapeutics bought by Gilead in 2008

Market cap $1.226 billion
Revenue $152 million
Gross margin $131 million

EV/gross margin 9.6 X

2. Imclone bought by Eli Lilly in 2008
Market cap $6.2 billion
Revenue $660 million
Gross margin $563 million

EV/ gross margin 9.3 X

3. Pharmasset bought by Gilead in 2011
Market cap $5.16 billion
No product revenue or Gross margin

Bought pre approval

4. Human Genome Science bought by Glaxo in 2012
Market cap $3.0 billion
Revenue $ 241 million
Gross margin $209 million

EV/gross margin 14.6 X

5. Amylin bought by Bristol Meyers in 2012
Market cap $5.1 billion
Revenue $ 677 million
Gross margin $536 million

EV/ Gross margin 9.0 X

6. Onyx bought by Amgen in 2013
Market cap $8.7 billion
Revenue $ 581 million
Gross margin $574 million

EV/gross margin 14.2 X

7. Millennium bought by Takeda in 2008
Market cap $8.2 billion
Revenue $557 million
Gross margin $517 million

EV/ gross margin 14.3 X

8. MGI pharma bought by Eisai in 2007
Market cap $3.3 billion
Revenue $ 450 million
Gross margin $297 million

EV/gross margin  10.6 X

9. Pharmion bought by celgene in 2007
Market cap  $2.7 billion
Revenue  $269 million
Gross margin $196 million

EV/ gross margin  12.3 X

10. AVNR bought by a Japanese company for about $3.00 billion
Revenue $28.6 million in revenue in the Q2 June 2014
COGS was $1.689 million

*Gross margin was $$26.94 million for the quarter for a annualized gross margin of 4 times this or $107 million*

The summary of the 10 examples of buyouts was a multiple of over 11.5 X EV/ Gross margin. This leaves out the outliers, with very high multiples. In fact Dendron is penalized by this analysis because the company has not started the EU sales, and most comparisons would have much higher gross margin based on US sales only accounting for 1/2 of total sales. Applying these numbers to Dendreon, they had a revenue run rate in June of about $330 million, prior to the bankruptcy. This would be higher by about $18 million from the GPO - chargeback payments that would flow into revenue after the 6 months price increase period. Gross margin would have been $177 to $194 million depending upon the treatment of the GPO charges this would give a potential valuation of the whole company of about $2.0 billion.Take out the

$620 debt, add back the $138 cash, you would get about $1.5 billion for shareholders, or a little under $10 per share. It has never been explained why DNDN's value is not like every other biotech in existence. Based on the filings by Dendreon and the involvement of Lazard in Feb 2014, it would appear that the company has never been really shopped, without the knowledge that the buyer could/should wait for the BK and buy the assets then.

AVANIR instead of starting the BK procedure in Feb 2014, when the stock was $2.00, instead shopped the company and got $17 per share.

*Again, since the above valuations were estimated the Debtor has announced earnings that exceed the conservative numbers used for the above valuation.* Since those letters to the Trustee the following was released by Dendreon:

> Dendreon (OTCBB: DNDNQ) announced that the company grew sales in four quarters successively, exceeded its revenue target for the first time ever, and achieved cash-flow break even in the fourth quarter (adjusted for non-recurring items), starting 2015 on a strong footing. In addition, the first commercial European patient initiated treatment with PROVENGE (sipuleucel-T) in Germany – the first country outside of the U.S. to offer the novel immunotherapy for advanced prostate cancer since receiving marketing authorization in the European Union (EU) in 2013.
>
> Dendreon finished 2014 strong with a net product revenue for the year ended December 31, 2014 of $303.8 million compared to $283.7 million for the year ended December 31, 2013. Net product revenue for the fourth quarter ended December 31, 2014 was $79.8 million compared to $74.8 million for the fourth quarter ended December 31, 2013. As of December 31, 2014, Dendreon had approximately $122 million in cash, cash equivalents, and short-term and long-term investments.
>
> "Achieving these three major milestones – delivering four consecutive quarters of year over year growth, exceeding our target revenue and commercializing

7

{00926687:v1 }

PROVENGE in Europe – starts 2015 on a positive note," said W. Thomas Amick, president and chief executive officer of Dendreon. "Dendreon is moving in the right direction, and we are delivering on our commitment to expand access to PROVENGE for advanced prostate cancer patients worldwide."

The price brought at the sale was so grossly inadequate as to shock the conscience of the court and raise a presumption of fraud, unfairness or mistake. In determining whether gross inadequacy exists the bankruptcy court must take into consideration appraisement of the property as a guide in the exercise of its discretion in accordance with the intendment of the statute cited.. A clear exposition of the governing principles is contained in <u>Ballentyne v. Smith, 1907, 205 U.S. 285, at page 290, 27 S.Ct. 527, at page 528, 51 L.Ed. 803</u>: <u>Graffam v. Burgess, 117 U.S. 180, 191, 192, 6 S.Ct. 868, 29 L.Ed. 839, 842, 843</u>. It is difficult to formulate any rule more definite than this, and each case must stand upon its own peculiar facts.' <u>In re Stanley Engineering Corp., 164 F.2d 316, 1947 U.S. App. LEXIS 2918 (3d Cir. Pa. 1947)</u>

The sale of Dendreon's assets was intrinsically unfair to the shareholders. It is way below its true value. It is worth noting that everyone gets paid here, when you consider the profits made by Deerfield by using their information obtained due to their position as note holders to divest their stock interest.

Now the Donahue Group requests review by this Court and/or an opportunity to be heard and/or plans to file an appeal with the District Court within the 14 day period that appeals are allowed and seeks an order from this Court staying the sale from closing until the matter is decided by the District Court or a hearing is schedule

8

{00926687;v1 }

that gives time for some of the group to appear. Some of the other issues of concern, without discussing them fully until the opportunity to be heard and or a supplement can be prepared and filed, include the following concerns. 1) The seller and the buyer were represented by the same law office, 2) Large institutional shareholders, based on inside information, were able to sell their equity position in the Company prior to the bankruptcy filing to the detriment of the small retail shareholders one of these being Deerfield who are also the primary note holders (Deerfield is represented by a law firm that previously represented an entity that attacked Dendreon in an effort to make money on "puts" against Dendreon, 3) an equity committee should have been appointed as otherwise bankruptcy counsel could not be properly obtained, 4) the large break-up fee (about 10 million dollars) designated for the stalking horse bidder (see conflict argument) along with the other issues above chilled the market for the sale and purchase of Dendreon. Essentially the long term stakeholders of this company have not been treated fairly and have been ignored by Dendreon and the Court. There is an intrinsic fairness issue.

That there was a conflict of interest between counsel for the Debtor Dendreon and counsel for the Buyer Valeant was first set forth in docket number 348. Then the U.S. Trustee requested further information regarding the conflict. Debtor's Counsel set it forth as follows in its February 9, 2015 filing (docket # 365):

> In the First Supplemental Declaration, I disclosed that Valeant Pharmaceuticals International, Inc. ("Valeant"), is a current client of the Firm. Valeant is the Court-approved stalking horse bidder for the sale of all or substantially all of the non-cash assets of the Debtors (Docket No. 355). I am providing the

additional disclosures herein in response to a request from the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") for additional information regarding Skadden's relationship with Valeant.

The ad hoc committee of shareholders does not think this sufficient to address the concerns of the conflict of interest inherent in the same counsel representing buyer and seller. There is just too much potential for problems that could have affected the process when the same firm could have information that could help Valeant and hurt other buyers and the shareholders.

The previous Court order of confirmation of sale was stayed by rule of law for 10 days from February 20th 2015. Under the former rules, a sale order was *not* stayed for 10 days. Now, by virtue of the 1999 amendments, a sale order is *expressly* stayed for 10 days. The Advisory Committee Note says that Rule 6004(g) is designed to facilitate an objecting party's ability to obtain a stay pending appeal In re Quanalyze Oil & Gas Corp., 250 B.R. 83, 2000 Bankr. LEXIS 721, 44 Collier Bankr. Cas. 2d (MB) 893 (Bankr. W.D. Tex. 2000), thereby eliminating what had been the somewhat unseemly practice of chapter 11 debtors or bankruptcy trustees rushing to close a sale before an anticipated objecting party could get a court to enter a stay order. The language of the rule itself, however, is not limited by its terms to appeals. The rule now says that sale orders are stayed for 10 days, period (unless the court orders otherwise). See FED.R.BANKR.P. 6004(g). In re Quanalyze Oil & Gas Corp., 250 B.R. 83, 2000 Bankr. LEXIS 721, 44 Collier Bankr. Cas. 2d (MB) 893 (Bankr. W.D. Tex. 2000).

{00926687;v1 }

Now, thanks to changes to Rules 6004, 7062, and 9014, sale orders are stayed for 10 days -- meaning that sales that close before that ten days expires could conceivably be unwound. Today is day 10 since the sale was confirmed at the hearing. This Court addressed a potential stay on page 40, paragraph 45 of the order approving sale stating.

To the extent this Court is concerned with the timing of this objection the Donahue Group states that upon the scheduling of the confirmation of sale hearing as amended on 02/05/15 the below signed representative of 250 small retail shareholders of Dendreon (DNDN now DNDNq) began assembling shareholders to accompany him to the scheduled hearing to present their arguments contrary to the sale being approved. The first indication of the final date of the sale confirmation hearing was filed by the clerk on February 5, 2015 a mere 15 snowy days prior to the hearing and received some days thereafter. Upon realizing the logistical problems of getting shareholders, all from other states, to Delaware on the scheduled date, particularly considering the weather conditions in the Eastern part of the United States at the time, the Donahue Group filed a motion to continue the hearing, so the below signed and members of the group could attend the hearing. Counsel completed the motion (now docket number 446) on the evening of Friday February 13, 2015. The motion could not be filed on Saturday the 14th or Sunday the 15th as the Clerk's Office was closed. Then counsel attempted to file it with the Clerk's Office on Monday February 16th only to discover that it was a holiday recognized by the Court and thus the Clerk's

{00926687;v1 }

Office was closed. Then, very persistently, counsel tried to file the motion all day on Tuesday the 17th day of February but this Court and the Clerk's Office was *closed due to extreme weather conditions*. Finally on the 18th of February the motion was filed and a time stamp placed on the motion. The motion was sent to counsel for the debtor the same day who did not object to the motion, prior to the hearing.

Per the Clerk's Office, an internal problem arose due to the fact that the Court/Clerks were having some IT problems with the site. Counsel was concerned about the non-appearance on the docket and upon inquiry to the Clerk was told that the filing would appear that day and be backdated to the 18th of February, which was the filing date and the first day the Court was open since February 13th. However, although filed, the motion still did not appear on the docket and counsel again inquired. A response was received from the Clerk on February 27, 2015 that the motion had finally been placed on the docket at #446. A review of that docketed motion will show the time stamp of February 18, 2015 (the first date that it could be filed since Friday, February 13th).

In addition the schedule for the day's sale confirmation hearing was not released until February 19th and the acquisition agreement was amended just the day before. This was not enough time for review and evaluation by the ad hoc group of equity holders. The shareholders having only a single attorney, with no administrative help, and having had their important request for appointment of an equity committee denied by the U.S. Trustee, have been denied the opportunity to

present their issues to this Court. Of course the Court did not rule on the motion and probably did not realize it was filed until after the hearing.

The Donahue Group reserves the right to supplement this request and be heard on the arguments set forth herein.

WHEREFORE, it is requested that this Court stay the effectiveness and closing of the sale to Valeant until the shareholders who were the long term stakeholders of this company can be heard and/or until a review by the District Court.

BELLINGER & DONAHUE

Kerry M. Donahue, Esq.
6295 Emerald Parkway
Dublin, OH 43016
Telephone: (614) 761-0402
Facsimile: (614) 789-9866
Email: Bedonwahoo@aol.com

*Counsel to the Donahue Group*

CERTIFICATE OF SERVICE

This request was sent to counsel for debtor this 2nd day of March 2015 by facsimile transmission and to the U.S. Trustee by e-mail transmission.

Kerry M. Donahue

13

{00926687;v1 }