IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
In re:                                                    :      Chapter 11
                                                          :
Dendreon Corporation, <u>et</u> <u>al.</u>,                         :      Case No. 14-12515 (LSS)
                                                          :
                            Debtors.[1]                   :      Jointly Administered
                                                          :
                                                          :      **Hearing Date: April 29, 2015, at 1:00 p.m. (ET)**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    **Related Docket Nos. 526, 604, 609**

## DEBTORS' OBJECTION TO MOTION FOR
## APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE AND
## <u>DETERMINATION OF PREJUDICE FOR PREVIOUS NON-APPOINTMENT</u>

The debtors and debtors in possession in the above-captioned cases (collectively,

the "<u>Debtors</u>") hereby object (this "<u>Objection</u>") to the motion of the self-titled ad hoc "Donahue

Group" of equity stockholders for appointment of an official equity committee and determination

of prejudice for previous non-appointment (Docket No. 526) (the "<u>Request</u>"). In support of this

Objection, the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

The original determination of the Office of the United States Trustee for the

District of Delaware (the "<u>U.S. Trustee</u>") that "appointment of a separate committee of equity

security holders [was] not warranted at [that] time," in December 2014, was an appropriate

determination well within the U.S. Trustee's statutory discretion. The decision not to have an

equity committee in these cases (the "<u>Chapter 11 Cases</u>") is still appropriate today.

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Dendreon Corporation (3193), Dendreon Holdings, LLC (8047), Dendreon Distribution, LLC (8598) and Dendreon Manufacturing, LLC (7123). The address of the Debtors' corporate headquarters is 601 Union Street, Suite 4900, Seattle, Washington 98101.

Appointment of an equity committee is unusual, and subject to a high burden of justification. In its Request for an equity committee at this late juncture, the Donahue Group fails to meet that high burden. In particular, the Donahue Group has failed to show that the Debtors are not "hopelessly insolvent," that stockholders have a prospect for a meaningful recovery, or that stockholder interests are currently inadequately represented. Appointment of an equity committee would be of no benefit to the estates, costly, and untimely. Therefore, the Request should be denied.

The Request is replete with arguments attempting to relitigate the Sale. The Sale has closed, and these arguments are moot. The Donahue Group appears to have conceded this in its Motion to Shorten Time, which requested that the Request be heard at the hearing in these cases scheduled for April 29, 2015 (Docket No. 604) (the "Motion to Shorten"). See Motion to Shorten ¶ 5 ("[T]he operational side of this case has ended with the closing of a court-approved sale . . . .").[2] Therefore, these arguments are not relevant, and the Debtors do not attempt herein to address such arguments.[3] For the reasons set forth herein, the Court should deny the Request.[4]

---

[2]    Likewise, the Donahue Group has withdrawn (Docket No. 583) its motion to stay the effectiveness of the Sale Order and the closing of the Sale pending review by this Court and/or appeal to the District Court (Docket No. 455) (the "Motion to Stay"), and the Motion to Stay has been dismissed with prejudice. The Donahue Group's appeal of the Sale Order has also been dismissed with prejudice. See Donahue Grp. of Ad Hoc Equity Shareholders v. Dendreon Corp. (In re Dendreon Corp.), No. 15-258 (D. Del. Apr. 22, 2015), Order re: Stipulation of Dismissal; Dendreon, No. 15-258 (D. Del. Apr. 16, 2015), Stipulation of Dismissal of Appeal, ECF No. 5.

[3]    This silence is not assent, and the Debtors dispute those arguments and reserve their rights with respect thereto.

[4]    The Request is also replete with unsubstantiated allegations that the Debtors were unjustified in filing for bankruptcy. The Debtors vehemently deny this and reserve their rights with respect to these allegations, pointing out merely the following. First, the filings were approved by a board of directors of Dendreon Corporation that was at the time, and remains, independent and disinterested, as discussed below. Second, under Bankruptcy Code section 1112(b)(1), (4), dismissal of a chapter 11 case must be "in the best interests of creditors and the estate," and "for cause." Third, determination of lack of good faith in a bankruptcy filing generally requires a "fact-intensive inquiry" that meets the high bar of showing that "the petition [does not] serve[] a valid bankruptcy purpose" and/or "[was] filed merely to obtain a tactical litigation advantage." In re Phila. Rittenhouse Developer, L.P., No. 10-31201, 2011 Bankr. LEXIS 1930, at *25 (Bankr. E.D. Pa. May 25, 2011); In re 15375 Mem'l Corp., 589 F.3d 605, 618 (3d Cir. 2009). The Chapter 11 Cases served valid bankruptcy purposes and were not tactical in nature. Dismissal would not be "in the best interests of creditors and the estate."

## BACKGROUND

1.      On November 10, 2014 (the "<u>Petition Date</u>"), the Debtors commenced the

Chapter 11 Cases by each filing petitions for relief under chapter 11 of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"). The factual background regarding the Debtors, including

their business operations, their corporate and capital structure, their capital raising and

restructuring activities, and the events leading to their decision to file these cases, is set forth in

the Declaration of Robert L. Crotty in Support of Chapter 11 Petitions and First Day Pleadings

(Docket No. 3) (the "<u>First Day Declaration</u>").

2.      The Debtors continue to manage and operate their business as debtors in

possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3.      On November 19, 2014, the U.S. Trustee appointed an Official Committee

of Unsecured Creditors in these cases (the "<u>Creditors' Committee</u>") pursuant to 11 U.S.C. §

1102(a) (Docket No. 92). No trustee has been appointed in these cases.

4.      At the outset of these cases, on November 24, 2014, the Donahue Group

wrote to the U.S. Trustee requesting appointment of a committee of equity security holders under

11 U.S.C. § 1102(a)(1). On December 3 and December 5, 2014, Debtors' counsel and counsel to

the Creditors' Committee each wrote to the U.S. Trustee opposing this request (<u>Exhibit A</u> and

<u>Exhibit B</u>, respectively). On December 5, 2014, the Donahue Group wrote a supplemental letter

to the U.S. Trustee regarding Debtors' counsel's letter. On December 18, 2014, the U.S. Trustee

denied the request.

5.      On February 20, 2015, this Court entered an order (Docket No. 410) (the

"<u>Sale Order</u>"), inter alia, approving the sale of substantially all of the Debtors' assets (the "<u>Sale</u>")

pursuant to the Second Amended and Restated Acquisition Agreement (the "<u>Acquisition</u>

<u>Agreement</u>") among the Debtors, Drone Acquisition Sub Inc. (the "<u>Purchaser</u>"), and Valeant

3

Pharmaceuticals International, Inc. ("Valeant"). The Court found that (i) the filings pertaining to the Sale had been satisfactorily noticed, (ii) adequate opportunity to object to the Sale had been given, (iii) the Sale was in the best interests of the Debtors and their estates, (iv) the Sale constituted a sound exercise of business judgment seeking to receive maximum value for estate assets, (v) the assets of the Debtors were "actively and adequately marketed," (vi) the bidding and auction process was "full and fair," (vii) the Sale was the best option available to the Debtors, (viii) the terms of the Acquisition Agreement, and the consideration to be paid thereunder, were "fair and reasonable," (ix) the Sale was at arm's length and in good faith, and was to be made free and clear, and (x) the Sale needed to be "consummated promptly" and was intended to be closed "as soon as reasonably practicable." Sale Order ¶¶ G, I-L, N-Q, BB.

6.      On February 23, 2015, the Sale closed.

7.      On March 25, 2015, the Donahue Group filed the Request.

8.      On March 10, 2015, the Debtors filed their proposed plan of liquidation (Docket No. 471) and associated disclosure statement (Docket No. 472). On April 10, 2015, the Debtors filed their proposed first amended plan of liquidation (Docket No. 575) (the "Proposed Plan"). On April 15, 2015, this Court approved the associated disclosure statement (the "Disclosure Statement") and set June 2, 2015, as the date for a hearing to confirm the plan (Docket No. 596). On April 16, 2015, the Debtors filed solicitation versions of the Proposed Plan and the Disclosure Statement.

## OBJECTION

9.      The U.S. Trustee or the court may appoint an equity committee. See 11 U.S.C. § 1102(a)(1) ("[T]he United States trustee . . . may appoint . . . [a] committee[] of . . . equity security holders as the United States trustee deems appropriate."); 11 U.S.C. § 1102(a)(2)

("[T]he court may order the appointment of . . . [a] committee[] of . . . equity security holders if necessary to assure adequate representation . . . .").

10.     As evidenced by the plain terms of the statute, the appointment of an equity committee is discretionary and appointment by the court is to be done only "if necessary to assure adequate representation." Equity committee appointment is unusual relief, and, given the circumstances at the time of the Donahue Group's original request, as set forth in Debtors' counsel's letter of December 3, 2014, the U.S. Trustee's decision was well within the bounds of discretion. Since then, the factors weighing against appointment have only multiplied. An equity committee would provide no benefit to the Debtors' estates, and the Debtors' estates would be unnecessarily depleted if they were compelled to finance an equity committee. The Request falls well short of its heavy burden, and should be denied.

## II.    THE APPOINTMENT OF AN EQUITY COMMITTEE IS RARE AND EXTRAORDINARY AND IS NOT JUSTIFIED IN THESE CHAPTER 11 CASES, BECAUSE THE DONAHUE GROUP CANNOT SHOW THAT (I) THERE IS A SUBSTANTIAL LIKELIHOOD FOR A RECOVERY AND (II) EQUITY HOLDER INTERESTS ARE INADEQUATELY REPRESENTED.

11.     The appointment of an equity committee is considered "extraordinary relief and should be the rare exception." In re Spansion, Inc., 421 B.R. 151, 156 (Bankr. D. Del. 2009) (citations omitted) (internal quotation marks omitted); see also In re Nw. Corp., No. 03-12872 (CGC), 2004 WL 1077913, at *2 (Bankr. D. Del. May 13, 2004) ("[A]ppointing an official equity committee 'should be the rare exception' . . . ." (quoting In re Williams Commc'ns Grp., Inc., 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002)). Due to the high burden of proof, courts often deny requests to have equity committees appointed. See, e.g., In re Exide Techs., No. 13-11482 (KJC) (Bankr. D. Del. Dec. 17, 2014); In re Eastman Kodak Co., No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 15, 2013); In re Sch. Specialty, Inc., No. 13-10125 (KJC)

(Bankr. D. Del. May 23, 2013); <u>In re AbitibiBowater Inc.</u>, No. 09-11296 (KJC) (Bankr. D. Del. Aug. 13, 2010); <u>In re Source Interlink Cos.</u>, No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009).

12.     The facts and circumstances of these Chapter 11 Cases more than adequately demonstrate that these are not cases in which an equity committee should be appointed. Before the Petition Date, the Debtors and their advisors worked tirelessly to seek alternatives to bankruptcy, including debt refinancing, equity capital raising, asset sales, and sale of the Debtors, ultimately concluding that the filing of the Chapter 11 Cases was in the best interests of the estates. Since filing, the Debtors and their advisors have continued to work tirelessly to maximize estate value, including through the Sale, which, as proven by the market, achieved the highest and best value for the Debtors' assets. While the consummation of the Sale provided the best possible recovery for the Debtors' creditors, unsecured creditors are estimated to receive between a 72% and a 75% recovery. As described herein, there is no scenario in which equity holders could have or will receive a recovery in these Chapter 11 Cases.

13.     To establish grounds for court appointment of an equity committee, movants must "establish that (i) there is a substantial likelihood that they will receive a meaningful distribution . . . under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests . . . without an official committee." <u>Nw.</u>, 2004 WL 1077913, at *2 (quoting <u>Williams</u>, 281 B.R. at 223) (internal quotation marks omitted); <u>see also</u> <u>In re Leap Wireless Int'l, Inc.</u>, 295 B.R. 135, 140 (Bankr. S.D. Cal. 2003) ("Shareholders committees should be appointed when equity holders establish there is a substantial likelihood that they will receive a meaningful distribution . . . and that the existing committee(s) do not adequately represent their interests."). Additionally, courts should consider a number of factors

6

in determining whether appointment is warranted, including "solvency . . . timing . . . complexity . . . and . . . cost." Nw., 2004 WL 1077913, at *2 (citing Williams, 281 B.R. at 219).

14.    These are onerous requirements for which the burden rests with the Donahue Group. The first requirement is "a substantial likelihood of a meaningful distribution." The second requirement is an inability to represent equity's interests. The Donahue Group has failed on both fronts. Additional factors of timing and cost also weigh against it.

**A.    The Donahue Group Cannot Show that the Debtors Are Not Hopelessly Insolvent and that Stockholders Have a Substantial Likelihood of a Meaningful Distribution.**

15.    To justify equity committee appointment, courts look for whether there is "a substantial likelihood that [equity holders] will receive a meaningful distribution" or, in the alternative, "whether the debtor appears to be hopelessly insolvent." Leap, 295 B.R. at 139-40 (citing Williams, 281 B.R. at 220); see also Spansion, 421 B.R. at 156 ("[I]f equity holders have no reasonable prospect of receiving a meaningful distribution, an equity committee could serve no legitimate role in negotiating a plan."); Williams, 281 B.R. at 220 ("When a debtor appears to be hopelessly insolvent, an equity committee is not generally warranted . . . ."); Rotech Healthcare Inc. v. Statutory Comm. of Equity Sec. Holders (In re Rotech Healthcare Inc.), No. 13-10741 (PJW) (Bankr. D. Del. Aug. 26, 2013) (disbanding the equity committee based on the debtors' enterprise value and insolvency).

16.    A determination of "hopeless insolvency" is "a practical conclusion, based on a confluence of factors, that the Debtors appear to be hopelessly insolvent." Williams, 281 B.R. at 221. Relevant data include "the Debtors' balance sheet . . . schedules of assets and liabilities . . . publicly held bonds . . . trading at a steep discount . . . [and whether a] higher valuation is in both the Creditors' Committee's and the Shareholders' interest." Id. at 220-21. As discussed below, the Debtors' asset and liability position, the bond prices of Dendreon

Corporation (the "Company"), and the aligned economic interests of debt and equity all clearly reflect insolvency.

17.     If equity holders are unlikely to receive any meaningful recovery, consideration of other factors not necessary. See Exide Techs. v. Wis. Inv. Bd., No. 02-1572-SLR, No. 02-11125-KJC, No. 02-1610-SLR, 2002 WL 32332000, at *1-2 (D. Del. Dec. 23, 2002) ("If a debtor appears to be 'hopelessly insolvent,' . . . appointment . . . is generally regarded as unjustified. . . . [Otherwise], courts consider the following additional factors in determining . . . adequate[] represent[ation] . . . [w]hether the shares are widely held and publicly traded . . . size and complexity . . . and . . . timing . . . ."); see also Williams, 281 B.R. at 220 ("[T]he debtor's solvency is a major factor . . . ."). As explained below, the Donahue Group has failed this "hopelessly insolvent" test, and thus appointment is unjustified.

18.     The Request speculated wildly about valuation of the Debtors' former business. By conceding in the Motion to Shorten that "the operational side of this case has ended with the closing of a court-approved sale," and by withdrawing the Motion to Stay and its related appeal, the Donahue Group has acknowledged that the purported historical "facts" assembled in the Request about the Debtors' financial performance are moot. Motion to Shorten ¶ 5.

19.     In the Sale, the Debtors exchanged substantially all of their assets, including approximately $80 million in cash, for approximately $495 million, consisting of $445.5 million in cash and $49.5 million in Valeant stock. Subject only to a modest quantity of additional cash on hand, minor miscellaneous assets, and estimated allocations to fee and other reserves through the conclusion of these cases, that Sale consideration of $495 million constitutes substantially all of the assets available for distribution from the Debtors' estates.

20.    The primary claim against the estates is on account of the 2.875% Convertible Senior Notes due 2016 (the "2016 Notes") issued by the Company. The 2016 Notes have a face amount of $620.0 million, and due and payable accrued and unpaid interest of approximately $5.7 million (Claim No. 197). The Proposed Plan provides that the claim on account of the 2016 Notes will be allowed in the amount of $625,694,097.22. The Debtors estimate that, in addition to the 2016 Notes claim, total allowed claims against the Debtors' estates will be between $4 million and $33 million. Therefore, under the absolute priority rule, for equity to receive anything in these cases, and ignoring all other claims (including general unsecured trade claims, administrative claims, and priority claims), the estates must have assets for distribution of more than $100 million in addition to the Sale proceeds.

21.    In the Motion to Shorten, the Donahue Group suggests two sources of stockholder recovery: (i) disallowance of claims and (ii) litigation against former directors and officers. Motion to Shorten ¶¶ 5-6. The Request also suggests preference actions. See Request at p. 11.

22.    As demonstrated by the Debtors' prompt filing of objections and motions after the bar date, the Debtors are diligently working to resolve and object to claims, and remain vigilant in seeking to expunge objectionable and satisfied claims. See Docket Nos. 532, 536, 537, 538, 539, 540. However, as set forth above, the Proposed Plan provides for allowance of the claim on account of the 2016 Notes, as the Debtors see no defense thereto. In that light, the Debtors do not believe that there are, nor has the Donahue Group suggested, any actions that could disallow a material amount of additional claims sufficient to render a recovery for equity holders even remotely possible.

23.     Regarding preference actions, even if valid actions existed, given the
Debtors' degree of insolvency, any preference recoveries would be collected from unsecured
creditors and redistributed to other unsecured creditors. In addition, nearly all of the Debtors'
prepetition contracts were assumed and assigned—and cured—in connection with the Sale. The
Debtors, the Creditors' Committee, and certain noteholders of the 2016 Notes evaluated
preference actions in the Chapter 11 Cases and determined that they would not maximize estate
value. The Donahue Group presents no contrary evidence that such actions could materially
benefit equity. As the <u>Williams</u> court said regarding claim subordination, "[T]hat the
Noteholders may double their recovery by subordinating . . . claims, further undermines the
necessity of an equity committee. The Creditors' Committee has a significant economic interest .
. . in investigating the . . . claims, notwithstanding its fiduciary obligation to do the same. . . .
[T]he Creditor's Committee and the Shareholders have similar interests . . . even if the Court
were to discount . . . that . . . disallowance . . . would not result in a recovery for equity . . . ."
<u>Williams</u>, 281 B.R. at 222-23.

24.     Moreover, the Debtors do not believe that any valid causes of action exist
against the Debtors' current or former directors or officers. The Company's current and former
directors and officers all owe or owed, and exercised, fiduciary duties towards the Company and
have sought to maximize enterprise value. Leading into and during the Chapter 11 Cases, the
Company's entire board of directors has consisted of independent directors free from creditor
influence. It was this disinterested board that decided to file these cases. The Debtors' officers
have been similarly free of conflict. Just on March 23, 2015, the Company received written
notice from the Securities and Exchange Commission (the "<u>SEC</u>") that the SEC had concluded a
long-running investigation and did not intend to recommend an SEC enforcement action. <u>See</u>

Dendreon Corp., Current Report (Form 8-K) (Apr. 8, 2015). Given the Debtors' insolvency, if any valid causes of action existed, the Debtors' creditors would be economically motivated and perfectly competent to advocate for litigation. Additionally, even if any valid causes of action existed, the Donahue Group has suggested no plausible likelihood that the proceeds of such actions would exceed $100 million. Moreover, the Donahue Group acknowledges that under the structure of the Proposed Plan, an equity committee would have at best indirect influence on enforcement of hypothetical causes of action. Motion to Shorten ¶ 6. In short, the Donahue Group makes no argument that stockholders are in or could feasibly come into the money, under any circumstances.

　　　　　25.　　Market prices for the Company's securities likewise indicate that the Company's common stock is underwater. As of Friday, April 17, 2015, the 2016 Notes were trading at approximately 70 cents on the dollar, roughly in line with the numbers above—under $500 million in assets and over $600 million in claims. This suggests that full recovery for creditors is deemed unlikely in the marketplace. See Bond Detail, Dendreon Corp, Fin. Indus. Regulatory Auth., http://finra-markets.morningstar.com/BondCenter/BondDetail.jsp?ticker=C539553&symbol=DNDN.GC. Company bonds the week before the Petition Date were similarly priced, trading at approximately 65 cents on the dollar. See id. Low bond prices are indicative of insolvency. See, e.g., Leap, 295 B.R. at 139 ("Further, we have evidence that the bonds are trading at a steep discount, another indicator of insolvency."); Williams, 281 B.R. at 221 ("WCG's . . . bonds are trading at a steep discount . . . another useful, though not exclusive, indicator of insolvency. . . . For [this and other] reasons, I find that the Debtors appear to be hopelessly insolvent.").

26.     The closing price for the Company's common stock on Friday, November 7, 2014, the last trading day pre-petition, was $0.9421 per share. As of Monday, April 20, 2015, the closing price was $0.04 per share. See DNDNQ Historical Stock Prices, NASDAQ, http://www.nasdaq.com/symbol/dndnq/historical. This is a price decline of 96%. To put this in context, based on 158.7 million shares outstanding immediately prior to the Petition Date, the Company's current market capitalization is approximately $6 million. This is slightly more than 1% of estimated estate value, and slightly less than 1% of estimated claims. The equity's de minimis lingering market capitalization is likely attributable to option value and market inefficiency.

27.     Finally, as discussed in more detail in the Debtors' objection to the Motion to Stay (Docket No. 553) (the "Objection to the Motion to Stay"), filed April 7, 2015, and in the declaration of Brandon Aebersold in support of the Sale (Docket No. 396) (the "Sale Declaration"), and as recognized in the Sale Order, the Sale was the result of an exhaustive marketing process run for more than one year that also evaluated debt refinancing and other non-Sale alternatives. See Objection to the Motion to Stay ¶ 33; Sale Declaration ¶¶ 7-8; see also Sale Order ¶¶ K-N. The Sale obtained the highest and best offer for the Acquired Assets and maximized the value of the Debtors' estates. Sale Order ¶ K. Net of approximately $80 million in cash, the Sale cash proceeds of $414.5 million were roughly 50.7% over the qualified bid minimum of $275 million established at the outset of these Chapter 11 Cases. Objection to the Motion to Stay ¶ 33. Realized sale prices hold greater legitimacy than the Donahue Group's moot and ungrounded statements about operational performance and value. As the Supreme Court has stated, "[T]he best way to determine value is exposure to a market . . . . [O]ne of the [Bankruptcy] Code's innovations [has been] to narrow the occasions for courts to make valuation

judgments . . . ." <u>Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 436, 457 (1999). As Judge Walsh stated in this Court in <u>Polaroid</u>, "I have never accepted . . . [hypothetical] valuation when . . . an appropriately shopped sales transaction is the alternative . . . ." <u>In re Polaroid Corp.</u>, No. 01-10864 (PJW) (Bankr. D. Del. June 28, 2002), Transcript of Hearing at pp. 172-73; <u>see also</u> <u>In re Cent. Ice Cream Co.</u>, 836 F.2d 1068, 1072 n.3 (7th Cir. 1987) ("[P]eople who . . . back their beliefs with their purses are more likely to assess . . . value . . . accurately than . . . people who simply . . . make an argument."); <u>Applebaum v. Avaya, Inc.</u>, 812 A.2d 880, 889-90 (Del. 2002) ("[A] property interest is best valued by the amount a buyer will pay for it."); <u>Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Group, Ltd.</u>, 847 A.2d 340, 357 (Del. Ch. 2004) ("[W]hen there is an open opportunity to buy a company, the resulting market price is reliable evidence of fair value."). In short, in accordance with their fiduciary duties, the Debtors and their directors and officers have worked diligently to, and have succeeded in, maximizing estate value throughout the Chapter 11 Cases. Nevertheless, the estates still would need more than $100 million in additional assets to pay all claims in full.

**B.     The Donahue Group Cannot Show that Equity Holder Interests Are Inadequately Represented in the Absence of an Official Equity Committee.**

28.     Even if the Debtors were solvent—which they are not—an equity committee would not be warranted unless the Donahue Group were to establish that its rights would be inadequately represented in the absence of an official equity committee. See <u>Williams</u>, 281 B.R. at 223 ("[I]n most cases, even those equity holders who do expect a distribution . . . can adequately represent their interest without an official committee . . . ."). Bankruptcy Code section 1102(a)(2) calls for "adequate representation," not "exclusive representation." <u>See</u> <u>Spansion</u>, 421 B.R. at 163 ("[T]he statutory focus . . . is not whether the equity holders are 'exclusively' represented, but whether they are 'adequately' represented." (quoting <u>Victor v.</u>

Edison Bros. Stores (In re Edison Bros. Stores, Inc.), No. 95-1354 (PJW), No. 96-177-SLR, 1996

WL 534853, at *4 (D. Del. Sept. 17, 1996)) (internal quotation marks omitted)); see also Leap,

295 B.R. at 139 ("The statutory concern is adequate representation." (quoting McLean, 70 B.R.

at 862)); Williams, 281 B.R. at 223 (also citing Edison).

        29.     No statute defines "adequate representation." See Williams, 281 B.R. at

220 ("The Code does not define 'adequate representation.'"); see also Spansion, 421 B.R. at 163

("[T]he duty to maximize estate value does not equate to adequate representation . . . ."). Rather,

courts look to alignment of economic interests and to the fiduciary duties of existing parties in

interest. Furthermore, "the moving party . . . has the burden of proving that an additional

committee is needed for adequate representation." Spansion, 421 B.R. at 156 (citing Edison,

1996 WL 534853, at *4).

        30.     The first question is whether existing parties are sufficiently aligned with

equity to adequately represent its interests. See Williams, 281 B.R. at 222-23 ("[T]he Creditors'

Committee has sufficiently aligned or parallel interests with the Shareholders to preclude the

need for an additional committee."); Leap, 295 B.R. at 139-40 ("The economic interests of the

bondholders and shareholders appear to be the same . . . to find the highest realistic value . . . .

And it is the fiduciary duty of the OCC to do so.").

        31.     As explained above, the Sale has reduced the estate substantively to cash

and to stock in a publicly traded company, which stock has a relatively stable and easily

ascertainable value. Thus, the value of the estates is not in serious dispute. Rather, the Debtors'

creditors are substantially and permanently impaired, and every incremental dollar brought into

the Debtors' estates will accrue to the Debtors' creditors. Therefore, the Creditors' Committee

and the Company's noteholders are at least as economically motivated as are stockholders to

seek to maximize the value of the estates, and the Request presents no facts or evidence that they have not been zealous advocates of estate maximization. Indeed, there is no logical reason that those parties would act against their economic interests. That the Proposed Plan does not contemplate equity distributions does not negate this alignment of interests. See Leap, 295 B.R. at 136-37, 139-40 (holding that the interests of equity holders were adequately represented by bondholders who supported a proposed plan under which equity holders would receive no distribution). In addition, the Debtors' directors and officers remain directly aligned with equity to the extent of their remaining equity positions.

32.    In addition to alignment of economic interests, the Creditors' Committee and the Debtors' directors and officers are obligated as fiduciaries to maximize value, which duties they have been pursuing diligently. See Edison, 1996 WL 534853, at *5 (affirming bankruptcy court denial of motion to appoint an equity committee and observing that equity holders seeking to form an equity committee had not provided any evidence that management was conflicted and "incapable of adequately representing non-insider shareholders"); Spansion, 421 B.R. at 163 ("It is expected that management would normally represent, among other interests, the interests of equity security holders." (citing Edison, 1996 WL 534853, at *4)).

**C.    Considerations of Complexity, Cost, and Timing Also Counsel Against Appointment of an Equity Committee.**

33.    Courts look to additional factors as well in determining whether an official equity committee should be appointed, including case complexity, cost–benefit analysis, and case timing. See Nw., 2004 WL 1077913, at *2 ("Among the facts the court should consider when making this determination [regarding appointment] are . . . timing, the number of shareholders . . . complexity . . . and . . . cost . . . ." (citing Williams, 281 B.R. at 219)); see also Spansion, 421 B.R. at 156 ("[A] court will consider . . . the number of shareholders . . .

15

complexity . . . and . . . cost."); <u>Williams</u>, 281 B.R. at 220 ("[F]actors [include] the number of shareholders . . . complexity . . . and . . . cost."); <u>In re Kalvar Microfilm, Inc.</u>, 195 B.R. 599, 600 (Bankr. D. Del. 1996) ("[T]he court will consider several factors . . . including . . . [w]hether the shares are widely held and publicly traded . . . size and complexity . . . delay and cost . . . whether . . . insolvent . . . [and] timing . . . ."). These factors each indicate against equity committee appointment.

34.     Regarding complexity, in spite of the Donahue Group's concerns about "the volume of pleadings filed," the best indicator for whether a case is complex for purposes of equity committee appointment is whether it has organizational, capital structure, and valuation complexity that could result in numerous divergent economic interests and economic uncertainty. Request at p. 32 (citing <u>In re Wang Labs., Inc.</u>, 149 B.R. 1, 3 (Bankr. D. Mass. 1992)). In spite of the estates' substantial size, for practical purposes the Debtors, their debts, and their valuation are quite simple. Substantially all claims are general unsecured claims against the Company, and substantially all assets are held by the Company and are either cash or publicly traded securities. <u>See Leap</u>, 295 B.R. at 139 ("[T]he debt structure is not overly complex. There is a small amount of trade debt . . . a large amount of bond debt (estimated at something less than $774 million) and then the public shareholders, 37% of whom are represented by movants.").

35.     Regarding cost, a court should "weigh[] the cost of appointing . . . against the potential benefit." <u>Spansion</u>, 421 B.R. at 156; <u>see also</u> <u>Williams</u>, 281 B.R. at 220 ("When a debtor appears to be hopelessly insolvent . . . 'neither the debtor nor the creditors should have to bear the expense of negotiating [with an equity committee] . . . .'" (citation omitted)). In addition to cash costs, appointment could affect the time value of money by needlessly delaying distributions to creditors under the Debtors' Proposed Plan. As discussed below, stockholders

should only be able to have their expenses paid by the estates if they provide substantial

contribution to the Debtors' estates under 11 U.S.C. § 503(b)(3)(D).

36.     Regarding the timeliness of equity committee formation, a principal role

of an equity committee is to participate in plan formulation. See Leap, 295 B.R. at 137, 140

("[T]he case is significantly advanced . . . . The . . . plan has been filed and a disclosure

statement hearing set . . . . The Court concludes that appointment of an official equity committee

is not warranted at this time."); see also Spansion, 421 B.R. at 164 n.23 ("Although the original

motion for appointment of an equity committee was filed in June 2009, the hearing . . . was

continued a number of times and was not held until November 30, 2009. At this late time, there

is little purpose to forming an official equity committee and requiring the estate to bear the

associated costs." (citing Kalvar, 195 B.R. at 601)); In re Exide Techs., No. 13-11482 (KJC)

(Bankr. D. Del. July 2, 2014), Transcript of Hearing at p. 26, ECF No. 1984 ("[O]ne of the

critical considerations is timing. . . . [O]ne of the reasons for that is official committees, it is

expected, would be participants in discussions with the debtor and other committees and other

stakeholders in connection with formulation of [a] plan.").

37.     In the weeks since the Sale closed, the Debtors (i) filed a proposed plan of

liquidation (Docket No. 471), (ii) filed the amended Proposed Plan, and (iii) received Court

approval for the Disclosure Statement, negotiating throughout with numerous constituencies. The

Proposed Plan distributes proceeds pro rata according to the absolute priority rule. See

Disclosure Statement pp. 30-36. This Court has set June 2, 2015, as the date for a hearing to

confirm the Proposed Plan. If an equity committee were appointed, all that it would do is incur

significant expenses rapidly "getting up to speed," object to confirmation, and attempt to litigate

valuation. Given the closing of the Sale and the Debtors' remaining asset mix, the use of a

financial advisor for valuation purposes would be frivolous. In short, the cases are too far along for appointment to be useful. See Kalvar, 195 B.R. at 601 ("The late timing of the motion ties in to the only remaining purpose of an equity committee in this case, which would be to object to confirmation, and litigate the valuation issue. The aforementioned costs associated with the formation of an equity committee cannot be justified in light of this purpose.").

## III.    STOCKHOLDERS HAVE ALTERNATIVE METHODS TO ADVANCE THEIR INTERESTS.

38.    Courts recognize that part of the policy justification by which equity committees are extraordinary and rare is that the Bankruptcy Code provides them with alternative methods to protect their interests.

39.    Under Bankruptcy Code section 1109(b), stockholders have standing without requiring a committee. See Leap, 295 B.R. at 140 ("The Court concludes that appointment of an official equity committee is not warranted at this time. . . . This does not leave shareholders . . . without recourse. Section 1109(b) gives them the right to raise and be heard on any issue . . . . They may object to valuation at the confirmation hearing . . . ."); Williams, 281 B.R. at 223-24 ("Section 1109(b) . . . allows an equity security holder to raise and be heard on any issue . . . . The Movants have already demonstrated their ability to organize and participate in this case with skill and zeal . . . ."). The Donahue Group has been an active participant in the Chapter 11 Cases since their earliest days, without an equity committee.

40.    Furthermore, under Bankruptcy Code section 503(b)(3)(D)-(4), stockholders can have administrative expenses allowed if their efforts "result in [a] substantial contribution to the estate." Leap, 295 B.R. at 140; see also Williams, 281 B.R. at 223 ("[E]ven those equity holders who do expect a distribution . . . can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution

. . . ."). Since the Debtors appear to be insolvent, they should not bear stockholder costs in the absence of a "substantial contribution" in return. This statutory alternative is why courts "employ a balancing test to weigh the cost of an equity committee versus the concern for adequate representation." Williams, 281 B.R. at 220.

41.    In short, the Donahue Group and other stockholders have at their disposal, and have already been utilizing, methods other than equity committee appointment to protect their interests. Under the circumstances, these alternative methods are better means for balancing the interests of parties in interest and for maximizing estate value.

**CONCLUSION**

42.    As set forth herein, the untimely Request should be denied. The Donahue Group has failed to meet its substantial burden of proof by failing to demonstrate that the Debtors are not hopelessly insolvent and that equity holders are not adequately represented. In addition, the Request fails to justify the expense and delay that would result from the appointment of an equity committee. Such an appointment would harm the estates, creditors, and other parties in interest, while bringing no benefit even to stockholders. In short, the Request fails to meet its heavy burden of proof, and the extraordinary relief that it requests should be denied.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE, the Debtors respectfully request entry of an order substantially in the form attached hereto, denying the Request in its entirety, and granting the Debtors such other and further relief as is just and proper.

Dated: Wilmington, Delaware
      April 24, 2015

        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

        */s/ Sarah E. Pierce*
        Anthony W. Clark (I.D. No. 2051)
        Sarah E. Pierce (I.D. No. 4648)
        One Rodney Square
        P.O. Box 636
        Wilmington, Delaware 19899-0636
        Telephone: (302) 651-3000
        Fax: (302) 651-3001

        - and -

        Kenneth S. Ziman
        Raquelle L. Kaye
        Four Times Square
        New York, New York 10036-6522
        Telephone: (212) 735-3000
        Fax: (212) 735-2000

        - and -

        Felicia Gerber Perlman
        155 N. Wacker Drive
        Chicago, Illinois 60606-1720
        Telephone: (312) 407-0700
        Fax: (312) 407-0411

        Counsel for Debtors and Debtors in Possession